FILED

**IN THE UNITED STATES DISTRICT COURT** 2018 JUL -5 PM 2: 12
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JOHN DOE<br>c/o Engel & Martin, LLC<br>4660 Duke Drive, Suite 101<br>Mason, Ohio  45040, | Case No. 6:18-CV- 1069-ORL-37-KRS<br><br>Judge: |
| Plaintiff, | COMPLAINT |
| v. | AND |
| ROLLINS COLLEGE<br>1000 Holt Ave<br>Winter Park, FL 32789, | JURY DEMAND |
| Defendant | |

## INTRODUCTION

1. Plaintiff John Doe brings this action for breach of contract, violation of Title IX, and other related claims.

2. This case arises out of the decision of Rollins College ("Rollins") to impose disciplinary sanctions against John Doe.

3. The allegations in this case are substantially similar in numerous respects to allegations brought by another Rollins student in this Court in *Mancini v. Rollins College, M.D.Fla. No. 6:16-cv-2232-Orl-37KRS.*

## PARTIES

4. Plaintiff John Doe is a former student at Rollins.

   a. John Doe is a New York resident with a residence at [OMITTED].

   b. John Doe has completed his degree at Rollins, however he faces sanctions from the school including a notation of "dismissal" on his transcript.

1

c. John Doe paid a significant amount of money to Rollins in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

d. The disclosure of John Doe' identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

5. Defendant Rollins is a private university with a principal place of business at 1000 Holt Ave, Winter Park, FL 32789.

## JURISDICTION AND VENUE

6. This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq* and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 200d *et seq.*. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This case is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332.

8. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### ROLLINS' SEXUAL MISCONDUCT POLICY

10. The relationship between John Doe and Rollins is governed by a number of policies and the Student Handbook.

11. Rollins in 2015 adopted the "Title IX: Sexual Misconduct and Harassment Policy" (the "Sexual Misconduct Policy"). A copy of the Sexual Misconduct Policy is attached as Exhibit A.

   a. The Sexual Misconduct Policy prohibits sexual harassment, sexual assault, sexual exploitation, stalking, and other related forms of sexual misconduct.

      i. Sexual assault is defined as follows:

> Having or attempting to have sexual intercourse or sexual contact with another individual without consent. This includes sexual intercourse or sexual contact achieved by the use or threat of force or coercion, where an individual does not consent to the sexual act, or where an individual is incapacitated

      ii. Sexual assault is defined to include non-consensual sexual contact:

> Having or attempting to have sexual contact with another individual without consent. Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, or disrobing of another without permission. Intimate parts may include the breasts, genitals, buttocks, mouth or any other part of the body that is touched in a sexual manner.

      iii. Consent is defined as follows:

> Consent to engage in sexual activity must be informed, knowing and voluntary. Consent exists when all parties exchange mutually understandable affirmative words or behavior indicating their agreement to freely participate in mutual sexual activity.

      iv. The Sexual Misconduct Policy further clarifies the definition of consent:

> Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Relying on non-verbal communication can lead to misunderstandings. Consent may not be inferred from silence, passivity, lack of resistance or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent.

v.  The Sexual Misconduct Policy provides that a person who is "physically incapacitated cannot consent to sexual activity:

> An individual who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily), or is unconscious, unaware or otherwise physically helpless is considered unable to give consent. For example, one who is asleep or passed out cannot give consent.

vi.  The Sexual Misconduct further clarifies the definition of incapacitation:

> Incapacitation is the inability, temporarily or permanently, to give consent, because the individual is mentally and/or physical helpless due to drug or alcohol consumption, either voluntarily or involuntarily, or the individual is unconscious, asleep or otherwise unaware that the sexual activity is occurring. In addition, an individual is incapacitated if he/she demonstrates that they are unaware of where they are, how they got there, or why or how they became engaged in a sexual interaction. Where alcohol is involved, incapacitation is a state beyond drunkenness or intoxication.

b.  The Sexual Misconduct Policy provides that Rollins "will respond promptly and equitably when any incident of sexual misconduct or harassment is alleged against a faculty, staff, or student."

c.  The Sexual Misconduct Policy provides that Rollins will provide benefits and accommodations to students who allege that they are the victims of sexual misconduct.

i.  These benefits and accommodations would not available to students but for the fact that the students claimed to have been a victim of sexual misconduct, and are provided without regard to any investigation.

ii.  Interim measures includes can include  "no contact" orders and changes in academic, employment or living arrangements

d.  The Sexual Misconduct Policy prohibits retaliation against both the alleged victim and the accused student.  The policy provides:

> Acts or attempts to retaliate or seek retribution against the reporting party, responding party, or any individual or group of individuals involved in the investigation and/or resolution of an allegation of sexual misconduct. Retaliation can be committed by any

4

individual or group of individuals, not just a responding party or reporting party. Retaliation may include continued abuse or violence, other forms of harassment, and slander and libel.

12. The Sexual Misconduct Policy states that "Typically" the investigative and disciplinary process "will be completed within 60 days" and that this "timeframe may be extended only for good cause." If there is an extension, then "both the reporting party and the responding party will be notified in writing of the extension and the reason for the extension."

13. The Sexual Misconduct Policy states that a Title IX investigator will conduct the investigation.

   a. The Sexual Misconduct Policy provides:

      During the investigation process, both the reporting party and the responding party will have the opportunity to be heard and to respond, the opportunity to have an advisor present during the investigation process, and the opportunity to provide names of relevant witnesses.

   b. The Sexual Misconduct Policy provides that an accused student may have an advisor "accompany them to the meetings". The advisor may consult with the parties prior to or during the course of the investigation meeting, but may not be a participant in the meeting.

   c. The Sexual Misconduct Policy provides that the prior sexual history of the reporting party "is typically not relevant" but that the prior sexual history of the responding party "may be relevant where there is evidence of a pattern of misconduct."

14. The Sexual Misconduct Policy does not provide for a hearing or other formal process. Instead, "the investigator will determine responsibility based on the relevant information presented during the investigation and the unique facts of the case."

   a. Responsibility is found based on the preponderance of the evidence, with no mention of the burden of persuasion or that accused students are considered to be innocent until proven guilty.

b. As a result, accused students have no opportunity to confront their accusers or adverse witnesses and, as a result, have no or limited opportunity to challenge the credibility of their accusers or adverse witnesses.

15. A student found responsible for a violation of the Sexual Misconduct Policy could receive sanctions including dismissal, suspension, probation, counseling, educational requirements, or a written warning.

16. A student found responsible for a violation of the Sexual Misconduct Policy may submit an appeal to a Vice President on some very limited grounds. The Title IX Coordinator will determine which Vice President will hear the appeal.

17. The relationship between John Doe and Rollins is governed by the Student Conduct System Handbook .

a. The Student Conduct System Handbook constitutes a contract between students and the school and, in particular, between John Doe and Rollins.

b. A copy of the Student Conduct System Handbook is provided to or available to each student.

18. Rollins has created a Reporting Party Bill of Rights. A copy of the Reporting Party Bill of Rights is attached as Exhibit B. The Reporting Party Bill of Rights guarantees including the following:

a. Complainants have the right to be treated by Rollins "with respect, dignity, and sensitivity throughout the investigation process."

b. Complainants have the right to receive interim measures or accommodations, such as a no-contact order or changes to academic, employment or living arrangements.

c. Complainants have the right to "a prompt and thorough investigation" and to choose to have Rollins not conduct an investigation.

