## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

JOHN DOE,

Plaintiff,

v.

ROLLINS COLLEGE

Defendants

Case No. 6:18-cv-01069-RBD-KRS

Judge: Dalton, Jr.

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
ON BREACH OF CONTRACT
CLAIM

# TABLE OF CONTENTS

MATERIAL FACTS AS TO WHICH PLAINTIFF CONTENDS
THERE IS NO GENUINE ISSUE FOR TRIAL ...................................................................1

    A.  The Rollins Sexual Misconduct Policy ....................................................................1

    B.  The Allegations Against Plaintiff .............................................................................3

ARGUMENT ...........................................................................................................................9

    A.  Standard ....................................................................................................................9

    B.  Breach Of Contract .................................................................................................9

        1.  Plaintiff and Defendant Had A Contractual Relationship ............................9

        2.  The Failure to Complete the Investigation in 60 Days. ..............................10

        3.  The Consideration Of Prior Sexual Activity ...............................................13

            a.  Questions About John Doe's Prior Girlfriends ...................................15

            b.  The Unreliable Evidence Of Prior Misconduct ..................................16

    C.  Title IX Selective Enforcement .............................................................................18

CONCLUSION ......................................................................................................................24

EXHIBITS

    A.    Title IX: Sexual Misconduct and Harassment Policy

    B.    Deposition of Oriana Guevara

    C.    Chronicle of Higher Education, June 25, 2017 Article

    D.    Deposition of Rollins 30(b)(6) Witness

    E.    Report

    F.    November 17, 2017 Emails

    G.    November 20, 2017 Letter

    H.    Deposition of Deena Wallace

    I.    March 5, 2018 Letter

    J.    Deposition of Mamta Accapadi

    K.    January 23, 2018 Emails

    L.    Bill of Rights

    M.   Meghan Weyant Deposition

    N.    Investigation 12

# TABLE OF AUTHORITIES

## CASES

*Ali v. Stetson Univ., Inc.*, 340 F.Supp.2d 1320 (M.D. Fla. 2004) ................................................10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................................................9

*Brown v. Sheriff of Orange Cty.*, M.D.Fla. No. 6:12-cv-1299, 2014 U.S. Dist. LEXIS 81514, (June 12, 2014) .........................................................................................................................1

*Christian v. Silver Maples Ltd. Dividend Hous. Assocs.*, E.D.Mich. NO. 85-CV-40328-FL, 1986 U.S. Dist. LEXIS 27154 (Apr. 5, 1986) ...............................................................................15

*Cordell Funding, LLLP v. Jenkins*, 722 F. App'x 890 (11th Cir. 2018) .........................................9

*Doe v. Case W. Res. Univ.*, N.D.Ohio No. 1:17 CV 414, 2019 U.S. Dist. LEXIS 74520 (May 1, 2019)....................................................................................................................................22

*Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016);................................................................18

*Doe v. Forest Hills School Dist.*, W.D.Mich. No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321 (Mar. 31, 2015) ....................................................................................................................13

*Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336 (S.D. Fla. 2017) ..................................................1

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ..........................................................21-22, 24

*Doe v. Ohio State Univ.*, 323 F. Supp. 3d 962 (S.D.Ohio 2018) ...............................................24

*Doe v. Rollins College*, 352 F. Supp. 3d 1205 (M.D.Fla. 2019) ...............................................18

*Doe v. Univ. of the South*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009)............................................19

*Fellheimer v. Middlebury College*, 869 F.Supp. 238 (D.Vt. 1994)............................................14

*Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000)..............................................................21

*Gen. Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448 (2d Cir. 1991) ......................15

*Gischel v. Univ. of Cincinnati*, S.D. Ohio No. 1:17-cv-475, June 26, 2018 Order....................24

*Jallali v. Nova Se. Univ., Inc.*, 992 So. 2d 338 (Fla. 4th DCA 2008) ........................................15

*Jarzynka v. St. Thomas Univ. School of Law*, 310 F.Supp.2d 1256 (S.D.Fla.2004) ...................10

*Jia v. Univ. of Miami*, S.D.Fla. No. 17-cv-20018, 2019 U.S. Dist. LEXIS 23587 (Feb. 12, 2019)........................................................................................................................................1

*John B. Stetson Univ. v. Hunt*, 88 Fla. 510, 102 So. 637 (1924) .................................................9

*Kernel Records Oy v. Mosley*, 694 F.3d 1294 (11th Cir. 2012),.................................................9

*Koeppel v. Romano*, 252 F. Supp. 3d 1310 (M.D.Fla. 2017)......................................................1

*Mallory v. Ohio Univ.*, 76 F. App'x 634 (6th Cir. 2003) ...........................................................18

*Mancini v. Rollins College*, No. 6:16-cv-2232, 2017 U.S. Dist. LEXIS 113160 (M.D. Fla. July 20, 2017) ..............................................................................................................................1

*McCawley v. Universidad Carlos Albizu, Inc.*, 461 F.Supp.2d 1251 (S.D. Fla. 2006) ..................10

*Placida Professional Ctr., Ltd. Liab. Co. v. FDIC*, M.D.Fla. No. 8:09-CV-2221, 2012 U.S. Dist. LEXIS 1186 (Jan. 5, 2012) ......................................................................................................1

*Rolph v. Hobart & William Smith Colleges,* 271 F. Supp. 3d 386 (W.D.N.Y. 2017) ...................20

*Sharick v. Southeastern University of Health Sciences, Inc.,* 780 So.2d 136 (Fla. 3rd DCA 2000) ...................9

*Sirpal v. Univ. of Miami,* 509 F.App'x 924 (11th Cir.2013) ..............................................................15

*Stenzel v. Peterson*, No. 17-580 (JRT/LIB), 2017 U.S. Dist. LEXIS 148467 (D. Minn. Sept. 13, 2017 ..................................................................................................................................24

*Sublime, Inc. v. Boardman's, Inc.,* 849 So. 2d 470 (Fla. 4th DCA 2003) ......................................13

*Thai Meditation Assn. of Alabama v. City of Mobile,* S.D.Ala. No. 1:16-cv-395-TFM-MU, 2019 U.S. Dist. LEXIS 87814 (May 23, 2019) ....................................................................................21

*United States v. Barnett*, M.D.Fla. No. 2:08-cr-100, 2009 U.S. Dist. LEXIS 127287(Jan. 14, 2009) .............................................................................................................................................21

*Univ. of Miami v. Militana*, 184 So.2d 701 (Fla. 3d DCA 1966) ...................................................10

*Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256 (11th Cir. 2009) ...........................................................9

*Villard v. Capella Univ.,* M.D.Fla. No. 6:17-cv-1429-Orl-41GJK, 2017 U.S. Dist. LEXIS 220541 (Dec. 21, 2017) ....................................................................................................................10