6

d. Complainants have the right to an "outcome based solely on information gathered during the investigation." Further: "Such information shall be credible, relevant, based in fact, and without prejudice."

e. Complainants have the right "not have irrelevant prior sexual history considered as information in the investigation."

19. The Sexual Misconduct Policy is incorporated into the Rollins Student Handbook. The Rollins Student Handbook provides that "[v]iolations of this policy . . . will follow the procedures outlined in the [Sexual Misconduct] Policy, rather than the procedures outlined in" the Student Handbook. this document.

---

### Sexual Misconduct & Harassment

Rollins College is committed to creating and maintaining a safe, healthy, and respectful community in which students, faculty, and staff can work together in an atmosphere free of discrimination based on their sex, gender identity, gender expression, and sexual orientation.

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in any federally funded education program or activity. In response, Rollins has created The Office of Title IX. The Title IX Coordinator leads Rollins' efforts to prevent and respond to sex and gender based discrimination.

Any member of the Rollins community who is affected by sexual misconduct or violence is encouraged to immediately notify the Title IX Coordinator, Campus Safety, or law enforcement, and to seek medical attention if necessary. All individuals are encouraged to make a prompt report to the College so that the College can take appropriate action to eliminate the harassment, prevent its reoccurrence, and address its effects in the Rollins community. Confidential support and assistance is also available on and off campus.

The full Title IX: Sexual Misconduct and Harassment Policy can be found at goo.gl/ EubPec. Violations of this policy that fall under the definition of sexual misconduct and harassment will follow the procedures outlined in the Title IX Policy, rather than the procedures outlined in this document.

---

20. Rollins has created a Responding Party Bill of Rights.  A copy of the Responding Party Bill of Rights is attached as Exhibit C.  The Responding Party Bill of Rights guarantees including the following:

    a.  Accused students have the right to be treated by Rollins "with respect, dignity, and sensitivity throughout the investigation process."

    b.  Accused students have the right to receive interim measures and accommodations such as a no-contact order or changes to academic, employment or living arrangements.

    c.  Accused students have the right to "a prompt and thorough investigation" and to choose to have Rollins not conduct an investigation.

    d.  Accused students have the right to an "outcome based solely on information gathered during the investigation."  Further: "Such information shall be credible, relevant, based in fact, and without prejudice."

    e.  Accused students have the right "not have irrelevant prior sexual history considered as information in the investigation."

21. Rollins adopted the Sexual Misconduct Policy in direct response to pressure from the the U.S. Education Department's Office of Civil Rights ("OCR").

    a.  On April 11, 2011, OCR sent a "Dear Colleague" to colleges and universities. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and Universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.  After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures in a manner that, while not completely ignoring due process concerns, shifted the focus more on victim advocacy.

    b.  On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that

responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf )

i.  In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id* at 1-2.

ii.  OCR further said: "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *Quoting Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

iii.  The Rollins Title IX Coordinator told the Chronicle of Higher Education that Rollins did not intend to make any revisions to its process following the repeal of the 2011 Dear Colleague Letter.

> "We really can't afford to change anything drastically right now," says Oriana Jiménez, Title IX coordinator at Rollins College, in Florida. Both students and parents continue to have expectations about how institutions should handle sexual-violence issues, she says, and students know more about their Title IX rights than ever before.

Sarah Brown, *In the Time of Trump, Colleges Start to 'Make Title IX Our Own,'* Chronicle of Higher Ed, June 25, 2017.

22. In recent years, and during the period preceding the disciplinary actions against John Doe, there was substantial criticism of Rollins, both in the student body and in the public media, accusing Rollins of not taking seriously complaints of female students alleging sexual assault by male students. This has included adverse news coverage and, campus meetings or protests, and enforcement actions concerning Rollins.

    a. On information and belief, Rollins, like other schools nationwide, was scared of being investigated or sanctioned by the Department of Education. Sanctions would include the loss of eligibility for all federal funding. Upon information and belief, Rollins annually receives millions of dollars in government grants and contracts, and students depend on federal financial aid.

    b. This criticism included criticism of the manner in which Rollins handled Title IX investigations.

    c. In approximately 2013-14, students at Rollins staged a "Slut Walk." USA Today described the protest as follows:

> Holly Fussell, a rising senior at Rollins College in Florida, says that while women primarily use the word "slut" to shame other women, she has also seen the word used in a "very powerful way to sort of take the term away from people that are using it in a negative way."

> "We had a 'Slut Walk' this past year at Rollins and we used the term in a more empowering way to say the way I dress does not imply consent, the way I look doesn't give consent, whether I was drinking doesn't give consent," she says. "The 'Slut Walk' was to protest people saying that 'she was dressed slutty' or 'she was asking for it' or 'she was drunk' as an excuse in order to justify rape."

Jonathan Swartz, *'Slut shaming' has more to do with social standing than sex, study says*, USA Today, June 3, 2014

d. In 2015, the Rollins Director of Public Safety published an article in the Orlando Sentinel concerning, among other matters, the 2011 Dear Colleague Letter. Ken Miller, *Are more laws needed for public safety on college campuses?*, Orlando Sentinel April 13, 2015. Miller wrote that "the campus personnel who are now charged with responding to sexual and gender violence have somehow become the enemy."

    i. Miller suggested, "A change in the current environment is needed so that we can provide the care and diligence that communities and survivors deserve

    ii. Miller wrote, "After more than 20 years in the profession, I do believe something should be done to prevent campus rape; however, layering more requirements — both at the state and federal level — is not the answer." Instead, Miller asks, "Isn't it our responsibility to provide options, medical/psychological care and on-campus judicial proceedings before reporting to law enforcement?

e. In September 2017 a column in *The Sandspur*, the student newspaper, suggested that "654 women and 197 men from this year's student body" were likely to be victims of sexual assault, and that "less than 10% of reported cases of sexual assault are false." Keila Makowski, *Protecting the Perpetrator: Title IX's New Guidelines*, The Sandspur, September 28, 2017.

    i. The article critics the changes made to the Department of Education's Title IX Guidance by the Secretary of Education.

    ii. The author writes,

> In [Secretary DeVos'] eyes, it is more a danger to be accused of sexual assault falsely that it is to be assaulted or to feel violated by having your assailant going to school with you. She does not understand that sexual assault is already the most underreported crime, with only 12 percent of campus sexual assaults being reported. 12 percent is such a low number, one that will only decrease if the government continues to take the side of perpetrators over victims.

23. In *Mancini, supra,* a plaintiff accused of sexual misconduct alleged that Rollins had a bias against males that caused an erroneous imposition of discipline.

    a. Plaintiff alleged bias in a number of ways:

        i. Rollins faced pressure to find males accused of sexual assault guilty in order to preserve federal funding that had been conditioned on compliance with the 2011 Dear Colleague Letter;

        ii. Rollins failed to provide the plaintiff with adequate and timely notice of the accusations against him;

        iii. Rollins failed to adequately train the investigator;

        iv. Rollins did not obtain a witness list from Plaintiff or a list of questions to ask the Accuser and other witnesses, disregarded witnesses supportive of Plaintiff's defense, and failed to have the witnesses review and correct the investigator's "distorted" characterizations of their testimony;

        v. Rollins failed to acknowledge alleged misconduct by the complainant and omitted favorable information from the investigative report;

        vi. Rollins discouraged plaintiff from pursuing allegations of misconduct by the complainant; and

        vii. Rollins used a biased investigative and adjudicatory process.

    b. This Court credited the allegations of differential treatment of the Plaintiff in *Mancini* to support an inference of gender bias.