*Whitaker v. Miami-Dade Cty.,* S.D.Fla. No. 13-24450-CIV, 2014 U.S. Dist. LEXIS 189246 (Apr. 23, 2014) ......................................................................................................................13

*Yusuf v. Vassar Coll.,* 35 F.3d 709 (2d Cir. 1994) ....................................................................4, 18

*Z.J. v. Vanderbilt Univ.,* 355 F. Supp. 3d 646 (M.D.Tenn. 2018) ...................................................22

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) .............................................................................................................................9

*Ferris Bueller's Day Off* (Paramount Pictures, 1986) .......................................................................17

Letter from Office for Civil Rights, U.S. Dep't of Educ. (April 11, 2011) ..........................................1

Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017) ..................................2

Open Letter From Members Of The Penn Law School Faculty: *Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015 ....................2

*Rethink Harvard's Sexual Harassment Policy,* Boston Globe (Oct. 15, 2014) ...................................2

Plaintiff John Doe, respectfully submits this Motion for Partial Summary Judgment on the Breach of Contract and t[h]e Title IX Selective Enforcement Claims. Plaintiff requests that the Court enter partial summary judgment on the issue of liability on these two claims and set this matter for a trial to determine damages and any appropriate permanent injunctive relief. Plaintiff is *not* seeking summary judgment on some elements of the breach of contract claim and the Title IX erroneous outcome claim. There is an issue of fact on those claims.[2]

## MATERIAL FACTS AS TO WHICH PLAINTIFF CONTENDS THERE IS NO GENUINE ISSUE FOR TRIAL

### A.      The Rollins Sexual Misconduct Policy

This case is one of many amidst a growing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses.[3]  After years of criticism for being too lax on campus sexual assault, on April 11, 2011, the U.S. Education Department's Office of Civil Rights ("OCR") sent a "Dear Colleague Letter" to colleges and universities. Letter from Office for Civil Rights, U.S. Dep't of Educ. (April 11, 2011). The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to

---

[1] *Cf. Brown v. Sheriff of Orange Cty.*, M.D.Fla. No. 6:12-cv-1299, 2014 U.S. Dist. LEXIS 81514, at *25 (June 12, 2014) (granting plaintiff's motion for partial summary judgment and proceeding to trial on the issue of damages); *Placida Professional Ctr., Ltd. Liab. Co. v. FDIC*, M.D.Fla. No. 8:09-CV-2221, 2012 U.S. Dist. LEXIS 1186, at *1-2 (Jan. 5, 2012) (observing that court had granted plaintiff's motion for partial summary judgment on liability "and thus, the issues for trial centered around the amount of [plaintiff's] damages).

[2] Plaintiff represents that he likely will obtain all the monetary and permanent injunctive relief he seeks through judgment on the Breach of Contract and the Title IX Selective Enforcement Claims, and thus there would be no need to proceed to trial on liability for the Title IX erroneous outcome claim if the Court grants this Motion.

[3] Cases within the 11th Circuit include: *Mancini v. Rollins College*, No. 6:16-cv-2232, 2017 U.S. Dist. LEXIS 113160 (M.D. Fla. July 20, 2017); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336 (S.D. Fla. 2017); *Koeppel v. Romano*, 252 F. Supp. 3d 1310 (M.D.Fla. 2017); *Jia v. Univ. of Miami*, S.D.Fla. No. 17-cv-20018, 2019 U.S. Dist. LEXIS 23587 (Feb. 12, 2019).

investigate and resolve complaints of sexual misconduct. The procedures adopted by schools has received substantial criticism from federal courts.

> Sexual assault is a deplorable act of violence… Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). In withdrawing the Dear Colleague Letter, OCR observed that prior actions

> may have been well-intentioned, but… led to the deprivation of rights for many students — both accused students denied fair process and victims denied an adequate resolution of their complaints.

*Id.* at 1-2. OCR further said:

> Legal commentators have criticized the [Dear Colleague Letter]… for placing 'improper pressure upon universities to adopt procedures that do not afford fundamental fairness.' [As a result, many schools have established procedures for resolving allegations that] lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.

*Id.*, *quoting* Open Letter From Members Of The Penn Law School Faculty: *Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014).

In 2015, Rollins adopted the "Title IX: Sexual Misconduct and Harassment Policy" (Policy (Exhibit A).). Rollins remained committed to the Policy in early 2017 despite criticism. The Rollins Title IX Coordinator, Oriana Jimenez, a/k/a Oriana Guevara, testified:

> Q Is there anything, as you think back, that could have been done, to improve the fairness of [the Rollins policy]?
> A. We had a very good process in place.

Q. Okay. Do you believe -- that's not my question. Is there anything that you could have done to improve the fairness?
A. No.

(Deposition of Oriana Guevara at 52 (Exhibit B).)  She told the Chronicle of Higher Education that Rollins "can't afford" to make any revisions to its process following the repeal of the 2011 Dear Colleague Letter.  (June 25, 2017 Article (Exhibit C.)[4]

The Sexual Misconduct Policy does not provide for a hearing or other formal process. Instead, Rollins uses a "single investigator model."  Under this model "the investigator will determine responsibility based on the relevant information presented during the investigation and the unique facts of the case."  (Policy at 10-11.)  The Rollins 30(b)(6) designee explained:

A. … the investigator serves as … investigator and then provides an analysis around credibility, a finding of fact and a determination in the case.
Q. Why does Rollins choose to use that model?
A. Through the multiple renditions of Title IX regulations and the "Dear Colleague" letter and consultation with local and national experts, there is a -- there is and was a belief that that is the best way to investigate a Title IX complaint and come to a finding.

(Deposition of 30(b)(6) Witness at 25 (Exhibit D).) [5]

A student found responsible for a violation of the Sexual Misconduct Policy may submit an appeal to a Vice President on some very limited grounds. Rollins employs a preponderance of the evidence standard, with no mention of the burden of persuasion or that accused students are considered to be innocent until proven guilty.  (*See*, *generally*, Policy.)

**B.    The Allegations Against Plaintiff**

Plaintiff, a former student at Rollins, was accused of sexual misconduct arising out of events that occurred during the early morning of February 18, 2017.  (Guevra Depo. at 116-117.)  The

---

[4] In her deposition, Guevara testified that she meant that "There was nothing in the requirements that required us to change anything."  (Guevara Depo. at 46.)  This explanation strains credulity.

[5] Notably, Rollins no longer uses this model   (30(b)(6) Depo. at 26.)

allegations are summarized in a report. (Report (Exhibit E.) John Doe unequivocally denied engaging in any misconduct.[6] (Report 17-22.)