24. The *Mancini* litigation has resulted in additional criticism and news coverage of the Rollins Title IX process.

a. Rollins was featured in an article on Reason.com.  Samantha Harris *Accused Student Says He Was Told to 'Stay Quiet' About His Own Lack of Consent*, Reason, July 29, 2017.  The author writes:

> Although there have been a number of court rulings favorable to accused students in these cases—and many more favorable settlements—the spate of lawsuits has not done much to move the needle back towards a fairer process for students accused of sexual misconduct and other serious wrongdoing.

b. A Rollins spokesperson was quoted in the Orlando Sentinel stating, the school was confident "all parties in this case were treated fairly and appropriately."  Gabrielle Russon, *Rollins student sues school after suspension in sex assault case*, Orland Sentinel, Dec. 29, 2016.

### THE DISCIPLINARY PROCEEDINGS AGAINST JOHN DOE

25. John Doe was accused of sexual misconduct arising out of events that occurred during the early morning of February 18, 2017 (the "Incident").

26. John Doe unequivocally denies engaging in any misconduct or violation of the Sexual Misconduct Policy.

27. The alleged victim will be referred to as "Jane Roe."  The disclosure of Jane Roe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by FERPA.

    a. Jane Roe was a senior at Rollins.

    b. Jane Roe and John Doe became friends during their junior years.  They spoke on daily basis from December 2016 through the date of the Incident.  They also communicated regularly on social media sites such as Facebook.

28. On February 17, 2017 John Doe invited Jane Roe to a Valentine's Day themed party at his Fraternity.

    a. At the party, John Doe spent some time with another woman, later identified as Witness 21. Jane Roe was jealous of John Doe spending time with Witness 21.

13

b. John Doe had some drinks prior to the party. At the party, John Doe and Jane Roe shared part of a bottle of champagne. John Doe does not believe that Jane Roe was incapacitated during the evening, describing her intoxication as between 4 and 6 on a 1-10 scale during the evening.

c. John Doe and Jane Roe left the party and went to a local bar. Jane Roe did not drink at the bar and after hanging out for a while, they decided to go home. John Doe did not touch Jane Roe's knee or leg at the bar, and does not recall the two engaging in any "flirtatious" behavior.

d. On the way back to John Doe's room, John Doe and Jane Roe held hands in a romantic manner. Once they got to the room, they started to watch a movie. John Doe and Jane Roe kissed. Jane Roe actively participated in the kissing. John Doe touched Jane Roe on her breasts, thighs and vagina while they kissed. Jane Roe indicated her consent continuing to enthusiastically make out with John Doe. Jane Roe never told John Doe to stop or said "no."

e. Jane Roe unbuckled John Doe's pants and touched his penis. John Doe asked Jane Roe is everything was "OK," as he did not want to complicate their friendship. She responded that everything was "fine." John Doe then penetrated Jane Roe's vagina with his fingers while they made out.

f. Jane Roe told John Doe, "I think we should stop." John Doe ceased all sexual activity and they finished watching the movie. After the movie, John Doe walked Jane Roe out of his room and she walked home.

29. Jane Roe sent a series of text messages the following morning before when the impressions of the evening were freshest in her mind. These text messages support the conclusion that Jane Roe consented to all sexual activity to John Doe.

a. Jane Roe texted John Doe the following morning.  During this exchange, Jane Roe did

   not claim that she was sexually assaulted, but instead simply said that "she did things I

   didn't actually feel comfortable doing at all" and that she did not "properly communicate."

   The exchange is:



   i. Jane Roe later explained to the investigator that she sent the message to help craft

      her narrative.

   ii. When asked about her text message to John Doe after the Incident, she explained

       that she does not use "a lot of absolute statements" in her text messages.  Jane Roe

       also said that "at Rollins, you can't just come out and say to someone that they

       raped you without the entire campus knowing."

b.  Jane Roe texted a friend, described *infra* as W1, the following morning.  During this

exchange, Jane Roe indicated that she regretted engaging in sexual activity with John

Doe.  The full exchange (names redacted) is:







30. On February 22, 2017, Jane Roe met with Oriana Jimenez, the Rollins Title IX Coordinator.

    a. After discussing the matter with Jimenez, Jane Roe indicated that she did not wish to participate in a Title IX investigation.

    b. Jane Roe received unspecified "academic accommodation" in February 2017 as a result of her claim to have been a victim of sexual assault.

        i. On information and belief, Jane Roe was permitted to take a class as a "credit/no credit" so that she would not receive a poor grade. Jane Roe indicated that if she received the poor grade ("another C") she would have lost her scholarship.

        ii. John Doe was not informed of this academic accommodation during the investigative process. Nonetheless, at one point the investigator asked John Doe "what motivation [Jane Roe] would have to fabricate what happened and be dishonest." John Doe could only respond, "I couldn't tell you, it's all a big surprise to me."

31. In early November, 2017, an individual "with a name similar to" John Doe was accused of sexually assaulting three women by an anonymous caller to the Title IX Office. No further information about this allegation is available, and, on information and belief, the allegations were unfounded.

32. On November 14, 2017, as a result of the anonymous "tip," Jimenez reached out to Jane Roe to see if she had any additional information about this alleged incident. Jane Roe indicated that she did not know about this incident. Jane Roe, however, said that "there was another female who had been potentially sexually assaulted by" John Doe. Jane Roe further told Jimenez that she "had since heard from other friends about the possibility of a third female, who had since graduated, who was also potentially sexually assaulted by" John Doe.

33. On November 14, 2017, after meeting with Jimenez, Jane Roe decided to "participate" in a Title IX investigation. Jane Roe submitted a written statement to Jimenez at that time. Jane Roe

explained that she decided to participate because she "had nothing to lose" and that several of her friendships have changed as a result of her allegations. She also said that after hearing of the anonymous November 2017 call, she "did not want [John Doe's] behavior to continue."

34. On November 20, 2017, John Doe was provided with notice of his alleged misconduct. This provided:

> [Jane Roe] alleges that in the early morning hours of Saturday, February 18, 2017 that you kissed her, sexually touched the intimate body parts, caused her to touch your intimate body parts, disrobed her, and, ultimately, sexually penetrated her digitally without her consent while in the residential hall dormitory in Gale Hall. These behaviors may constitute a violation of . . . [the Sexual Misconduct Policy . . . [sic]

35. Rollins retained an outside investigator D.B. Wallace of, D.B. Wallace Investigations, to conduct the investigation. On information and belief, Wallace is an attorney who graduated in 2007 from Stetson University College of Law.