The alleged victim, referred to in the Amended Complaint as "Jane Roe," was another student at Rollins. John Doe and Jane Roe attended a Valentine's Day social function together. While at the event, they both consumed alcohol. They left the social function and went to local bar, where John Doe had at least one more drink. John Doe and Jane Roe left the bar and walked, holding hands, to John Doe's dorm room. They watched a movie and started kissing. (*See* Report 7-9, 17-19.) This is where the stories diverge. John Roe states that John Doe touched her in a sexual manner, including penetrating her vagina with his finger, without her consent. (Report at 10.) John Doe state that that Jane Roe was an active and enthusiastic participant in all of the sexual activity, including unbuckling his pants and removing his penis. (Report at 19.)

On February 22, 2017, Jane Roe met with the Rollins Title IX Coordinator. Jane Roe indicated that she did not wish to participate in a Title IX investigation, (Guevara Depo. at 115-116.) The Title IX Coordinator did not take any investigative actions. (Guevara Depo at 118-121.) Jane Roe did receive assistance in February 2017 as a result of her claim to have been a victim of sexual assault. For example, prior to conducting any investigation the Title IX Coordinator wrote letters to Jane Roe' professors asking for academic accommodations. (Guevara Depo. at 122.) She also received housing benefits. (Guevara Depo. at 123.)

Over eight months later, in November 2017, an individual "with a name similar to" Plaintiff's was accused of sexually assaulting three women by an anonymous caller to the Title IX Office. (Guevara Depo. at 127 ("There was a first name mentioned that sounded similar to John Doe's

---

[6] This Court will not be called upon to determine whether Plaintiff actually committed a sexual assault. A selective enforcement claim exists "regardless of the student's guilt or innocence." Y*usuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

name…").)  As a result of the anonymous "tip," the Title IX Coordinator reached out to Jane Roe to see if she had any additional information.  Jane Roe indicated that she was "surprised" to hear about the allegation.   (Guevara Depo. at 128.)   The Title IX Coordinator promised Jane Roe "additional interim measures" and Jane Roe decided to "move forward with an investigation."  (Guevara Depo. at 128-29.)  The Title IX Coordinator also told Jane Roe that the school would "look into the matter further…" regardless of her desires and, as a result, Jane Roe decided to "move forward with an investigation."  (Guevara Depo. at 129. )

On November 17, 2017 the alleged victim sent an email to the Title IX coordinator indicating that she wished to go forward with the investigation.  (November17, 2017 Emails (Exhibit F).)  On November 20, 2017 John Doe was informed of the allegations against him.  (November 20, 2017 Letter (Exhibit G).)  Rollins retained an outside investigator, Deena Wallace.  Wallace conducted interviews with approximately 20 witnesses, none of whom had first-hand knowledge of the alleged sexual misconduct.  (*See, generally,* Report.)  Many – almost all – of the witnesses lacked any first-hand knowledge of the Incident; the Investigator testified:  "There were no eyewitnesses to the event so if you're asking about firsthand knowledge… No one had firsthand knowledge."  (Deposition of Deena Wallace at 133 (Exhibit H.)   Wallace interviewed Jane Roe four times, but only spoke to John Doe once.  (Wallace Depo. at 118.)

The Investigator concluded that the determination of responsibility turned on the credibility of John Doe and Jane Roe, also referred to as the "Reporter" and the "Respondent."   She wrote in her report:

> There are no actual eyewitnesses to the sexual encounter, and there is a conflict in testimony of the Reporter and Respondent.  To resolve the conflict in testimony, it is necessary to weigh the credibility of the testimony of the Reporter and Respondent, as well as the surrounding witnesses and other relevant evidence.

(Report at 58.)  The Investigator essentially took what Jane Roe said at face value.  For example, Jane Roe claimed that her academic performance suffered, yet the Investigator never attempted to verify

this information.  (Wallace Depo. at 110.)  the Investigator was told that Jane Roe received academic accommodations that could have affected her credibility, but made no inquiry into the exact nature of the accommodations.  (Wallace Depo. at 91.)  the Title IX Coordinator did not provide the Investigator with this information.  (Guevara Depo. at 125.)  Jane Roe also claimed that she suffered mental distress and sought counseling, but the Investigator did not seek to verify this information, either.  (Wallace Depo. at 139.)

Instead of attempting to verify the information provided by Jane Roe, the Investigator sought to resolve the credibility issue by engaging in a far reaching examination of John Doe's life and character.  Most notably, for purposes of this Motion, the Investigator sought to uncover information about John Doe's sexual history.  The Investigator started by asking about all of John Doe's prior girlfriends.  The Investigator explained in her deposition why she asked this question:

> That question was asked of reporting party and several other witnesses, because beginning with the reporter, there was this history of him having, you know -- at least from the reporter's standpoint, he was a close friend of hers and had misread these social queues that were going on between them. He felt like -- she got the feeling like he felt like there was something more than there was. That maybe she had feelings for him that she simply didn't have. And from other people's -- other witness's testimony, he seemed to be the guy who always prowled around. He always had these close girlfriends around him. In every instance that I was hearing as it related to any sexual contact he had was an inappropriate form of sexual conduct. There was no  history of him having a consensual sexual relationship or a consensual romantic relationship regardless of whether  sex was involved or not…

(Wallace Depo. at 95-96.)  The Investigator further explained that she asked about the prior girlfriends to determine whether John Doe understood the concept of 'consent'

> A.  …He's being accused of sexual activity without consent. It's important to me to understand where he is in all of this and why -- you know, what knowledge and what experience he may have with consent. That's one question that played into a much larger decision.

(Wallace Depo. at 100.)[7]   The Investigator also pursued information on rumors about allegations of other instances of sexual misconduct by John Doe.   Specifically, the Investigator pursued unsubstantiated allegations that  John Doe had engaged in non-consensual sexual activity with three other women, identified as "Witness 8," "Witness 10," and "Witness 19." (Wallace Depo. at 124.) The Investigator wrote in her report that John Doe had a pattern of sexual misconduct, described as follows:

> … all three of these women were friends, if not very close friends with Respondent… and ended up having their vaginas penetrated by him without giving informed, knowing and voluntary consent.

(Report at 64.)

This would be incredibly damning if true!  *But none of this is supported by the interviews conducted by the Investigator.*  Specifically, none of the three alleged "other victims" told the Investigator that John Doe penetrated their vaginas without consent.  Witness 8 said they only made out at a bar.  (Report at 34).  Witness 10 did not recall what happened with John Doe.  (Report at 39.)  Witness 19 said she did not remember any misconduct by John Doe.  (Report at 50.).

During the investigation, the Investigator and the Title IX Coordinator received information that John Doe was also a victim because Jane Roe initiated sexual activity while John Doe was intoxicated.  Witnesses and text messages suggested that *both* Plaintiff and Jane Roe were intoxicated when they engaged in sexual activity.  The Investigator admitted this at her deposition:

> Q  … do you recall during the interview the reporting party indicating that the respondent appeared to be drunk?
> A  … At some point in the night, I believe she said he appeared to be drunk. Yes.