36. On November 20, 2017, the investigator interviewed Jane Roe.

   a. Jane Roe told the investigator that in February 2017, she believed John Doe developed a "crush" on her. She explained that John Doe would "FaceTime her a lot and they would talk for over an hour."

   b. On February 17, 2017, Jane Roe agreed to accompany John Doe to a fraternity party as his date.

   c. Jane Roe stated that she had a glass and a half of wine before meeting John Doe at his room. She stated that John Doe was "visibly drunk." At the party, Jane Roe and John Doe were "zip-tied together." At some point in the evening, another woman was "zip-tied" to John Doe; Jane Roe reported that she believed John Doe had a "crush" on this other woman.

   d. Jane Roe stated that she and John Doe shared a bottle of champagne, she had some other drinks, and that she felt "drunk." She left the party with John Doe and they went to a

19

local bar. Jane Roe reported that John Doe was "rubbing her knee and holding her hand" at the bar.

e. Jane Roe reported that she left the bar with John Doe and the two went to John Doe's room. She states that she was intoxicated. She claims she needed to hold John Doe's hand because she was "falling over" and that "everything was blurry."

f. Jane Roe stated that John Doe encouraged her to remain in the room and watch a movie. She said that John Doe was "not as intoxicated as she was." Jane Roe alleges that she fell asleep while watching the movie and that John Doe started to kiss her.

    i. She stated that she "was in a way kissing him back because her lips were moving" but that she was "in and out of sleep." She said that she told John Doe, "no, no, I don't want to." She claims that, at that point, John Doe said, "we don't have to have sex" and began to touch her breasts and inner thigh and her vagina.

    ii. Jane Roe claims that she told John Doe, "I don't want to be here, I want to go to my room." John Doe allegedly responded, again, "we don't have to have sex." Jane Roe claims that John Doe removed his pants exposing his penis and "in a very smooth way" stroked her hand and moved her hand to his penis. Jane Roe claims that she touched John Doe's penis and that John Doe then inserted his fingers in her vagina.

    iii. Jane Roe claims that she told John Doe to "stop." He did, but she claims he kept rubbing her and "trying to hook up." She eventually left John Doe's room.

37. Wallace conducted a series of follow-up interviews with Jane Roe, including a meeting on November 28, 2017, a phone call on November 29, 2017, a meeting on December 7, 2017, and a phone call on December 12, 2017. During the December 12, 2017 interview Jane Roe provided

additional details about the Incident in response to a claim that John Doe "believes his actions were reciprocal to hers."

38. Wallace interviewed John Doe on December 7, 2017.

    a. John Doe also submitted two written statements.

    b. The interview lasted over three hours.

    c. Wallace attempted to "ambush" John Doe by asking him about other, unrelated, allegations of sexual misconduct. John Doe was not told about these allegations prior to his interview. Wallace and Jimenez told John Doe that if he chose not to answer questions about these allegations, "his position would not be able to be taken into consideration regarding potentially critical evidence."

39. Wallace interviewed Witness 1 ("W1") on November 28, 2017.

    a. W1 did not have any first hand knowledge of the Incident.

    b. W1 is one of Jane Roe's best friends and a sorority sister.

    c. W1 attended the party with John Doe and Jane Roe. W1 described Jane Roe as "sufficiently drunk or tipsy but not too drunk."

    d. W1 spoke with Jane Roe the day after the incident. W1 said Jane Roe reported that John Doe had "fingered" her even though she said "no."

    e. Jane Roe Texted W1 1 at 3:29 am.

40. Wallace interviewed Witness 2 ("W2") on November 20, 2017.

    a. W2 did not have any first hand knowledge of the Incident.

    b. W2 is one of Jane Roe's former roommates and sorority sister.

    c. W2 saw Jane Roe at the party; W2 reported that Jane Roe did not appear to be intoxicated.

    d. Jane Roe Texted W2 at 3:31 am.

    e. W2 provided information that cast doubt on Jane Roe's credibility. W2 described Jane Roe as "attention seeking" and that Jane Roe "threw around the term 'rape,'" which W2 believed was "miscommunicating what actually happened." W2 said Jane Roe initially thought about the situation as "both of them being drunk" but later described John Doe as a "predator."

41. Wallace interviewed Witness 3 ("W3") on November 21, 2017.

    a. W3 did not have any first hand knowledge of the Incident.

    b. W3 is Jane Roe's "little sister" at her sorority.

    c. W3 was not at the party. W3 spoke with Jane Roe after the Incident. The investigative report includes conclusory statements from W3 such as: Jane Roe "would never make this up."

    d. W3 accompanied Jane Roe to her initial meeting with Jimenez.

42. Wallace interviewed Witness 4 ("W4") on November 28, 2017.

    a. W4 did not have any first hand knowledge of the Incident. In fact, W4 was in Argentina at the time of the Incident!

    b. W4 is one of Jane Roe's friend and sorority sisters.

    c. W4 communicated with John Doe over FaceTime shortly after the incident. W4 reported that John Doe did not know that Jane Roe was upset. John Doe told W4 that Jane Roe "threw her hands down his pants."

    d. W4 reported that Jane Roe "freaked out" when W4 did not take "her side." W4 described Jane Roe as "attention seeking."

43. Wallace interviewed Witness 5 ("W5") on November 20, 2017.

    a. W5 did not have any first hand knowledge of the Incident. W5 only learned about the Incident a few nights after it occurred.

    b.  W5 is Jane Roe's sister. She is also one of Jane Roe's sorority sisters.

44. Wallace interviewed Witness 6 ("W6") on November 20, 2017.

    a.  W6 did not have any first hand knowledge of the Incident. W6 said that he was aware of an incident between John Doe and Jane Roe, but that he is not sure what happened and did not know any details.

    b.  W6 is one of John Doe's friends and fraternity brothers.

    c.  Wallace re-interviewed W6 on November 28, 2017. Most of the interview was not relevant to the Incident. Instead, Wallace focused on an event in November 2017 and whether John Doe was upset that another woman was at the event.

45. Wallace interviewed Witness 7 ("W7") on November 21, 2017.

    a.  W7 did not have any first hand knowledge of the Incident.

    b.  W7 is one of Jane Roe's friends and sorority sisters.

    c.  W7 indicated to the investigator that Jane Roe reported the Incident to her a few days after the Incident. W7 gave inconsistent impressions of Jane Roe. At one point W7 said Jane Roe was "visibly emotional" and crying, yet she later said Jane Roe was "shutting down emotions" and "able to calmly retell what had happened."

    d.  W7 has received "Title IX training" and always tries to encourage reporting "in an effort to give survivors as much power as possible." Nonetheless, Wallace editorialized, "she is still able to give an unbiased perspective because of her training . . ."

46. Wallace interviewed Witness 8 ("W8") on November 20, 2017.

    a.  W8 did not have any first hand knowledge of the Incident.

    b.  W8 is one of Jane Roe's friends and sorority sisters.

    c.  W8 indicated that she does not know any details of what happened between John Doe and Jane Roe.

d. Almost the entirety of Wallace's interview of W8 concerned W8 being upset about how John Doe had spoken about W8 in the past. Despite the fact that John Doe was never accused of any sexual misconduct around W8, the investigative report noted that W8 "feels like she is having a panic attack" is she sees John Doe on campus.

e. Wallace conducted a follow-up interview with W8 on November 29, 2018.

47. Wallace interviewed Witness 9 ("W9") on November 20, 2017.

a. W9 did not have any first hand knowledge of the Incident.

b. W9 is one of Jane Roe's friends and sorority sisters.

c. W9 was at the party with John Doe and Jane Roe, but did not have specific memories of the event.

48. Wallace interviewed Witness 10 ("W10") on November 29, 2017.

a. W10 did not have any first hand knowledge of the Incident.

b. W10 had graduated from Rollins and is one of Jane Roe's sorority sisters.

c. Almost the entirety of the interview of W10 involved an allegation by W10 that John Doe had committed sexual misconduct in the Fall of 2016.

   i. W10 alleged that she attended a party with John Doe. She was drinking during the event and recalls waking up naked in John Doe's bed the next morning. She assumed she had sex with John Doe.

   ii. W10 told Wallace that she had no other memories of that evening. She said that she "never explicitly told anyone that she felt 'assaulted.'" Wallace included the editorial comment that W10 "said she's not sure he will stop if something doesn't happen to him."