(Wallace Depo. at 71.)   Despite receiving this information, and despite the broad scope of the Investigator's investigation in other respects, Rollins did not initiate an investigation into whether

---

[7] Wallace clarified that she meant consent within the sexual context.  (Wallace Depo. at 101.)

Plaintiff was too intoxicated to knowingly consent to sexual activity with Jane Roe. (Wallace Depo. at 105.)

The Report concluded that Jane Roe was credible and Plaintiff was not credible. The Investigator concluded that John Doe had violated the Rollins Sexual Misconduct Policy. (Report at 58-63.) Plaintiff was considered not credible because, even though he was "very respectful, polite, and seemed genuinely concerned about this Investigation," he "appeared very nervous." The conclusion that Jane Roe was credible was made without the benefit of a hearing, relied primarily on hearsay, and excused inconsistencies in Jane Roe's statements. The report reads:

> The emotional instability, tearing up, physical shaking, the need to move Residence Halls, withdrawn behavior, lack of ability to focus, drop in academic grades, increase in therapy sessions, lack of confidence, inability to lead training on Title IX, and triggering moments are all corroborative of [Jane Roe's] allegation of having been sexually assaulted, as opposed to waking up and regretting a drunken mistake with a friend.

(Report at 56-71.) Significantly, although the report noted that Jane Roe received accommodations and other benefits as a result of her claim to be a victim of sexual assault, the report falsely stated that "no witnesses, including [John Doe] could think of a reason why [Jane Roe] would have a motivation to make this up." This statement was made even though the Title IX Coordinator testified that John Doe would not have been able to learn of the accommodations received by Jane Roe:

> Q … When John Doe was interviewed in this case, was he aware of the accommodations that were provided to Jane Roe?
> A. No. He was not entitled to have that information.

(Guevara Depo. at 125.) Guevara later admitted the impossibility of answering this question:

> Q. But, we're clear -- just so we're clear, when all the witnesses were asked why the reporter would make this up, none of them were aware that she had received accommodations, right?
> A. None of them were aware she received accommodations.

(Guevara Depo. at 180.)

On March 5, 2018, Plaintiff was informed by the Title IX Coordinator that he had been found responsible for violating the Sexual Misconduct Policy; the Title IX Coordinator essentially cut-and-pasted the Report. (Letter (Exhibit I); Guevara Depo. 181) His appeal was later denied. (Deposition of Mamta Accapadi at 52 (Exhibit J).) Plaintiff was dismissed from Rollins; this litigation followed.

## ARGUMENT

### A. Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. Breach Of Contract

Florida law governs the breach of contract claim. Under Florida law, the elements for breach of contract are "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Cordell Funding, LLLP v. Jenkins*, 722 F. App'x 890, 894-95 (11th Cir. 2018), *quoting Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).

#### 1. Plaintiff and Defendant Had A Contractual Relationship

Under Florida law, a student and a private university have a contractual relationship. *John B. Stetson Univ. v. Hunt*, 88 Fla. 510, 102 So. 637 (1924); *Sharick v. Southeastern University of Health Sciences, Inc.*, 780 So.2d 136, 138 (Fla. 3rd DCA 2000). The terms and conditions of that contractual relationship may include the publications of the private university at the time of enrollment. *Sharick*, 780 So.2d at 138. The university's publications are sometimes referred to an "implied-in-fact contract" rather than an express contract. *Jarzynka v. St. Thomas Univ. School of Law*, 310 F.Supp.2d

1256, 1268-1269 (S.D.Fla.2004).[8]  Regardless of whether conceived as an "implied" or explicit

contract, courts are clear that the terms of this relationship are generally set forth in university catalogs,

student manuals, student handbooks, and other university policies and procedures. *Ali v. Stetson Univ.,*

*Inc.,* 340 F.Supp.2d 1320, 1328 (M.D. Fla. 2004), *quoting Univ. of Miami v. Militana*, 184 So.2d 701, 704

(Fla. 3d DCA 1966); *Villard v. Capella Univ.*, M.D.Fla. No. 6:17-cv-1429-Orl-41GJK, 2017 U.S. Dist.

LEXIS 220541, at *4 (Dec. 21, 2017).

There is no issue of material fact here.  The Title IX Coordinator confirmed that the College

intended the Policy to act as a binding agreement:

> Q.  … It's binding.  People -- students have to follow it, right?
> A.  Yeah.
> Q.  Okay.  And the school has to follow it, too, right?
> A.  Yeah.
> Q.  So, there's obligations on both sides?
> A.  Absolutely.

(Guevara Depo. at 52-53.)  The Vice President similarly testified:

> Q.  And this is a policy that was binding on students when John Doe was there in the college?
> A.  Yes.
> Q.  It's also binding on the college too, right?
> A.  Can you please clarify.
> Q.  Sure.  I mean it has some obligations that the college has to follow as well?
> A.  Yes.

(Accapadi Depo. at 23.)

### 2.      The Failure to Complete the Investigation in 60 Days.

The Policy provides:

> The College will respond promptly and equitably when any incident of sexual
> misconduct or harassment is alleged against a faculty, staff, or student.  Typically the
> process will be completed within 60 days.  This timeframe may be extended only for
> good cause.  If good cause exists to extend the timeframe, both the reporting party

---

[8] The "implied" part of the contract appears to be that "if the student fully complies with the rules
and regulations of the institution, then the university will confer to him a degree."  *McCawley v.
Universidad Carlos Albizu, Inc.*, 461 F.Supp.2d 1251, 1257 (S.D. Fla. 2006) (citations omitted).

and the responding party will be notified in writing of the extension and the reason for the extension.

(Policy at Bates#000686.)  Under the Sexual Misconduct Policy, most investigations are completed within 60 days.  (Accapadi Depo. at 24.)

The College breached this agreement by not even starting – much less completing – and investigation for months.  The record establishes that Jane Roe spoke to the College's Title IX Coordinator on February 22, 2017.  (Guevara Deo. at 115.)  The undisputed fact in this case is that John Doe was informed of the result of the investigation on March 5, 2018 and the disciplinary process was completed 414 days later, on April 12, 2018 (when the school completed the review of John Doe's Appeal.)  (March 5, 2018 Letter; Accapadi Depo. at 55.)

The Title IX Coordinator admitted that she took almost no investigative steps after receiving a report in February 2017, although Rollins was not prohibited by any policy from doing so.  She testified:

> Q. Did you take any investigative steps, as a result of your meeting with Jane Roe on February 22nd, 2017?
> A. She chose not to exercise her right to request an investigation at this time. She filed a report, and what she wanted were interim measures.
> Q. … Rollins could decide to open up an investigation even though Jane Roe didn't want one. Right?
> A. Correct.