49. Wallace interviewed Witness 11 ("W11") on December 7, 2017.

a. W11 did not have any first hand knowledge of the Incident.

    b. W11 is friends with both Jane Roe's and John Doe, and also John Doe's fraternity brother.

    c. W11 was at the party with John Doe and Jane Roe, but did not observe them.

    d. Almost the entirety of Wallace's interview of W11 concerned the irrelevant allegations made by W8 and W10.

50. Wallace interviewed Witness 12 ("W12") on November 28, 2017.

    a. W12 did not have any first hand knowledge of the Incident.

    b. W12 is one of Jane Roe's "best" friends and sorority sisters.

    c. W12 spoke with Jane Roe about two weeks after the Incident. W12 was approached because W12 was a prior victim of sexual misconduct. The investigative report includes the conclusory statement from W12 that Jane Roe was "initially very hurt, sad and angry, and now she seems like she's accepted it . . ."

    d. Almost the entirety of the remainder of Wallace's interview of W12 concerned the irrelevant allegations made by W8 and W10.

51. Wallace interviewed Witness 13 ("W13") on November 29, 2017.

    a. W13 did not have any first hand knowledge of the Incident.

    b. W13 does not seem to even know John Doe or Jane Roe. Almost the entirety of the remainder of Wallace's interview of W12 concerned the irrelevant allegations made by W8.

52. Wallace interviewed Witness 14 ("W14") on December 3, 2017.

    a. W14 did not have any first hand knowledge of the Incident.

    b. W14 "didn't know who [Jane Roe] was by name, but recognized her once shown a picture . . ."

    c. W14 saw John Doe and Jane Roe at the bar following the party. She said that Jane Roe was a "little more drunk than [W14], but was able to dance." She never saw Jane Roe "falling over herself sitting down, unresponsive, or asleep."

53. Wallace interviewed Witness 15 ("W15") on November 28, 2017.

    a. W15 did not have any first hand knowledge of the Incident.

    b. W15 is friends with John Doe, his fraternity brother, and his roommate.

    c. W15 saw John Doe and Jane Roe return to John Doe's room. John Doe had said that the night went well and that Jane Roe wanted to watch a movie. He observed Jane Roe and did not believe that she was drunk.

    d. Wallace questioned W15 about John Doe's social history, including whether John Doe ever "had a romantic girlfriend" while at Rollins. A large portion of Wallace's interview of W15 concerned the irrelevant allegations made by W8.

54. Wallace interviewed Witness 16 ("W16") on November 28, 2017.

    a. W16 did not have any first hand knowledge of the Incident. In fact, the investigative reports acknowledges that W16 "has no relevant information to offer."

    b. W16 is a former friend of Jane Roe and her sorority 'big sister.' W16 is described as a Rollins graduate whose name was mentioned in a text message between John Doe and W8.

    c. W16 said that Jane Roe has a tendency to exaggerate. When Wallace received this information, she asked whether Jane Roe is "known to exaggerate about being assaulted . . ."

55. Wallace interviewed Witness 17 ("W17") on November 30, 2017.

    a. W17 did not have any first hand knowledge of the Incident.

    b. W17 is friends with W10. W17 is a sorority sister of Jane Roe, but according to the investigative report does not appear to have any knowledge of Jane Roe. W17 seems to only know John Doe slightly.

    c.  The Investigative Report does not indicate that W17 was asked any questions about the Incident; instead Wallace questions W17 about W10's allegations against John Doe.

56. Wallace interviewed Witness 18 ("W18") on November 29, 2017.

    a.  W18 did not have any first hand knowledge of the Incident.

    b.  W18 is a sorority sister of Jane Roe

    c.  W18 was questioned because another witness had mentioned that she had a video of John Doe "fingering" a former Rollins student (later identified as W19). W18 did not, in fact, possess such a video The Investigative report describes a videos taken by W18 as follows:

> In these video clips, [John Doe] is behind W19 and is seen kissing W19's neck, while W19 has her head back. W19's moving in a slight back and forth motion with her eyes closed. [sic.] W19's mouth moves at times.

    d.  Notably, W18 "can't say" that W19 did not consent to sexual activity of John Doe in the video.

57. Wallace interviewed Witness 19 ("W19") on December 5-6, 2017.

    a.  W19 did not have any first hand knowledge of the Incident.

    b.  W19 is friends with John Doe.

    c.  W19 recalled kissing John Doe once or twice, but did not recall the incident in the video played by W18. She said that it was an "experimental" time for her in College and that it was "not uncommon" for her to get drunk and kiss various men. She indicated that she would have consented to kissing John Doe. Wallace attempted to get W19 to say that John Doe touched her vagina her without her consent, but W19 indicated that she could not remember or determine from the videos if John Doe "fingered" her. She further said that she was not upset by the video.

58. Wallace interviewed Witness 20 ("W20") on December 7, 2017.

    a.  W20 did not have any first hand knowledge of the Incident.

b. W20 is a member of the same fraternity as John Doe.

c. W20 was asked about a party attended by John Doe and W8. This party had nothing to do with the Incident. W20 said that John Doe and W8 did not get along, and that John Doe was upset when he learned that W8 was coming to the party.

d. The description of W20's interview is typical of the rumor, hearsay, and innuendo that pervades the investigative report instead of facts about the Incident:

> An unknown third party told W20 that [John Doe] and W8 had "previous relations" their freshman and sophomore year. The only detail W20 could remember regarding what this third party told him was that [John Doe] was really into W8 either their freshman or sophomore year in college. W8 did not reciprocate his feelings "or maybe she got with another guy and that may have frustrated him."

59. Wallace interviewed Witness 21 ("W21") on December 7, 2017.

a. W21 did not have any first hand knowledge of the Incident.

b. W21 is friends with John Doe and also a sorority sister of Jane Roe.

c. W21 was invited by John Doe to the party attended by John Doe and Jane Roe. W21 spent some time with John Doe and Jane Roe, and believes that Jane Roe was mad that W21 was spending time with John Doe. W21 was unable to say if Jane Roe was intoxicated.

60. Wallace interviewed Witness 22 ("W22") on December 7, 2017.

a. W22 did not have any first hand knowledge of the Incident.

b. W22 is friends with John Doe and his fraternity brother.

c. W22 was at the party with John Doe and Jane Roe. He was not drinking because he recently had surgery. He recalled seeing John Doe walking around, but did not recall any observations of Jane Roe.

61. On December 15, 2017, John Doe's advisor requested the opportunity for John Doe to review all documents and statements obtained during the investigation in order to prepare a response.

Approximately 2 weeks later, Jimenez responded. Jimenez told John Doe that he had received all information he is entitled to see.

62. On January 23, 2018, John Doe inquired about the status of the investigation. He was told that the matter was delayed because, according to the school, Wallace had a serious medical condition.

63. At a number of times during the investigation, Wallace and Jimenez received information and allegations that both John Doe was the victim of violations of the Title IX Policy.

    a. A number of witnesses, and the text messages obtained, suggested that both John Doe and Jane Roe were intoxicated when they engaged in sexual activity. Rollins did not initiate an investigation into whether John Doe was too intoxicated to knowingly consent to sexual activity with Jane Roe.

    b. John Doe reported to Jimenez that he was being harassed by some of the witnesses, and in particular, W8. Rollins did not initiate an investigation into this retaliation.

        i. On December 12, 2017, John Doe sent an email to Jimenez suggesting that he had been approached by two people who were aware of details of the investigation from Jane Roe. He claimed that this was "a form of bullying" and a possible violation of his FERPA rights.