(Guevara Depo. at 118.)  She later explained that Rollins decided to offer academic accommodations to Jane Roe  at this time although no investigation had been done.  (Guevara Depo. at 122.)   This time delay was a violation of the contractual agreement between the parties.  The Policy provides that "the process will be completed" typically within 60 days of "when any incident of sexual misconduct or harassment is alleged…"  Thus, the clock for a "prompt" response started running at the time of the initial allegation, February 2017.   The Vice President admitted that "most investigations are completed within 60 days." (Accapadi Depo. at 24.)  She later elaborated:

Q. So I want to know, is it your understanding of this policy that Rollins is required to complete the investigation within 60 days except if there is good cause to extend it?
A. The 60 days is a reference to be able to complete an investigation in a reasonable time frame. That is typically 60 days.

(Accapadi Depo. at 26.)

Plaintiff anticipates that Rollins will argue that the 60 day clock started on November 17, 2017. Even if the Court accepts this interpretation of the Policy, Rollins still did not comply. Under this interpretation, the process had to be completed by January 16, 2018, unless extended for good cause. However, the investigation was not even completed by this date.[9] On January 23, 2018, -- almost a week after the deadline – John Doe's counsel sent a letter suggesting that the investigation had improperly extended beyond 60 days. (January 23, 2018 Emails (Exhibit K).) The Title IX Coordinator admitted that she had not informed John Doe that the investigation would be extended beyond 60 days prior to the expiration of the time period.

Q. Now, prior to this letter, had you sent anything to John Doe, indicating that the investigation was going to take more than 60 days?
A. If you don't have it, then I didn't send it.
Q. And as we've discussed, is it your understanding that you were required by the policy to do so?
A. Correct.
Q. Okay. So, this was not -- so, in other words, extending this beyond 60 days was not consistent with the policy, right?
A. The policy allows for extensions beyond 60 days. All it says, is that the parties must be notified.
Q. And you didn't notify the parties?
A. I notified them on Day 64.

(Guevara Depo. at 140-141.) In fact, through the middle of March, The Title IX Coordinator was still providing edits to drafts of the Investigator's reports. (Guevara Depo. at 142.) The report was not completed until March, 2018 and the appeal was not completed until April 12, 2018. (Guevara Depo.

---

[9] Interestingly, the report inaccurately states that the investigation was concluded on December 12th, 2017. (Report at 1.) However, Wallace testified that she continued to work on the report significantly after that date. (Wallace Depo. at 92.)

at 182; Accapadi Depo. at 55.)  Notably, the Rollins Sexual Misconduct says that "the process," and not just "the investigation," will be completed in 60 days.  Thus, even under this interpretation of the start of the process, the "process" was not completed for 146 days – well over twice the time in the Rollins policy.

This is a material breach.  Under Florida law, time is considered to be "of the essence" when, *inter alia*, it can be determined from the subject matter of the contract that time was clearly an essential and vital part of the bargain or the treatment of time as non-essential would produce a hardship.  *See Sublime, Inc. v. Boardman's, Inc.*, 849 So. 2d 470, 471 (Fla. 4th DCA 2003).  In this case, both of these factors apply.  The Rollins Sexual Misconduct clearly created an expectation that the process would be completed expeditiously in order to obtain accurate and reliable information.  The obligation of Rollins to act in a timely manner helps to assure that the parties and witnesses are interviewed when the information is relatively fresh in their minds – the delay of almost nine months before the start of the investigation had a deleterious effect on the ability of John Doe to defend himself – a problem that is especially acute when there is no presumption of innocence and Rollins uses the lowest possible standard of proof. *Cf. Whitaker v. Miami-Dade Cty.,* S.D.Fla. No. 13-24450-CIV, 2014 U.S. Dist. LEXIS 189246, at *9 (Apr. 23, 2014) ("concerns about witnesses' fading memories and the disappearance of evidence are legitimate concerns…").  The Title IX Coordinator, after testifying that she had no concerns about the ability of Rollins to conduct a full and fair investigation over a year after the alleged incident, admitted that memories could have faded over the interval.  (Guevara Depo. at 130.)  In other cases, courts have noted that the failure to comply with the 60 day time limit could be evidence of s failure to comply with Title IX.  *Doe v. Forest Hills School Dist.*, W.D.Mich. No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321, at *33 (Mar. 31, 2015) (fining possible deliberate indifference, citing *inter alia* "is undisputed that Forest Hills did not complete its investigation within 60 days").

   **3.     The Consideration Of Prior Sexual Activity**

The sexual misconduct policy provides:

> In general, in a case where the responding party raises consent as a defense, any prior consensual relationship between the parties may be relevant. Any other prior sexual history of the reporting party is typically not relevant and may not be permitted. Prior sexual history of the responding party may be relevant where there is evidence of a pattern of misconduct that may be relevant in the determination of responsibility…

(Policy at 14.) Similarly, Rollins has a "Responding Party Bill of Rights." This document provides that a student accused of sexual misconduct has the following right:

> To not have **IRRELEVANT** prior sexual history considered as information in the investigation.

(Bill of Rights (emphasis in original) (Exhibit L).) Rollins personnel acknowledged that the purpose of this provision was to limit inquiry into prior sexual history into instances of prior sexual misconduct. One administrator testified that the provision limited relevance to "prior Title IX allegations, prior Title IX reports, prior violations, [and] prior code of conduct violations." (Meghan Weyant Deposition at 30 (Exhibit M).)

The investigator breached this policy in two ways: (i) by asking about all of John Doe's prior girlfriends; (ii) obtaining unreliable and unsubstantiated allegations of sexual misconduct. This is a material breach, as the investigator relied on this evidence in assessing the credibility of John Doe. This was a material breach because the investigator testified that she believed that this evidence helped establish "a pattern of misconduct of him essentially taking advantage of women with lower inhibitions…" (Wallace Depo. at 149.) The failure of a school to follow its own policies and procedures can support partial summary judgment in favor of students. *See e.g. Fellheimer v. Middlebury College*, 869 F.Supp. 238, 247 (D.Vt. 1994) (granting partial summary judgment to student on breach of contract claim where school failed to comply with notice provisions).[10]

---

[10] The Eleventh Circuit has observed that while under Florida law, the legal relationship between a private university and a student is contractual in character, the "court will not interfere with a private university's enforcement of its regulations unless the university has acted arbitrarily and capriciously, in violation of a constitution or statute, or for fraudulent purposes." *Sirpal v. Univ. of Miami*, 509

### a.      Questions About John Doe's Prior Girlfriends

The Rollins investigator asked witnesses about John Doe's prior girlfriends.  This question was asked during the Investigator's initial interview with Jane Roe.  (Report at 7; Wallace Depo. at 95.)  At her deposition, the Investigator first attempted to claim that this was in compliance with the Policy because asking about prior girlfriends is somehow not an inquiry into John Doe's sexual history.  She explained:

> Q   Why is asking about whether he had prior girlfriends not a violation of the prohibition against asking about the prior sexual history of the parties?
> A   Nothing -- there is nothing about him having a girlfriend -- there is nothing about that question that has anything to do with sexual history…. I'm asking if he had any serious girlfriends I which to base an experience of knowing what -- of having a better understanding of what consent is…

(Wallace Depo. at 96.)   Later, the Investigator asserted, "I'm not asking specifically about sexual misconduct. I'm asking about whether or not he has had a girlfriend."   (Wallace Depo. at 98.)