            1. Jimenez responded that she needed the names of the individuals involved and details of the statements. John Doe responded by providing additional details.

            2. On December 13, 2017, Jimenez announced that she had "concluded her investigation on these matters." The so-called investigation seemed to consist solely of allowing the alleged wrong-doers to deny any violations of the anti-retaliation provisions of the Sexual Misconduct Policy. No action was taken other than the issuance of a new "new contact" order.

ii. On or about May 13, 2018 – after the investigation – John Doe was assaulted by W8's boyfriend. The friend was upset about the allegations by W8 and Jane Roe against John Doe. W8, W10 and W12 were present during the assault. A police report was filed.

64. The investigative report included a number of uncorroborated allegations of misconduct that were irrelevant to the charges being investigated and, as a result, should not have been considered pursuant to the Sexual Misconduct Policy. These included:

a. The investigative report included a statement by W1. Witness 1 described attending a party of John Doe's date in 2015. She said that at the party, John Doe "repeatedly tried to hold her hand and kiss her."

b. The investigative report included a statement by W8 about a prior incident between W8 and John Doe. Before November 2017, W8 went on a date with John Doe; John Doe wanted things to be more serious, but W8 thought they were on the date as friends. W8 alleged that John Doe got upset when she later started dating someone else, and later referred to her as a "slut."

65. The investigative report contained a number of editorial comments while describing John Does' statements. Similar statements are not present during the descriptions of Jane Roe's statements.

a. Many of the editorial comments describe common behavior for a young person being forced to discuss intimate sexual matters and allegations of possibly criminal behavior. For example, Wallace writes the following about John Doe's description of Jane Roe touching his penis: "[John Doe] appeared very hesitant and nervous during this part of the conversation. He took long pauses before answering and would look at his advisor prior to answering."

b. Some of the editorial comments seem to criticize John Doe for exercising his right to have an attorney present during the interviews, even though this is a right guaranteed by the Clery Act.

    i. For example, at one point, Wallace writes about John Doe responding to a text message from Jane Roe: John Doe "appeared nervous [and] looked at his advisor . . ." At another place, Wallace noted "[John Doe's] advisor asked for a chance to talk to [John Doe] . . . prior to answering any questions about" certain topics. At yet another place Wallace specifically mentions that John Doe "conferred with his advisor

66. The Investigative Report also includes rumors and innuendo suggesting that John Doe had committed other sexual assaults.

a. The investigative report indicates that in early November, 2017, an individual "with a name similar to" John Doe was accused of sexually assaulting three women by an anonymous caller to the Title IX Office. No further information about this allegation was included. The investigator asked Jane Roe if Jane Roe had any information about this alleged incident. Jane Roe indicated that she did not know about this incident.

b. The investigative report indicates that Jane Roe had said that "there was another female who had been potentially sexually assaulted by" John Doe. This appears to be W10.

    i. The investigative report includes a further statement by Jane Roe that she "had since heard from other friends about the possibility of a third female, who had since graduated, who was also potentially sexually assaulted by" John Doe.

    ii. The investigator questions other witnesses about this alleged incident, even though these witnesses had no direct knowledge of the alleged misconduct. Typical of the approach of Wallace is her questioning of W4 about this incident. Wallace writes,

"W4 never spoke to [John Doe] about [this allegation] and she's only heard what allegedly occurred between them through other sorority sisters."

c.  The investigative report includes a description by Jane Roe of John Doe claiming that he had "hooked up" with one of the witnesses.  This appears to be W8.  The investigative report includes numerous details about this incident but then, remarkably, concludes W8's "testimony will not be factored into the determination of responsibility."  On information and belief, this statement is a bad faith effort by Wallace to include "dirt" on John Doe in the investigative report, yet insulate herself from charges of improperly including irrelevant and unreliable material.

d.  The investigative report includes the following irrelevant, inflammatory and conclusory statement from Jane Roe: "[Jane Roe] explained she doesn't believe [John Doe] understands consent, as his college experience of hooking up with people is only when girls are in an intoxicated states."

e.  Wallace provided the following description of her questions about John Doe's character and other alleged incidents:

> [John Doe] was told he'd be questioned on additional witness statements regarding similar allegations.  It was reiterated to [John Doe] that he was only being investigated for the incident involving [Jane Roe,] but that these other witnesses could be used as evidence in the instant matter.  [John Doe] wanted to know if these were just things [Wallace] had heard from other people and said, "they haven't made reports?"  It was explained that at this time there is only one reporter, but that these witnesses spoke to [Wallace,] personally.

67.  The investigative report also includes rumor and innuendo about John Doe's character and prior sexual history.

a.  The investigative report includes statements from Jane Roe about John Doe's "disposition when he is drinking."  Jane Roe stated that John Doe gets "aggressive" and that he "gets mad and defensive easily."  For example, the investigative report includes a statement from

W8 that when John Doe is drinking, "he can become pushy by trying to initiate making out."

b.  The investigative report includes statements about John Doe that he has "not had a real girlfriend while at Rollins" and that he "admitted to developing a crush on girls who were strictly friendly in the past."

   i.  The investigative report includes a statement by W2 that John Doe "tends to have girl friends that he gets close to and develops a crush on and then tries to act on it."

   ii.  The investigative report included a statement by W4 that John Doe "doesn't get with girls often," so if he sees someone showing interest he will "disregard sobriety and go for it."

c.  The investigative report included an uncorroborated statement by W12 that John Doe became "handsey" one night when they were drinking.

68.  The investigative report also included information about Jane Roe's reaction to so-called "triggering events" months after the Incident.

a.  The investigative report describes Jane Roe celebrating her 21st birthday in February 2017. Jane Roe said that she was not drinking a lot because, in part, she was "in a weird mood after" the Incident.  She said that she told her mother, who responded that Jane Roe should "try and put it away and have fun."

b.  The investigative report describes Jane Roe as "shaking and crying" after attending a training session in August 2017 dealing with Title IX issues.  She was particularly upset that John Doe's roommate made a comment about bystanders.  She said that she does not think John Doe's roommate was sufficiently "supportive of her."

     c.  The investigator obtained a statement from W7 about this incident, including descriptions of Jane Roe as crying and shaking hysterically and being "inconsolable."

69.  The investigative report contained a number of "findings of fact." In actuality, these Findings of Fact reflect the bias of the investigator. The Findings of Fact almost invariably credit the version of events by Jane Roe without considering contrary evidence.

70.  The investigative report includes a section entitled "analysis."

     a.  The Analysis acknowledges that, in resolving Jane Roe's allegations, the finder of fact would be required to assess the credibility of Jane Roe and John Doe.

         i.  This credibility assessment was made without the benefit of cross-examination or any opportunity for John Doe to confront adverse witnesses.

         ii.  The Analysis states:

> There are no actual eyewitnesses to the sexual encounter, and there is a conflict in testimony as to the actual sexual incident. To resolve the conflict in testimony, it is necessary to weigh the credibility of the testimony of [Jane Roe] and [John Doe], as well as the surrounding witnesses and any other relevant evidence.

     b.  The analysis states that Jane Roe "provided credible evidence."

         i.  The analysis credits reports to W1 and other "close friends regarding the incident."

         ii.  The analysis notes that Jane Roe admitted she may not have verbalized "no" as clearly as she initially claimed and that she was either inconsistent or lacked memory about key portions of the Incident. Remarkably, the Analysis excuses any inconsistencies in the testimony of Jane Roe and concludes that they, in fact, enhanced her credibility:

> The way in which [Jane Roe] acknowledged the possibility of thinking more in her head, making strong eye contact, expressing frustration over her gaps and memory, and the confidence in which she expressed the words and body language she knows she used all support her credibility. If [Jane Roe] wanted to fabricate the truth, she could have easily never come off the original stronger words she told me she used. Jane Roe explained that she still thinks she used many of the stronger

words but can't say with 100% certainty she wasn't mumbling "uh oh" in place of "no."

   iii.  The analysis found later claims by Jane Roe of distress as "most compelling of all."