---

F.App'x 924, 929 (11th Cir.2013), *quoting Jallali v. Nova Se. Univ., Inc.*, 992 So. 2d 338, 342 (Fla. 4th DCA 2008).

In this case, there is no issue of fact that Rollins acted in an arbitrary or capricious manner.  "Rules without standards for those who apply them… are capable of arbitrary enforcement."  C*hristian v. Silver Maples Ltd. Dividend Hous. Assocs.*, E.D.Mich. NO. 85-CV-40328-FL, 1986 U.S. Dist. LEXIS 27154, at *12 (Apr. 5, 1986).  *Cf. Gen. Elec. Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1455 (2d Cir. 1991) (delegation without standards allows the private party to exercise selfish or arbitrary motivations or whims).  In this case, a number of witnesses testified that Rollins did not have any criteria or standards for how the policy provision about prior sexual history was applied, but that it would be up to the investigator on a case-by-case basis.  Wallace testified:

Q  … Are there any criteria that you use to determine whether an allegation of sexual -- prior sexual misconduct is relevant?

A  If you -- do I have a checklist that I go through? No

(Wallace Depo. at 80.  *See also* Weyant Depo. at 28 "Q. So what would be a legitimate reason to ask [about prior sexual history]? A. I don't know…"); Guevara Depo. at 81 ("Q. Well, in your role of overseeing the investigation, how would you try to determine whether that would be proper or improper? A.  I would need the investigator to explain to me how it's -- how it's relevant.").)  There was similar testimony about the lack of criteria surrounding the 60-day rule.  (*See* Accapadi Depo. at 25 ("There could be a whole host of extenuating circumstances…").)

However, the Investigator eventually conceded that this was, in fact, an inquiry into John Doe's prior sexual history:

> Q  I guess what I want you to clarify is … *were you asking about his prior girlfriends because you were interested in whether he understood consent within the sexual context?*
> A  *Yeah.* If he had ever -- not just consent but also understood. There was also that element of signs and reciprocity with amongst two consenting adults, like two people who are both interested in one another.

(Wallace Depo. at 101 (emphasis supplied).)

This, by itself, was a material violation because the Policy only permits inquiry into prior sexual history where "there is evidence of a pattern of misconduct." The Investigator admitted during her deposition that the question about prior girlfriends went beyond any permissible inquiry into a "pattern of misconduct." She acknowledged, "the answer as to whether or not he had prior girlfriends is not evidence of sexual misconduct…" (Wallace Depo. at 104.) The Title IX Coordinator explicitly testified that such a broad inquiry into prior girlfriends was not permissible under the Policy:

> Q. So, it would be improper, then, for an investigator to ask about the sexual history of the respondent, unrelated to allegations of misconduct?
> A. I can't answer that question without having the context of a specific scenario. But, in general, I don't think that an investigator would ask about irrelevant sexual history that was consenting with consenting partners.
> Q. So, in other words, you wouldn't ask about how many boyfriends or girlfriends the responding party had?
> A. No.
> Q. And just like for the reporting party, you wouldn't ask about how many boyfriends or girlfriends they had during their time at the college?
> A.  *No, I don't think she would ask that.*

(Guevara Depo. at 80 (emphasis supplied).)

### b.     The Unreliable Evidence Of Prior Misconduct

The Investigator relied on irrelevant and unsubstantiated allegations of prior misconduct involving Witness 8, Witness 10, and Witness 19. The Investigator wrote in her report that John Doe had penetrated the three women's vaginas without their consent; this was part of the reason she

concluded John Doe was not credible when he denied engaging in sexual misconduct with Jane Roe. (Report at 64.)

However, a close review of the evidence provided by these witnesses shows that none actually described any actual misconduct by John Doe. Wallace first investigated an allegation that John Doe had "hooked up" with Witness 8. Wallace investigated the encounter between John Doe and Witness 8 based on the following conclusory and hearsay-filled statement from Jane Roe:

> When asked about the prior incidents that she's aware of involving Respondent and the other females potentially assaulted by Respondent, Reporter explained that Witness 8 told her that Respondent came up to her the Thursday before Halloween of this year (2017) and told her that they had hooked up two years ago. Reporter said Witness 8 had no recollection of that ever happening, as she was so intoxicated the night Respondent said it happened.

(Report at 12.)[11] Wallace claimed that she ultimately did not rely on the information about Witness 8 in reaching her decision because there was no evidence the two engaged in any sexual activity. (Wallace Depo. at 84.) However, Wallace compared John Doe "genuine, sincere" statement about Witness 8 with "how [John Doe] spoke about" Jane Roe to determine that he was not credible. (Report at 64; Wallace Depo at 144.)

Wallace did, however, rely heavily on information about alleged sexual encounters between John Doe and the two other women, "Witness 10" and "Witness 19." None of this information was reliable, and Wallace's conclusion were not supported by her own interviews. In regards to Witness 10, the Investigator suggested that John Doe had engaged in sexual misconduct with Witness 10 even though Witness 10 told the Investigator that she did not recall her encounter with John Doe. The Investigator testified:

> Q  And during her interview, I want to make sure that Witness 10 told you she didn't have any memory of what happened.

---

[11] *Cf. Ferris Bueller's Day Off* (Paramount Pictures, 1986) ("My best friend's sister's boyfriend's brother's girlfriend heard from this guy who knows this kid who's going with the girl who saw Ferris pass out at 31 Flavors last night. I guess it's pretty serious.").

[A] … Yes. She did not know what had happened.

(Wallace Depo. at 139-40 (objection omitted).[12]  In regards to Witness 19, the Investigator relied upon

a report that John Doe had engaged in sexual misconduct with Witness 19, even though Witness 19

*also* told the Investigator that she had not been assaulted by John Doe. The Investigator testified:

> Q  … Witness 19, never actually told you that [she] had been assaulted by John Doe?
> A  That is correct.

(Wallace Depo. at 150.)[13]

This was a breach because the policy does not allow the inclusion of unsubstantiated material

in an investigative report.  The Title IX Coordinator acknowledged:

> Q. Is rumor sufficient to create evidence of a pattern of misconduct?
> A. I don't know how rumor would be evidence. But, rumor, as a Title IX Coordinator,
> sometimes is something that I was required to look into. So, if a rumor became more
> evidentiary because I found information based on looking into what was so-called a
> rumor, then that could become something.
> Q.  What if you didn't find the information , do you still include that in your report?
> A. No, it can't be included in the report.

(Guevara Depo. at 75.)