The analysis credits her claim, in this respect, that she "no longer felt safe" living

near where John Doe lives.   On information and belief, Jane Roe had previously

planned to move out of her room.

   iv.  The analysis concludes – based mostly on subjective emotional reactions and not

on any physical evidence – that Jane Roe was credible:

> The emotions instability, tearing up, physical shaking, the need to move Residence Halls, withdrawn behavior, lack of ability to focus, drop in academic grades, increase in therapy sessions, lack of confidence, inability to lead training on Title IX, and triggering moments are all corroborative of [Jane Roe's] allegation of having been sexually assaulted, as opposed to waking up and regretting a drunken mistake with a friend.

71. The investigative report observes that "no witnesses, including [John Doe] could think of a reason

why [Jane Roe] would have a motivation to make this up."  However, elsewhere the Investigative

Report noted that Jane Roe received accommodations and other benefits as a result of her claim

to be a victim of sexual assault.

72. The Investigative Report found John Doe's statement to be not credible.

   a.  The analysis concludes – based mostly on subjective emotional reactions and not on any

physical evidence – that John Doe was not credible.  The Investigative Report states:

> [John Doe] was very respectful, polite, and seemed genuinely concerned about this investigation.  It should be noted that [John Doe] appeared very nervous during his interview and would often hit the side of the chair he was sitting in, as he spoke.  [John Doe] avoided eye contact during critical portions of his interview, sometimes using the exact word for word language in the written statement, leading this investigator to believe he was very rehearsed.

   b.  The Investigative report editorializes, suggesting "there is . . . reason to believe [John Doe]

does not have a clear understanding of what consent is."

    c.   The analysis in the Investigative Report relies on other allegations against John Doe in assessing his credibility. The analysis incudes: "Due to the number of other witnesses with similar allegations against [John Doe] . . . [John Doe's] statements regarding [Jane Roe's mutual consensual actions are not credible."

73. The Investigative Report tended to credit the witnesses who were friends or sorority sisters of Jane Roe, but rejected the testimony of witnesses who were friends or fraternity brothers of John Doe. For example, W6 was found not to be credible, in part, because "he appeared to be very influenced by his [fraternity] brotherhood." In contrast, the investigative report accepts uncritically the following: "W10 also denied 'plotting' anything against [John Doe] with W8 or [Jane Roe], indicating that she's not acting in concert with her sorority sisters, but playing a supportive role . . ."

74. On March 5, 2018 received a 27 page letter from Jimenez. This letter primarily re-printed the investigative report.

    a.   The letter indicated, based on the information contained in the investigative report prepared by Wallace, John Doe had been found responsible for violating the Sexual Misconduct Policy.

    b.   John Doe received the following sanctions:

        i.   A no contact order prohibiting contact with Jane Roe;

        ii.   Permanent separation from Rollins without the opportunity for readmission. This dismissal is noted on John Doe's transcript.

        iii.   Prohibition from participation in commencement/graduation and any alumni events.

75. On March 21, 2018, John Doe submitted an appeal.

76. On April 12, 2018, John Doe's appeal was denied.

77. The discipline imposed by Rollins has caused John Doe to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.

78. Discipline by Rollins has caused John Doe significant economic and emotional damages in an amount difficult to quantify but reasonably believed to be well in excess of $75,000.00

## COUNT I
## (TITLE IX – ERRONEOUS OUTCOME)

79. Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

80. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

81. Rollins is an education program or activity operated by recipients of Federal financial assistance.

82. Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

83. The decisions of the hearing process and the appeal process for John Doe were erroneous outcomes which were the direct result of a flawed and biased proceeding. In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Rollins has reversed this process and assumed that John Doe was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

84. Rollins committed impermissible gender bias against John Doe in the investigation and adjudication of Jane Roe's accusations.

   a. There has been substantial criticism of Rollins, both in the student body and in the public media (including the Internet), accusing schools of not taking seriously complaints of female students alleging sexual assault by male students. On information and belief, Rollins's administration was cognizant of, and sensitive to, these criticisms. As a result, Rollins's decision-makers and its investigators were motivated to favor the accusing female

over the accused male, so as to protect themselves and Rollins from accusations that they had failed to protect female students from sexual assault.

b.  On information and belief, Rollins was motivated in this instance to accept the female's accusation of sexual assault so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male student. The investigators, hearing panel, and administration adopted a biased stance in favor of the accusing female and against the defending male in order to avoid the criticism that Rollins turned a blind eye to such assaults by men.

85. Rollins has discriminated against John Doe because of sex. This discrimination is intentional and is a substantial or motivating factor for Rollins's actions in this case. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include:

a.  Rollins, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

b.  Rollins has applied flawed or incorrect legal standards, employed biased or negligent investigatory techniques.

c.  Rollins officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on John Doe is the result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at Rollins.

86. The circumstances of the Investigatory process, the hearing process, and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding. The Department of Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

87. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include:

    a. A general atmosphere at Rollins where those who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on Rollins from OCR, DOJ, student groups, and public opinion.

    b. The adjudication of the claims against John Doe occurred at the time that Rollins officials were touting New York's "Enough is Enough" law and their aggressive approach to issues of sexual assault on campus.

    c. The failure of Rollins to conduct full and fair investigations.

    d. The failure of Rollins to afford accused students counsel or the opportunity to present evidence in their defense and to effectively cross-examine their accusers under the auspices of "protecting" victims.

    e. The Sexual Misconduct Policy denies male students, like John Doe, the basic guarantees of fundamental fairness in hearings. These rights include an impartial decision-maker, the assistance of counsel, the ability to confront adverse witnesses, the right to remain silent in the face of criminal accusations, and the presumption of innocence.

88. Rollins assumed that Jane Roe, as an alleged female victim, was truthful and reliable. As a result of this gender bias, Rollins failed to adequately investigate and question Jane Roe's credibility.

    a. Rollins ignored significant evidence that Jane Roe was not a credible witness, including text messages that contradicted her statements.

    b. Rollins failed to consider what, if any, accommodations or benefits Jane Roe received that may have affected her credibility and reliability.

    c. Rollins's practices and procedures appear to not necessarily be hostile to men, but can be seen as biased in favor of unfairly protecting "vulnerable" and "virtuous" females.

89. Rollins assumed that John Doe, as an accused male student, was not truthful and reliable. As a result of this gender bias, Rollins improperly considered character evidence, rumor, innuendo, and evidence of John Doe's prior sexual history.

90. The circumstances of the Investigatory process, the hearing process, and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding.

91. Rollins officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, Rollins and its agents demonstrated and acted on pervasive gender bias.