## C.  Title IX Selective Enforcement

To prevail on a Title IX Selective Enforcement claim, Plaintiff must demonstrate that a

similarly-situated member of the opposite sex was treated more favorably.  *Doe v. Rollins College*, 352

F. Supp. 3d 1205, 1211 (M.D.Fla. 2019)*, citing Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016);

*Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003).  In a selective enforcement claim, a plaintiff

alleges that the decision to initiate proceedings or the penalty imposed was affected by plaintiff's

gender. *Yusuf*, 35 F.3d at 715. In other words, Plaintiff succeeds if he can demonstrate that a person

---

[12] The Report indicates that Witness 8 just "assumed" that she and John Doe had sex, but did not
remember.  (Report at 39-40.)

[13] The Report describes a video that allegedly showed John Doe "fingering" Witness 19 without her
consent.  However, even after watching the video, Witness 19 said, "I look very drunk.  I can't really
tell what's happening under the table and I don't remember."  (Report at 50.)

of the opposite sex was in circumstances sufficiently similar to plaintiff's and was treated more favorably by defendant. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

In this case, Rollins officials failed to initiate disciplinary process with respect to Jane Roe after receiving credible information that Jane Roe, in addition to John Doe, may have violated the sexual-misconduct policy by engaging in sexual activity with John Doe while John Doe was incapacitated due to alcohol. The Title IX Coordinator indicated that a person who is too drunk to drive a car would, under the Rollins Policy, could be considered to be "incapacitated" and, thus, unable to provide consent for sexual activity:

> A. If a person is too drunk to drive, they are too drunk to consent... That is incapacitation. They're incapacitated from doing something they would normally be able to do.

(Guevara Depo. at 59-60.) The Investigator received information that John Doe may have been drunk. (Report at 7; Wallace Depo. at 104.) She was also told by John Doe that Jane Roe initiated sexual activity. (Report at 11; Wallace depo. at 106.) Yet Wallace and Guevara did not conduct any inquiry into this potential violation of the policy by Jane Roe (i.e. initiating sexual activity while John Doe was incapacitated.) Wallace's testimony about his decision is remarkable, in that it exposes the bias of an investigator who could not conceive that a female student would initiate sexual activity:

> Q  Did you go back and ask [Jane Roe], after you received this information from the responding party, what she did to seek and obtain consent?
> A  She didn't initiate anything. There was nothing for her to consent for.
> …
> Q  If you believe her story. His story is that she did initiate some type of sexual activity, right?
> A  That is accurate.
> Q  And, of course, you didn't make a determination about whose story was accurate before you completed your investigation, right?
> [A]  That determination -- the question was did I go back and ask her what kind of consent she sought. No.

(Wallace Depo. at 108-109 (objections omitted).)

Discovery has revealed another comparator where Rollins became aware that a female student may have engaged in sexual activity with a male student who was intoxicated, but the female student did not face an investigation or discipline.. Rollins produced an investigation into an allegation of sexual misconduct completed on March 10, 2016; this is referred to as "Investigation 12.". (Investigation 12 (Exhibit N). Like this case, Investigation No. 12 involved consensual sexual activity that, according to the complainant, became non-consensual during the encounter. And, as in this case, there was evidence that the respondent was too intoxicated to consent to sexual activity. The investigator recorded this summary from the interview of the female reporting party: "Responding Party told Reporting Party that he had a lot of vodka and was very drunk."

Investigation 12 is notable not only because it provides another comparator, but because it further illustrates the selective enforcement inherent in the Rollins process – all apparently based on a belief that males initiate sexual activity and therefore must obtain consent. from embarrassed females The report in Investigation 12 placed all of the burden to obtain consent on the male student. The concluded, for example, that the responding party was too intoxicated to "obtain" consent: "Responding Party was unable to seek and obtain consent due to his level of intoxication." In this way, the report reinforces the archaic view that that women are guardians of virtue and must maintain a certain place in society, while men are inherently sexual predators. *Cf. Rolph v. Hobart & William Smith Colleges,* 271 F. Supp. 3d 386, 402 (W.D.N.Y. 2017) (student alleged gender bias, in part, on the fact that school "panel questioned him extensively about whether he was intoxicated… but failed to question her about whether she appeared intoxicated; this, according to Plaintiff, 'is consistent with a view of men as predators and women as guardians of virtue'").

The decision of the Sixth Circuit in *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018), cited by this Court in denying the Motion to Dismiss, is on-point.[14] *Miami Univ.* involved a situation where a male and a female student had consumed alcohol and then engaged in sexual conduct. The female student later claimed that some of the activity was not consensual. This accusation of sexual misconduct was evaluated by the school, and the male student was found responsible for violating the school's sexual-assault policy. The court observed that during the investigation of whether the male student had committed misconduct, the investigators and administrators had received information that the male student was also intoxicated and, as a result, unable to provide consent to sexual activity. The court found unequal treatment when approved of an equal protection claim in this circumstance:

> [The administrator] knew that [the female student] had potentially violated the University's sexual misconduct provisions at the same time she reviewed the allegations against [the male student]. … [The administrator] chose to pursue disciplinary action against [the male student], but not [the female student]...

882 F.3d at 596.[15] Thus, as in *Miami Univ.*, Rollins "had credible information that both students had potentially violated the University's sexual misconduct policy [but] . . . chose not to pursue disciplinary action against" one of the students. 882 F.3d at 596.

---

[14] Although considered under §1983 because Miami University is a public institution, the analysis of a selective enforcement claim under Title IX in this case is the same; the actionable "unequal treatment" arises out of a school administrator's "failure to initiate the University's disciplinary process with respect to" an alleged victim of the opposite gender "after receiving credible information that [the alleged victim] may have violated the sexual-misconduct policy." 882 F.3d at 597. *See Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("Selective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect."); *United States v. Barnett*, M.D.Fla. No. 2:08-cr-100, 2009 U.S. Dist. LEXIS 127287, at *35 (Jan. 14, 2009) (applying equal protection standards to claims alleging racially selective enforcement); *Thai Meditation Assn. of Alabama v. City of Mobile*, S.D.Ala. No. 1:16-cv-395-TFM-MU, 2019 U.S. Dist. LEXIS 87814, at *30 (May 23, 2019) (selective enforcement analysis for "nondiscrimination and equal protection claims is essentially the same").