92. John Doe has been deprived of access to educational opportunities at Rollins.

93. As a direct and proximate result of Rollins's violations of John Doe' rights under Title IX, John Doe has suffered severe and substantial damages.

    a.  John Doe was denied the opportunity to attend his own graduation.

    b.  John Doe has lost the opportunity to obtain a valuable scholarship to graduate school.

    c.  John Doe's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

94. Rollins is liable to John Doe for his damages.

95. Pursuant to 42 U.S.C. §1988, John Doe is entitled to their attorney's fees incurred in bringing this action.

## COUNT II
## (TITLE IX – SELECTIVE ENFORCEMENT)

96. Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

97. Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

98. Rollins committed impermissible gender bias against the Plaintiff in the investigation and adjudication of John Doe's accusations.

99. Rollins received credible information that that John Doe engaged in sexual activity with Jane Roe while John Doe was intoxicated. Rollins did not encourage John Doe to file a complaint, consider the information, or otherwise investigate.

100.   Rollins received credible information that John Doe was the victim of retaliation during the pendency of the investigation. Rollins did not encourage John Doe to file a complaint, consider the information, or otherwise do anything more than a cursory investigation.

101.   Rollins violated Title IX by selectively enforcing its sexual assault policies on the basis of gender:

    a.  Regardless of plaintiff's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by John Doe's gender. A female student, Jane Roe, was in circumstances sufficiently similar to John Doe's and was treated more favorably by Rollins.

    b.  The severity of John Doe's punishment was due to his gender because Rollins has maintained and perpetrated an archaic view of sexuality in which men are aggressors and women are "guardians of virtue."

102.   Rollins committed impermissible gender bias against John Doe in the investigation and adjudication of Jane Roe's accusations.

103. Rollins officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on John Doe is the result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at Rollins.

104. Rollins has discriminated against John Doe because of sex. This discrimination is intentional and is a substantial or motivating factor for Rollins' actions in this case.

105. As a direct and proximate result of Rollins' violations of John Doe's rights under Title IX, Jane Roe has suffered severe and substantial damages.

   a. John Doe was denied the opportunity to attend his own graduation.

   b. John Doe has lost the opportunity to obtain a valuable scholarship to graduate school.

   c. John Doe's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

106. Rollins is liable to John Doe for his damages.

107. Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT III
### (BREACH OF CONTRACT)

108. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

109. By enrolling at Rollins, and paying his tuition and fees, and attending the school, John Doe and Rollins had a relationship that may reasonably be construed as being contractual in nature.

110.    The terms of the contract between John Doe and Rollins are generally found in various Colleges policies and procedures, including those set forth in the Sexual Misconduct Policy and the accompanying "Bill of Rights" for complainants and respondents.

111.    The alleged breaches concern the following contractual provisions:

    a.  The contract between John Doe and Rollins, as set forth in the Sexual Misconduct Policy, contains the following guarantee of essential fairness: "The College is committed to . . . timely and fair resolution of sexual misconduct and harassment complaints."

    b.  The contract between John Doe and Rollins, as set forth in the Sexual Misconduct Policy, requires Rollins, as a recipient of Federal funds to comply with Title IX. The Department of Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

    c.  The contract between John Doe and Rollins, as set forth in the Sexual Misconduct Policy, contains the following guarantee of essential fairness: "The College will respond promptly and equitably when any incident of sexual misconduct or harassment is alleged against a faculty, staff, or student."

    d.  The contract between John Doe and Rollins as set forth the Bill of Rights for Respondents, guarantees to John Doe an outcome based on information that is "credible, relevant, based in fact, and without prejudice." The Sexual Misconduct Policy includes the express statement that a student be found "guilty" by the preponderance of the evidence.

    e.  The contract between John Doe and Rollins, as set forth in the Bill of Rights for Respondents and the Sexual Misconduct Policy, guarantees to John Doe that the investigators and decision-makers will not consider "irrelevant prior sexual history." considered as information in the investigation.

112. The contract between John Doe and Rollins contains an implied covenant of good faith and fair dealing. This implied covenant prohibits Rollins from doing anything which will have the effect of destroying or injuring the right of John Doe to receive the fruits of the contract. The contract between John Doe and Rollins, as a result, impliedly included the requirement that Rollins provide John Doe with an investigatory and adjudicatory process that was "essentially fair."

113. John Doe paid Rollins tuition and fees.

114. Rollins repeatedly and materially breached the explicit guarantee of fundamental fairness and as well as the implied covenant of good faith and fair dealing and other contractual provisions. These breaches include, but are not limited to, the following:

    a. Rollins was required to have a "fair," and "equitable" process for the adjudication of the allegations of sexual misconduct by Jane Roe.

        i. Rollins breached this contractual requirement through the use of a biased investigator. The investigator used by Rollins, Wallace, was biased. This is demonstrated by the investigative report, which found Jane Roe to be credible and John Doe to be not credible based on rumor, innuendo, and hearsay and in spite of significant contrary evidence.

        ii. Rollins breached this contractual requirement when John Doe was never given the opportunity to cross-examine or otherwise question Jane Roe. As a result, the decision-maker was unable to adequately assess her credibility.

    b. Rollins was prohibited from considering John Doe's prior sexual history. Rollins breached this requirement when the investigative report relied upon by the decision-makers contained numerous allegations of misconduct or other aspects of John Doe's character that had no relevance to the investigation of the Incident.

    c. Rollins breached its express and implied obligation to provide an outcome based on credible and reliable facts when it found John Doe Responsible without sufficient evidence.

        i. There was no physical evidence or witness to support the allegations that John Doe was guilty.

        ii. Text messages and other evidence contradicted or undermined the testimony of Jane Roe.

        iii. The failure to require that John Doe be found guilty only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing.

    d. Rollins breached the explicit and implied obligation to conduct a investigation and adjudicatory process in compliance with Federal Law.  Rollins breached its obligation under the Clery Act by negatively commenting on John Doe's choice to be represented by the attorney of his choice.

115.    The conduct of entire process treated John Doe as if he was guilty from the start, thereby tainting the investigative process and violating the guarantees of fundamental fairness.

    a. Rollins administrators and Investigators acted from the beginning as someone who "believed" the Complainant without conducting any investigation.

    b. John Doe was prohibited from confronting his accuser.

    c. The bias of the entire process was so pervasive throughout the processes that it destroyed any possibility of fairness and ensured that John Doe would be found guilty. The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process.

116.   As a direct and foreseeable result of Rollins's failure to honor its express and implied contractual promises and representations, John Doe has sustained, and will continue to sustain, substantial injury, damage, and loss.

     a.  John Doe was denied the opportunity to attend his own graduation.

     b.  John Doe has lost the opportunity to obtain a valuable scholarship to graduate school.

     c.  John Doe's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

*Wherefore*, Plaintiff seeks the following relief from the Court:

- Judgment in favor of John Doe awarding damages in an amount to be determined at trial;
- An Injunction restoring John Doe as a student, the removal of any negative notations on his transcripts, and prohibiting further disciplinary proceedings in a manner that violates Title IX or the contract between the parties.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

47

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

/s/ Carlos J. Burruezo, Esq.
CARLOS J. BURRUEZO, ESQ.
Florida Bar Number 843458
carlos@burruezolaw.com
docketing@burruezolaw.com
BERTHA L. BURRUEZO, ESQ.
Florida Bar Number 596973
bertha@burruezolaw.com
941 Lake Baldwin Lane, Suite 102
Orlando, Florida 32814
Office: 407.754.2904
Facsimile: 407.754.2905

/s/ Joshua Engel
JOSHUA ADAM ENGEL (0075769)
ANNE TAMASHASKY (0064393)
*Pro hac vice application to be submitted*
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com