[15] Significantly, the Sixth Circuit observed that "the exact alleged sexual misconduct of each student" need not be the same. 882 F3d at 597 ("we have not previously required a plaintiff to allege that the misconduct giving rise to an allegedly discriminatory disciplinary outcome be of the same type and degree"), *citing Heyne*, 655 F.3d at 571 (holding that the plaintiff sufficiently pleaded an equal-protection claim when he alleged that he was punished more harshly for running over another student's foot with

Defendant will likely argue that Plaintiff cannot state a selective enforcement claim because Plaintiff never made a complaint to Rollins.[16] This arguments fails both factually and legally. Factually, the Policy does not require a complaint from an alleged victim for the school to initiate an investigation; the obligations of the school are triggered simply when someone becomes aware of potential sexual misconduct. The Policy provides that faculty and staff "*are required* to report information about any type of sexual misconduct and harassment that they become aware of involving a student." (Policy at 11 (emphasis in original).) This is referred to as "mandatory reporting." The Vice President for Student affairs explained that no 'report' by an alleged victim is necessary:

> Q. …Rollins is a mandatory reporting college?
> A. Yes.
> Q. What does that mean?
> A. It means that we have the responsibility to report when somebody shares an incident or an experience related to what could be -- what could fall – a violation within the Title IX policy.
> Q. So in other words, if someone learns about a potential violation, they have a responsibility to report it?
> A. Yes.
> Q. And they don't need to wait for a student to say, I want to make a report, or anything like that, they have to do it on their own anyway?
> A. If you're in a mandatory reporting role.

---

his vehicle than the other student was for threatening the plaintiff's life because of the different races of the two students).

*Doe v. Case W. Res. Univ.,* N.D.Ohio No. 1:17 CV 414, 2019 U.S. Dist. LEXIS 74520 (May 1, 2019), and *Z.J. v. Vanderbilt Univ.,* 355 F. Supp. 3d 646 (M.D.Tenn. 2018), are inapposite. In *Case W.,* both students were intoxicated but the record suggested that "all of the alleged sexual acts were initiated and performed by" the male student. 2019 U.S. Dist. LEXIS 74520 at *39. Similarly, in *Z.J.* both the male and female students "seem[ed] to agree that it was [the male student] who sought to initiate sexual intercourse." 355 F. Supp. 3d at 678. In contrast, in this case, John Doe alleged that jane Roe initiated some sexual activity.

[16] The Sixth Circuit in *Miami Univ.* emphasized that the equal protection problem arises from the "failure to initiate the University's disciplinary process" and not on whether the either student actually received any discipline. 832 F.3d at 597 (observing that the disciplinary process against the other student "may have led to a finding of not responsible or the imposition of a lesser sanction").

(Accapadi Depo. at 24-25.)  The Title IX Coordinator similarly testified about the mandatory reporting obligations:

> Q. When you say, mandated to report, does that mean, if you become aware of alleged violations, you have to report it to the Title IX office?
> A. Correct.
> Q. …Does the person who receives the information need to receive a formal report, or is it just that they become aware of the potential violation?
> A. If they become aware to any extent, they don't need to -- they don't have training to receive a report, but anybody could become aware of potential misconduct. So, if they become aware of it, they must report it to the Office of Title IX.

(Guevara Depo. at 56.)  This mandatory reporting role includes the Investigator, who testified at her deposition that she would inform the Title IX Coordinator if she discovered any possible sexual misconduct:

> Q  … If you discover allegations of sexual misconduct against someone other than the accused student… what do you do?
> A  I would alert the Title IX coordinator.

(Wallace Depo. at 65-66.)

The Rollins Policy *also*  does not require John Doe, or any other alleged victim, to request an investigation.  Rather, Rollins retains the discretion to initiate an investigation on its own initiative, even in situations where the alleged victim does not desire an investigation.  (Policy at 4.)  The Title IX Coordinator was very clear in her deposition that she had an obligation to investigate *every* allegation of possible misconduct:

> A. …As a Title IX Coordinator, I'm responsible for looking into *every potential matter of sexual misconduct that came to my attention.* Sometimes they became something, many times, and often times, they did not.

(Guevara Depo. at 76 (emphasis supplied).)  A school administrator also admitted that Rollins did not need the approval of John Doe to initiate an investigation into possible misconduct by Jane Roe:

> Q. …your understanding is the school has the discretion to -- even if a victim doesn't want an investigation to go forward, the school can do it on its own?
> A.  Absolutely.

(Weyant Depo. at 31.)

This exact argument was raised and rejected in *Miami Univ.* In reviewing a deliberate indifference Title IX claim, the Sixth Circuit instructed that the focus of the court's inquiry was on the knowledge of individuals at the school, and not on the formality of whether a student actually submitted a formal complaint:

> We require only that "the funding recipient had actual knowledge of the sexual harassment," and not that the plaintiff followed a formal procedure to put the funding recipient on notice. [Plaintiff's] failure to initiate his own complaint against [the alleged victim] for her sexual misconduct has no impact on the actual knowledge of the defendants.

882 F.3d at 591 (6th Cir. 2018). *See also Gischel v. Univ. of Cincinnati,* S.D. Ohio No. 1:17-cv-475, June 26, 2018 Order at 4 (granting reconsideration in part; *Miami Univ.* did not require that a Plaintiff have actually lodged a Complaint in order to state an equal protection or selective enforcement claim).[17]

## CONCLUSION

The Court should enter partial summary judgment on the issue of liability on the Breach of Contract and Title IX selective Enforcement Claims. This matter should be set for a trial to determine damages and any appropriate permanent injunctive relief.

---

[17] *Stenzel v. Peterson*, No. 17-580 (JRT/LIB), 2017 U.S. Dist. LEXIS 148467, at *4-5 (D. Minn. Sept. 13, 2017), suggests that if the accused student did not initiate or attempt to initiate a complaint against his or her accuser, the two cannot be compared. However, this case was decided before the more persuasive opinion in *Miami Univ. Cf. Doe v. Ohio State Univ.,* 323 F. Supp. 3d 962, 967 (S.D.Ohio 2018) ("the Sixth Circuit's decision in *Miami Univ.* suggests that the Court can consider Jane Doe a similarly-situated member of the opposite sex and that John Doe did not have to file a formal complaint against her to be similarly situated").

Respectfully submitted,

/s/ Joshua A. Engel
Carlos J. Burruezo, Esq. (#843458)
carlos@burruezolaw.com
Bertha L. Burruezo, Esq. (#596973)
bertha@burruezolaw.com
941 Lake Baldwin Lane, Suite 102
Orlando, Florida 32814
Office: 407.754.2904
Facsimile: 407.754.2905

JOSHUA ADAM ENGEL (Ohio 0075769)
ANNE TAMASHASKY (Ohio 0064393)
*Special Admission*
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com
tamashasky@engelandmartin.com

## CERTIFICATION OF COUNSEL

Pursuant to Local Rule 3.01(g), the undersigned counsel certifies that before filing this Motion counsel has NOT conferred with counsel for the opposing party in a good faith by email in an effort to resolve the issues raised by the motion and obtain the relief sought without court action. This is a Motion excluded by Local Rule from this requirement.

/s/ Joshua Engel
Joshua Adam Engel (Ohio No. 0075769)
(*pro hac vice*)

## CERTIFICATE OF SERVICE

This certifies that the foregoing was filed electronically on July 26, 2018. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Joshua Engel
Joshua Adam Engel (Ohio No. 0075769)
(*pro hac vice*)

25