UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN DOE,

     Plaintiff,

v.                            CASE NO.: 6:18-cv-01069-Orl-37KRS

ROLLINS COLLEGE,

     Defendant.

_____/

## DEFENDANT ROLLINS COLLEGE'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Rollins College ("Rollins" or the "College"), responds to Plaintiff, John Doe's, Motion for Partial Summary Judgment (Doc. 56) and requests this Court to deny the Motion in its entirety.

### I. Introduction

On August 2, 2019, Rollins filed a Motion for Summary Judgment as to all claims made by Plaintiff.[1]  Because the issues contained in the cross motions for summary judgment are substantially similar, rather than restating its factual background, Rollins incorporates the statement of facts in its Motion for Summary Judgment (Doc. 60).  Accordingly, in this Response, Rollins will cite only facts that it believes Plaintiff has misstated or that require further elaboration based on the arguments made in Plaintiff's Motion.

### II. Background

Notwithstanding Plaintiff's recitation of the history of regulations, policies and purported governmental pressures surrounding the enforcement of Title IX, the undisputed record evidence shows that Rollins' policies and Title IX enforcement were not affected by any alleged pressures. The witnesses deposed by Plaintiff universally testified that they were not aware of any student,

---

[1] (Doc. 60) Defendant's Motion for Summary Judgment.

societal, or governmental pressures impacting Rollins' Title IX policy or its handling of allegations relating to Title IX.[2]  Therefore, Plaintiff's assertions about the history of Title IX and the "pressures" placed on colleges is not relevant to the Court's determination in this case.

### A. Initiation of the Title IX investigation following report by Jane Roe

Although Jane Roe initially reported the nonconsensual sexual encounter with Plaintiff on February 22, 2017, only days after it occurred, she chose not to exercise her right to request an investigation at that time.[3]  Then, in November 2017, Rollins' Campus Safety received an anonymous call stating that there was a "man on campus . . . that had sexually assaulted three women."[4] The caller revealed the man's first name and "mentioned his role in the community," specifically that the man was the president of a fraternity.[5]  Because the name provided was similar to the first name of Plaintiff and Plaintiff was the president of a fraternity, Oriana Jimenez, Rollins' Title IX Coordinator, reached out to Jane Roe to discuss her allegations against Plaintiff and the allegations of the anonymous caller.[6]

While speaking to Jane Roe, Jimenez told her that Rollins received an anonymous phone call and asked if Jane Roe knew who would have made the call.[7]  Jimenez and Jane Roe also discussed whether or not Jane Roe wanted to move forward with an investigation into her February 2017 allegations against Plaintiff.[8] Contrary to Plaintiff's assertion, Jimenez did not "promise" Jane Roe additional interim measures.  Jimenez testified that Jane Roe "inquired about her rights under the [Sexual Misconduct] policy and what [an investigation] would mean. [Jimenez and Jane Roe] talked about additional interim measures, including a no contact

---

[2] April 15, 2019 Deposition of Oriana (Jimenez) Guevara ("Guevara Depo.") at 29-38; April 16, 2019 Deposition of Meghan Harte Weyant ("Weyant Depo.") at 39-41; April 15, 2019 Deposition of Maeghan Rempala ("Rempala Depo.") at 34.
[3] Guevara Depo. at 115-116.
[4] Guevara Depo. at 127.
[5] Guevara Depo. at 127.
[6] Guevara Depo. at 127.
[7] Guevara Depo. at 128.
[8] Guevara Depo. at 128-129.

order . . . ."[9]  Jimenez informed Jane Roe that Rollins would need to look into the issue which would involve contacting the individuals provided by Jane Roe in February 2017 and during the November 2017 conversation.[10]  Jimenez and Jane Roe's conversation ended with Jane Roe choosing to move forward with a Title IX investigation.[11]  Accordingly, the investigation into the allegations against Plaintiff was initiated by Jane Roe in November 2017.

### B.  The Investigation and Investigative Report

Plaintiff asserts that, during the investigation, and in making her decision finding Plaintiff responsible for violations of Rollins' Title IX: Sexual Misconduct and Harassment Policy ("Policy"), "[t]he Investigator . . . took what Jane Roe said at face value."[12]  This statement is incorrect. First, Deena Wallace ("Wallace"), the Title IX Investigator, testified that Jane Roe volunteered the information regarding her academic performance, and she did not verify it because Wallace did not deem the information relevant to her investigation.[13]  Similarly, Wallace testified that Jane Roe's statement that she started to attend more therapy than normal was not something that needed to be corroborated.[14]  Wallace testified that she did take steps to corroborate information that she felt was relevant to her investigation.  By way of example, Jane Roe described various ways the nonconsensual sexual encounter with Plaintiff affected her, which Wallace saw as inconsistent with someone merely regretting an otherwise consensual "hook-up."[15]  Wallace testified that she corroborated and verified the information she relied upon

---

[9] Guevara Depo. at 128.  Plaintiff makes unsubstantiated assertions that Jane Roe had "motive" to falsely accuse Plaintiff to obtain interim measures.  Motion at 8.  However, Jane Roe received interim measures in February 2017, immediately following her initial complaint against Plaintiff.  Moreover, she would have continued to receive interim measures, including academic accommodations, even without initiating an investigation.  *See* Guevara Depo. at 122 ("There is no requirement to investigate before providing students with interim measures").  Plaintiff's allegations of wrongful motive are not supported by record evidence.

[10] Guevara Depo. at 128-129.

[11] Guevara Depo. at 128-129.

[12] Motion at 5.

[13] June 19, 2019 Deposition of Deena Wallace ("Wallace Depo.") at 110.

[14] Wallace Depo. at 111.

[15] Wallace Depo. at 138-139.

in coming to this conclusion by speaking to other witnesses.[16]  Further, even a cursory review of the Final Report reveals that Wallace conducted a thorough investigation, interviewed twenty-two witnesses, gathered evidence and corroborated information obtained through her various interviews, much of which was related to Jane Roe's allegations.[17]

Plaintiff further mischaracterizes the evidence against him relating to his pattern of sexual misconduct.[18]  Plaintiff states that the information obtained by Wallace about Plaintiff's other nonconsensual sexual encounters was untrue and was unsupported by the interviews conducted.[19] To the contrary, as she described in the Final Report, Wallace was able to verify the nonconsensual encounters:

**Witness 8:**
- When interviewed, Witness 8 admitted that she had little memory of the night in question.[20]
- Witness 8 told Wallace that she recalled waking up naked in Plaintiff's room following a night out in which she got "incredibly intoxicated" and ended up throwing up.[21]
- Witness 8 stated that Plaintiff told her that they had "hooked-up" and she was "begging for it."[22]  Witness 12 was present when Plaintiff said this.[23]
- Witness 10 provided Wallace with a text message exchange in which Witness 8 told Witness 10 that she believed she was raped by Plaintiff when she was a sophomore and he had told her so the night before.[24]
- Witness 11 stated that Plaintiff told him that Plaintiff kissed Witness 8 in a bar and admitted to him that Witness 8 was really drunk.[25]
- Witness 11 also told Wallace that he saw Witness 8 when she returned home with Plaintiff from the bar and she was "incredibly drunk."[26]
- Witness 13 confirmed Witness 8's distress at finding out from Plaintiff that something had happened between them and she believed from that conversation that they had nonconsensual sex.[27]
- Finally, Plaintiff admitted that he made out in a bar with Witness 8.[28]

---

[16] Wallace Depo. at 139.
[17] See August 1, 2019 Declaration of Deena Wallace, Exhibit A (hereinafter "Final Report").
[18] Motion at 6-7.
[19] Motion at 7.
[20] Final Report at 36.
[21] Final Report at 34.
[22] Final Report at 35.
[23] Final Report at 43.
[24] Final Report at 41, Exh. P.
[25] Final Report at 42.
[26] Final Report at 42.
[27] Final Report at 44-45.
[28] Final Report at 21-22.

**Witness 10:**

- Witness 8 confirmed that Witness 10 told her that Plaintiff took her to his Semi-Formal; Witness 10 became incredibly drunk; and, when Witness 10 woke up, she was naked and Plaintiff told her they had sex but Witness 10 had no memory of it.[29]
- Witness 10 told Wallace that she has no memory of the Semi-Formal after about an hour into the event but stated that the next thing she remembers "waking up completely naked in [Plaintiff's] bed not having any recollection from the night before."[30]
- That morning, after using the bathroom, Witness 10 noticed bleeding from her vagina and [noticed] that it was painful to the touch.[31]  Witness 10 told Wallace that after noticing the blood and pain in her vagina, she knew Plaintiff had sex with her.[32]
- Witness 10 stated that Plaintiff told her that they went back to his room and had sex, but that he had no idea she was "that drunk" and "didn't realize what was going on."[33]
- Witness 11 stated that Plaintiff told him he had sex with Witness 10.[34]  Further, Witness 17 confirmed that Witness 10 woke up naked in Plaintiff's bed "not knowing what had happened [but she] assumed they had sex and that she was taken advantage of."[35]
- Witness 17 also confirmed that she spoke to Witness 10 that night and corroborates the fact that Witness 10 was so drunk and she was slurring her words to the point of it being difficult to understand what she was saying.[36]
- Plaintiff refused to answer any questions about his version of events that occurred with Witness 10.[37]

**Witness 19:**

- Witness 18 took videos of Plaintiff and Witness 19's encounter at Fiddler's Green and, when she showed the video to Plaintiff, he requested that Witness 18 delete it because "he could get in trouble."[38]
- Witness 18 stated that Witness 19 appeared more intoxicated than Plaintiff at the time of the incident.[39]
- Witness 19 told Wallace it is unlikely she would have consented to Plaintiff fingering her, particularly in a public place, because it is not a sexual act that she typically allowed to be performed on her.[40]
- Witness 19 stated she had no memory of that evening and reviewing the video did not refresh her memory.[41]  It was Plaintiff who confirmed that he kissed and fingered Witness 19 at a bar called Fiddler's Green.[42]
- When asked if he obtained consent to perform these acts, Plaintiff stated that "it just

---

[29] Final Report at 35.
[30] Final Report at 38.
[31] Final Report at 39.
[32] Final Report at 39.
[33] Final Report at 40.
[34] Final Report at 42.
[35] Final Report at 48.
[36] Final Report at 67.
[37] Final Report at 64.
[38] Final Report at 49.
[39] Final Report at 49.
[40] Final Report at 50.
[41] Final Report at 50.
[42] Final Report at 21.

kinda happened."[43]  Upon reviewing the video, Plaintiff further confirmed that it was video of him kissing and fingering Witness 19.[44]

Based on the foregoing, the interviews conducted by Wallace confirm "the common theme is that [Plaintiff] performed sexual acts upon these three women, whose inhibitions were lowered by alcohol, and he assumed consent rather than *obtaining* consent."[45]

### C.  Information obtained by Wallace regarding Plaintiff's level of intoxication

Plaintiff continually argues that Rollins should have unilaterally initiated an investigation into Jane Roe because she allegedly "initiated sexual activity while John Doe was intoxicated."[46] First, it is clear that under Rollins' Policy, simply being intoxicated does not mean that an individual cannot consent to sexual activity.[47] Rollins' Policy specifically states, "Where alcohol is involved, incapacitation is a state beyond drunkenness or intoxication."[48]  More important, Plaintiff testified that he consented to the sexual encounter with Jane Roe.[49]  Further, Plaintiff never complained to Wallace, or anyone else at Rollins, of nonconsensual sexual contact with Jane Roe.[50]  During the investigation, Wallace interviewed Witness 15, Plaintiff's roommate and friend.[51]  Witness 15 saw Plaintiff and Jane Roe immediately prior to their sexual encounter and stated that Plaintiff was "more on the sober side."[52]  Wallace testified that Plaintiff himself told her that he was not incapacitated and she believed that Plaintiff also told her he was not even drunk at the time of the sexual encounter with Jane Roe.[53]  Based on the information she obtained through her investigation, Wallace concluded that "[b]y all accounts, [Plaintiff] was not heavily intoxicated [during the sexual encounter with Jane Roe] . . . ."  It is undisputed that

---

[43] Final Report at 21.
[44] Final Report at 21.
[45] Final Report at 70-71.
[46] Motion at 7.
[47] Guevara Depo. at 59-64; June 20, 2019 Deposition of Meghan Harte Weyant ("Corporate Rep. Depo.") at 73-75.
[48] Final Report at Exh. A, Rollins/Doe-000680.
[49] February 19, 2019 Deposition of John Doe ("John Doe Depo.") at 113.
[50] Wallace Depo. at 106-109.
[51] Final Report at 45-46; 69.
[52] Final Report at 46.
[53] Wallace Depo. at 105.

Plaintiff never made any allegations of nonconsensual sexual activity with Jane Roe until this litigation.

## III.  Memorandum of Law

### A.  Rollins did not breach any alleged contract with Plaintiff

The parties agree that Florida law governs Plaintiff's breach of contract claim.[54] The relationship between a student and a private educational institution is solely contractual in nature. *Stetson Univ. v. Hunt*, 102 So. 637 (Fla. 1925); *Sharick v. Southeastern Univ. of Health Scis., Inc.,* 780 So. 2d 136 (Fla. 3d DCA 2000).   The educational institution "may set forth the terms under which it will admit and subsequently . . . students who subject themselves to the rules, regulations, and regimen of the [school]." *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 929 (11th Cir. 2013).   These terms are generally derived from the school's publications at the time of enrollment, such as the student handbook. *See id.* at \*4; *see also Sharick*, 780 So. 2d at 138.[55]

"A private university has broad discretion in what rules and regulations it shall issue and how it enforces its rules." *McCawley v. Universidad Carlos Albizu, Inc.*, 461 F. Supp. 2d 1251, 1257 (S.D. Fla. 2006).   Due to the unique nature of the private institution-student implied-in-fact contract, the courts adhere to a "deferential standard" that courts will not "interfere with a private university's enforcement of its regulations" in material breach of its implied-in-fact contract unless "the university has acted [1] arbitrarily and capriciously, [2] in violation of a constitution or statute, or [3] for fraudulent purposes." *Sirpal*, 509 F. App'x at 929.   "This standard applies with respect to disciplinary decisions." *Sirpal v. Univ. of Miami*, No. 09-22662-CIV, 2011 WL 3101791 at \*14 (S.D. Fla. July 25, 2011); *see also McCawley v. Universidad Carlos Albizu, Inc.*, 461 F. Supp. 2d 1251, 1257 (S.D. Fla. 2006) (The only way for a plaintiff to "defeat" the actions

---

[54] Motion at 9.

[55] For purposes of this Response, Rollins does not dispute whether the publications relied upon by Plaintiff are the terms of the parties' implied-in-fact contract.   Instead, Rollins assumes its Policy contains the terms of the parties' contract and responds only to Plaintiff's assertion that Rollins breached those terms.

of a college or university . . . "is to show the actions of the [college or] [u]niversity were arbitrary and capricious."). "As long as the actions of [a college or university] have a rational basis, founded on reason and fact, and are not shown to be the product of bias or prejudice, they cannot be considered to be arbitrary or capricious." *McCawley*, 461 F. Supp. 2d at 1258.

### B. The relevant portions of Rollins' Policy

Plaintiff first claims that because the Title IX process took more than 60-days, Rollins breached a contract with Plaintiff. Rollins' Policy states in relevant part,

> The College will respond promptly and equitably when any incident of sexual misconduct or harassment is alleged against a faculty, staff, or student. Typically, the process will be completed within 60 days. This timeframe may be extended only for good cause. If good cause exists to extend the timeframe, both the reporting party and the responding party will be notified in writing of the extension and the reason for the extension. This includes a direct complaint or if the College becomes aware of the situation by other reliable means. The College's response may take a number of forms within its discretion. This includes offering reasonable protection and services to the complainant or others, conducting a Title IX inquiry or review, conducting an investigation, and imposing corrective action.[56]

Plaintiff ignores other relevant, key portions of the Policy that specifically give the College discretion in initiating an investigation when a Reporting Party requests that Rollins not pursue an investigation. Rollins' Policy states,

> Where the College has received a report of sexual misconduct or harassment but the reporting party requests that he or she remain confidential and/or requests that the College not pursue an investigation, the College must balance this request with its responsibility to provide a safe and non-discriminatory environment for all members of the Rollins community. The College is required to take all reasonable steps to investigate and respond to a complaint, but its ability to do so may be limited by the reporting party's request. However, under compelling circumstances, including: evidence of a pattern of repetitive behavior, the use of force or threat of force, or the use of a weapon by the responding party, the College may conduct further investigation, or take other appropriate measures without the reporting party's consent . . . .[57]

Similarly, in arguing that Wallace improperly considered Plaintiff's prior sexual history, Plaintiff omits a relevant and key portion of the Policy section. The Policy states,

---

[56] Final Report at Exhibit A, Rollins/Doe-00686.
[57] Final Report at Exhibit A, Rollins/Doe-000676.

> <u>During the investigation process, the Title IX Investigator will determine whether information concerning the prior sexual history of either party is relevant.</u> In general, in a case where the responding party raises consent as a defense, any prior consensual relationship between the parties may be relevant. Any other prior sexual history of the reporting party is typically not relevant and may not be permitted. Prior sexual history of the responding party may be relevant where there is evidence of a pattern of misconduct that may be relevant in the determination of responsibility assigning of corrective action.[58]

Finally, in his Motion, Plaintiff argues that Rollins *ipso facto* acted in an arbitrary and capricious manner because this portion of Rollins' Policy is "rules without standards."[59] However, the Policy states that it is within the discretion of the investigator to determine whether information concerning prior sexual history is relevant but provides guidance to the investigator in exercising this discretion by explaining when such information may be relevant.[60]

### C. Rollins' complied with the procedure set forth by its Policy

#### 1. Rollins did not breach any contract with Plaintiff by choosing not to investigate Jane Roe's allegations in February 2017

In his Motion, Plaintiff argues that Rollins breached the contract between the parties by failing to investigate Jane Roe's allegations when they were first raised in February 2017.[61] The Policy does not require that Rollins perform a formal investigation into every allegation brought to the College's attention. Instead, the plain language of the Policy provides that, despite Rollins being required to take reasonable steps to investigate and respond to a complaint, this requirement may be limited by the reporting party's request not to pursue an investigation.[62] Those were the circumstances here.

It is undisputed that when Jane Roe initially reported the allegations of nonconsensual sexual activity with Plaintiff in February 2017, she unequivocally requested that Rollins not

---

[58] Final Report at Exhibit A, Rollins/Doe-000686 (emphasis added).
[59] Motion at 14-15, n. 10.
[60] Final Report at Exhibit A, Rollins/Doe-000686.
[61] Motion at 11.
[62] Final Report at Exhibit A, Rollins/Doe-00676.

initiate an investigation.[63]  Jimenez testified that, at that time of Jane Roe's initial report, Rollins did not have enough information for it to exercise its discretion to perform an investigation without Jane Roe's consent.[64]  Jimenez testified that Rollins only exercises its discretion to initiate a formal investigation in "compelling circumstances," such as when the College receives reports of a repetitive pattern of misconduct, an assault that was violent in nature or an assault involving a weapon.[65]  Here, despite the fact that Jane Roe reported claims of Plaintiff sexually assaulting others, Jimenez testified that because she did not have a formal report of the other alleged sexual assaults and the other victim had already graduated, the claims could not be corroborated.[66] Consequently, Rollins did not initiate a Title IX investigation in February 2017.

Rollins' Policy leaves it to the discretion of Rollins to decide if it will unilaterally investigate sexual misconduct allegations when a reporting individual requests no investigation. Because the initiation of a unilateral investigation is within the discretion of Rollins, Plaintiff's breach of contract claim fails.  *See Burger King Corp. v. Hinton, Inc.*, 203 F. Supp. 2d 1357, 1362 (S.D. Fla. 2002) (where a party maintains the sole reasonable discretion to perform under an agreement, a breach of contract claims fails). Further, it is clear from the foregoing that Rollins' decision not to initiate the investigation was not arbitrary or capricious and did not violate Title IX.  Plaintiff's claim fails for these reasons as well.  *Sirpal v. Univ. of Miami*, No. 09-22662-CIV, 2011 WL 3101791, at *16 (S.D. Fla. July 25, 2011), *aff'd*, 509 F. App'x 924 (11th Cir. 2013) (granting summary judgment on breach of contract claim where the plaintiff offered no evidence that the university's actions were arbitrary or capricious).

### 2. Rollins had good cause to issue the Final Report more than 60-days after the investigation commenced

---

[63] Guevara Depo. at 116.
[64] Guevara Depo. at 116-117.  While Jimenez did not initiate a formal investigation, Jimenez testified that, at the time, Jimenez requested that Jane Roe provide Rollins with a statement, documentation of the incident, and any text messages or other documentation she had regarding her allegations.  Guevara Depo. at 119.
[65] Guevara Depo. at 116-117; see also Final Report at Exhibit A, Rollins/Doe-00686.
[66] Guevara Depo. at 116-117.

At Jane Roe's request, Rollins initiated a formal investigation into the allegations against Plaintiff in November 2017.[67]  The undisputed evidence shows that the actual investigation concluded on December 12, 2017.[68]  December 12, 2017 was the last date that Wallace received any evidence related to the allegations involving Plaintiff and Jane Roe, therefore the investigation was completed on that date.[69]  The task that took longer than 60-days was the preparation of the Final Report.[70]  The delay in finalizing the Final Report was because Wallace suffered from significant health problems that resulted in a lengthy in-patient hospital stay.[71]  Wallace completed the draft of the Final Report on or about February 12, 2018, while she was hospitalized.[72]  Plaintiff received official notice of the Investigator's findings on March 5, 2018.[73]  Plaintiff appealed on March 17, 2018, submitted supplemental information on March 21, 2018, and received an appeal decision on April 12, 2018.[74]

Rollins' Policy states that while "[t]ypically, the process will be completed within 60 days, this timeframe may be extended only for good cause."  The term "good cause" is not defined by the Policy.  "It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Mariposa Assocs., Ltd. v. Regions Bank*, No. 13-23838-CIV, 2015 WL 1478652, at *6 (S.D. Fla. Mar. 31, 2015).  Rollins' witnesses testified that good cause to extend the Title IX process could include illness, a very large number of witnesses, hospitalization, or if a party could not

---

[67] Guevara Depo. at 128-129.
[68] Final Report at 1.
[69] Wallace Depo. at 92.
[70] Wallace Depo. at 156; Guevara Depo. at 145. On January 23, 2018, 64 days after Plaintiff was notified of the Title IX investigation, Rollins informed Plaintiff that the investigation would not be completed in the 60-day time period. The Policy only requires that the parties be notified in writing of the extension and the reason for the extension. There is no requirement that the parties be notified prior to the expiration of the 60-days.  Here, Plaintiff was notified in writing that the report was not finalized because Wallace was "in and out of the hospital with a major medical concern."  Rollins complied with the notification requirements of the Policy.  Motion at Exhibit K.
[71] Wallace Depo. at 156.
[72] Wallace Depo. at 157.
[73] John Doe Depo. at Exh. 14.
[74] John Doe Depo. at 82-83; April 16, 2019 Deposition of Mamta Accapadi ("Accapadi Depo.") at Exh. 52.

participate in the investigation process.[75]    Here, Wallace was hospitalized from December 22, 2017 (prior to the "expiration" of the 60-days) until March 19, 2018.[76]    Despite being hospitalized, Wallace nevertheless completed the Final Report and Plaintiff was informed of the outcome on March 5, 2019, prior to Wallace's release from the hospital.[77]    Under any definition, a three month hospital stay constitutes good cause to extend the 60-day timeframe.   Because Rollins had good cause to extend the process and because there is no evidence that the decision to do so was arbitrary, capricious or in violation of Title IX, Plaintiff's claim for breach of contract for alleged violation of the 60-day portion of the Policy fails and summary judgment should be granted in Rollins' favor.  *See Doe v. Case W. Reserve Univ.*, No. 1:17 CV 414, 2019 WL 1982266, at *8, 11 (N.D. Ohio May 1, 2019) (holding plaintiff's claim for breach of contract failed where it took the university 90 days to complete the investigation because the policy did not require completion in 60 days but merely stated the university generally attempts to resolve complaints from filing to determining within 60 days); *Sirpal v. Univ. of Miami*, No. 09-22662-CIV, 2011 WL 3101791, at *16 (S.D. Fla. July 25, 2011).

### 3.  Any alleged breach of the 60-day requirement by Rollins is not material

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish . . . a material breach of that contract . . . and damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (internal citations omitted).   "To establish a material breach, the party alleged to have breached the contract must have failed to perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties."  *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015).   "[T]rivial noncompliance and minor failings do not constitute material breaches." *Id.*  A material breach

---

[75] Guevara Depo. at 66; Accapadi Depo. at 28.
[76] Wallace Depo. at 156.
[77] Wallace Depo. at 156, John Doe Depo. at Exh. 14.

occurs only when an injured party has sustained a substantial injury due to the breach. *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1342–43 (M.D. Fla. 2006). Any breach alleged by Plaintiff for the extension of the Title IX process beyond 60-days is not material. Plaintiff argues that the breach is material because "time is of the essence" to ensure Rollins' obtains reliable and accurate information.[78] However, there is no evidence that the short delay resulted in "faded memories" or other evidentiary issues. In fact, Wallace completed the evidence gathering stage of the investigation prior to the 60-day deadline.[79] Finally, Plaintiff suffered no damages due to the alleged breach. To the contrary, as a result of the delay, Plaintiff was able to successfully graduate in December 2017.[80] Because Plaintiff's dismissal became effective in Spring 2018, after Plaintiff's graduation, the sanction did not impact Plaintiff's undergraduate degree.[81] Accordingly, not only was there no damage or breach as a result of the delay, it was actually beneficial to Plaintiff.

### 4. Wallace's questions about whether Plaintiff had girlfriends was not in violation of Rollins' Policy and, therefore, no breach of contract occurred

In contending Wallace's inquiry into whether Plaintiff had prior girlfriends was a breach of contract, Plaintiff relies on the Policy and the Responding Party Bill of Rights.[82] The crux of Plaintiff's argument is that questions regarding Plaintiff's prior relationship status were irrelevant and could not be considered by Wallace under the Policy.[83] First, in requesting information about prior girlfriends, Wallace was not asking questions about Plaintiff's prior sexual history.[84] Instead, Wallace asked about having any serious girlfriends to determine if

---

[78] Motion at 13.
[79] Wallace Depo. at 92.
[80] John Doe Depo. at 14.
[81] Accapadi Depo. at Exh. 52.
[82] Motion at 14.
[83] Motion at 15-16.
[84] Wallace Depo. at 96.

Plaintiff was able to understand consent.[85]  Wallace asked this question because she was told by
multiple witnesses that Plaintiff would effectively blur friendships and romantic interest and
Plaintiff continually stated that Jane Roe gave him "signals" or "signs."[86]  Wallace testified that
whether Plaintiff had a history of serious, consensual relationships would have impacted the
believability of information from other witnesses.[87]  Accordingly, Wallace was not inquiring into
the sexual history of Plaintiff when asking about past girlfriends, and her reasons for requesting
such information were relevant to her determinations of credibility and believability of the
evidence provided during the investigation.  Moreover, the Policy grants the investigator full
discretion to "determine whether information concerning prior sexual history of either party is
relevant."[88] Here, Wallace determined that, in the context of this case, whether Plaintiff had prior
consensual, romantic relationships was relevant.  The Policy puts this determination squarely
within the discretion of Wallace, therefore, there is no breach.[89]

In addition, Plaintiff has not shown that Wallace's reasoning for this inquiry was arbitrary
or capricious.  Wallace testified that whether Plaintiff had a girlfriend was one way she was able
to determine whether Plaintiff understood consent as defined by Rollins' Policy.[90]  Wallace
explained,

> And one way for me to determine whether or not he had a concept of what
> consent is . . . was to see if he had experienced a serious relationship in his history
> at Rollins to be able to give him some sort of context. That is not a clear-cut way
> of determining whether or not he understood consent, but it was just one question
> that I was able to ask that would shed some light on it.[91]
>                                        * * * * *
> [T]hat question is aimed at trying to determine . . . what experience does
> [Plaintiff] have with knowing and understanding the reciprocity of relationships

---

[85] Wallace Depo. at 95-103.
[86] Wallace Depo. at 99-102.
[87] Wallace Depo. at 103.
[88] Final Report at Exhibit A, Rollins/Doe-000686.
[89] Wallace Depo. at 104 stating, "[T]he policy also allows for the investigator to take [prior sexual history] into consideration where the investigator believes it to be relevant."
[90] Wallace Depo. at 96-97.
[91] Wallace Depo. at 97.  *See also* Wallace Depo. at 99-100.

when somebody is interested in you and that interest is reciprocated and consent within that context.[92]

Because Wallace had a "rational basis, founded on reason and fact" her actions cannot be considered arbitrary or capricious and Plaintiff's claim fails. *See McCawley v. Universidad Carlos Albizu, Inc.*, 461 F. Supp. 2d 1251, 1258 (S.D. Fla. 2006).

### 5. Rollins did not breach a contract with Plaintiff when it concluded that his nonconsensual, sexual interactions with female friends constituted a pattern of behavior under the Policy

Rollins' Policy states "the Title IX Investigator will determine whether information concerning the prior sexual history of either party is relevant."[93] It further provides, "[p]rior sexual history of the responding party may be relevant where there is evidence of a pattern of misconduct that may be relevant in the determination of responsibility . . . ."[94] Plaintiff argues that Wallace "relied on irrelevant and unsubstantiated allegations of prior misconduct" involving other individuals.[95] Plaintiff further argues that the consideration of the other incidents of sexual assault "was a breach because the policy does not allow the inclusion of unsubstantiated material in an investigative report."[96]

While the Policy provides guidance to the investigator regarding consideration of prior sexual history of both parties, the Policy does not dictate what information may be considered by the investigator and included in the report. Instead, the Policy states "[a]t the conclusion of the investigation, the investigator will determine responsibility based on the relevant information presented during the investigation and the unique facts of the case."[97] The plain language of the Policy provides clear discretion to the investigator in that regard.[98]

---

[92] Wallace Depo. at 100. *See also* Wallace Depo. at 101-102.
[93] Final Report at Exhibit A, Rollins/Doe-000686.
[94] Final Report at Exhibit A, Rollins/Doe-000686.
[95] Motion at 16.
[96] Motion at 18.
[97] Final Report at Exhibit A, Rollins/Doe-000686.
[98] Final Report at Exhibit A, Rollins/Doe-000686.

Here, Jane Roe informed Wallace about prior incidents in which Plaintiff may have sexually assaulted other individuals.[99] Wallace then investigated the allegations by interviewing the alleged victims as well as interviewing other individuals to determine if any corroborating evidence existed.[100]  Wallace concluded that Witness 8's allegations of rape were credible, but not reliable, and therefore did not consider that specific testimony in her determination.[101] However, Plaintiff admitted to kissing Witness 8 and Wallace found that the evidence from other reliable witnesses suggested that Plaintiff "made out" with Witness 8 while she was in an incapacitated state as opposed to having sex with her like Witness 8 believed.[102]

As to Witness 10 and Witness 19, contrary to Plaintiff's assertion, the information relied upon by Wallace was substantiated.  First, Plaintiff admitted that he kissed and fingered Witness 19 in the bar, which was reflected on the video provided by Witness 18.[103]  Further, Plaintiff admitted that he did not obtain consent to do so and stated instead that "it just kinda happened."[104] Finally, Witness 19 stated that she was so intoxicated, she had no memory of that evening.[105]  Plaintiff refused to respond to questions regarding the sexual assault of Witness 10.[106]  However, other witnesses reported that Plaintiff stated he had sex with Witness 10.[107] Witness 10 did not have any memory of that evening because she was so intoxicated that she was incapacitated.[108]  Wallace concluded that this information was relevant and that "the common theme is that Respondent performed sexual acts upon three women, whose inhibitions were lowered by alcohol, and he assumed consent rather than obtaining consent."[109]  Pursuant to the

---

[99] Final Report at 12.
[100] See Final Report.
[101] Final Report at 67.
[102] Final Report at 64.
[103] Final Report at 21.
[104] Final Report at 21.
[105] Final Report at 50.
[106] Final Report at 64.
[107] Final Report at 40.
[108] Final Report at 40; 48; 64.
[109] Final Report at 71.

Policy, this determination is within the purview of the investigator – particularly when there is "evidence of a pattern of misconduct that may be relevant in the determination of responsibility."[110]

Wallace's discussion with Plaintiff regarding the allegations related to Witness 8 also factored into her determination of Plaintiff's credibility.[111] This is because "the manner in which [Plaintiff] spoke about Witness 8 was vastly different than the hesitant, nervous manner in which he spoke about the incident with [Jane Roe] . . . [g]iven the opportunity to compare a genuine, sincere statement [about Witness 8] with how [Plaintiff] spoke about [Jane Roe], further convinces this Investigator that [Plaintiff's] statements regarding [Jane Roe's] actions during the incident are not credible."[112] Credibility determinations are left to the discretion of the investigator.[113] Because the plain language of the Policy leaves the determination of what information is relevant, whether there is a pattern, and credibility to the investigator, Rollins followed the Policy with regard to its investigation into the allegations against Plaintiff. Finally, the foregoing demonstrates that Wallace's decision was not arbitrary or capricious. As a result, there is no breach of contract and Plaintiff's claim fails.

### D. There is no evidence of selective enforcement, so Plaintiff's Motion should be denied and summary judgment should be granted in Rollins' favor[114]

To prove selective enforcement under *Yusuf*, Plaintiff must show that "a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *See Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003) ("To support a selective enforcement claim," the male

---

[110] Final Report at Exh. A, Rollins/Doe-000686.
[111] Final Report at 64.
[112] Final Report at 64.
[113] Guevara Depo. at 20; Wallace Depo. at 72.
[114] As Rollins argues in its Motion for Summary Judgment (Doc. 60) the appropriate framework for analyzing Title IX gender discrimination claims is the *McDonnell Douglas* standard. However, for purposes of this Response, Rollins addresses the selective enforcement claim in response to Plaintiff's argument. Regardless, both require Plaintiff demonstrate a similarly situated individual was treated differently and Plaintiff is unable to do so.

plaintiff must allege "that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University"). The Eleventh Circuit has set forth the standard for comparators stating a plaintiff must show that the alleged comparator is "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019). This means that, ordinarily, a comparator (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "will have been subject to the same . . . policy, guidelines, or rule as the plaintiff"; (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; (4) "will share the plaintiff's . . . disciplinary history." *Id.* at 1227. In other words, "a plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished. *Id.*

Plaintiff argues that Jane Roe is a comparator and Rollins should have investigated whether Plaintiff consented to the sexual encounter with Jane Roe because Plaintiff was intoxicated at the time it occurred. Plaintiff further argues that "mandatory reporting" obligated Wallace and Rollins administrators to report a sexual misconduct violation on Plaintiff's behalf and investigate whether Plaintiff was able to consent to sexual activities. Plaintiff's argument is unavailing. As discussed, Rollins had discretion to unilaterally initiate an investigation but only exercises that discretion in limited circumstances.[115] Moreover, there was no evidence that Plaintiff was so intoxicated that he was unable to consent, triggering any alleged mandatory reporting requirement. To the contrary, the evidence is clear that Plaintiff consented to the entire encounter and was "more on the sober side" at the time it occurred.[116]

Further, Courts have recently rejected Plaintiff's argument that a selective enforcement claim can be based on nothing more than the fact that both parties were intoxicated at the time of the alleged conduct. On August 6, 2019, the First Circuit affirmed summary judgment for the

---

[115] Final Report at Exhibit A, Rollins/Doe-00676; Guevara Depo. at 116-117.
[116] Final Report at 46; John Doe Depo. at 113.

defendant in a selective enforcement Title IX claim, finding the reporter and the plaintiff were not similarly situated. *Haidak v. Univ. of Massachusetts-Amherst*, No. 18-1248, 2019 WL 3561802, at *12-13. The First Circuit found that the reporter initiated the charges to seek relief while the plaintiff's accusations came "second in time and arose only defensively." *Id.* at 13. Other courts have held that where "the accused student did not similarly initiate or attempt to initiate a complaint against his or her accuser, the two cannot be compared." *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 933 (S.D. Iowa 2018); *see also Doe v. Ohio State Univ.*, 323 F. Supp. 3d 962, 967-68 (S.D. Ohio 2018); *Doe v. Case W. Reserve Univ.*, No. 1:17 CV 414, 2019 WL 1982266, at *13 (N.D. Ohio May 2, 2019) (holding that plaintiff's selective enforcement claim failed as a matter of law because the reporter was not similarly situated where the only allegations were that both students were intoxicated and the university did not perform an investigation); *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 972 (S.D. Ohio 2018) (holding that plaintiff and the reporter were not comparators because the plaintiff did not complain about unwelcome touching at any point before the litigation); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 678 (M.D. Tenn. 2018) (finding the plaintiff's argument that he was similarly situated to the alleged victim merely by virtue of having been intoxicated to be "wholly insufficient.").[117]

Plaintiff argues that Case 12 provides "another comparator" but it is difficult to determine if Plaintiff claims that the reporting party or responding party is the alleged comparator.[118] To the extent Plaintiff asserts that the responding party is a comparator, Plaintiff's claim fails. In order to be a comparator, Plaintiff must identify a similarly situated female. *See Sheppard v.*

---

[117] Plaintiff urges the Court to apply the analysis *Doe v. Miami Univ.*, 882 F. 3d 579 (6th Cir. 2018) to this case even though that case was decided on an equal protection claim at the motion to dismiss stage. "As the Supreme Court has cautioned, the standards for pleading and proving [Title IX and Equal Protection claims] vary in certain, and sometimes important, respects." *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 598 (N.D.N.Y. 2016) (*citing Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009)).

[118] Motion at 1.

*Visitors of Virginia State Univ.*, 3:18-CV-723-HEH, 2019 WL 1869856, at *5 (E.D. Va. Apr. 25, 2019) ("stating Plaintiff has failed to identify a similarly situated female student."); *Doe v. Univ. of Dayton*, 766 F. App'x 275, 284 (6th Cir. 2019) ("[The] plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably.").

Likewise, Case 12's reporting party and Plaintiff are not similarly situated.[119] First, the investigator in Case 12 was Jessica Narducci, not Wallace.[120] Moreover, investigation focused on allegations of Intimate Partner Violence under the Policy.[121] Case 12's reporter made a formal complaint for violations of Rollins' Policy to the Title IX Coordinator, Plaintiff did not.[122] Plaintiff continues to improperly assert that, simply because he now claims he was intoxicated during the sexual encounter, Rollins was required to initiate a Title IX investigation even where there was no allegation of lack of consent from the responding party. *See Haidak v. Univ. of Massachusetts-Amherst*, No. 18-1248, 2019 WL 3561802, at *12-13.[123] Because Plaintiff cannot show a similarly situated female student who was treated more favorably, Plaintiff's Motion should be denied.

## IV.  Conclusion

Plaintiff's Motion should be denied in its entirety and summary judgment should be granted in favor of Rollins College on all of Plaintiff's claims.


Dated this 21st day of August, 2019.

---

[119] Motion at Exhibit N, p. 1-2.
[120] Motion at Exhibit N, p. 3.
[121] Motion at Exhibit N, p. 3.
[122] Motion at Exhibit N, p. 2.
[123] Plaintiff finds fault with Case 12's investigator, because she concluded that the "Responding Party was unable to seek and obtain consent due to his level of intoxication." Plaintiff asserts this is evidence of sex discrimination because it puts the burden to obtain consent on the male student. Motion at 20. However, there are no allegations that Case 12's reporting party performed any acts on the responding party that were not consensual. *See* Motion at Exhibit N. To the contrary, it is only Case 12's reporting party who claimed any lack of consent to any part of the sexual encounter. Accordingly, there was no reason for the investigator to investigate consent on the part of the respondent in Case 12. *See* Motion at Exhibit N.

Respectfully submitted,

ALEXANDER DEGANCE BARNETT, P.A.

By: _____

Mark G. Alexander
Florida Bar No. 434078
E-mail: mark.alexander@adblegal.com
Kelly DeGance
Florida Bar No. 0606022
E-mail: kelly.degance@adblegal.com
Samantha Giudici
Florida Bar No. 0058667
E-mail: samantha.giudici@adblegal.com
E-mail: mailbox@adblegal.com
1500 Riverside Avenue
Jacksonville, FL 32204
(904) 345-3277 Telephone
(904) 345-3294 Facsimile
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of this filing to: Joshua Adam Engel and Anne Tamashasky, Engel and Martin, LLC, 4660 Duke Drive, Ste 101, Mason, Ohio 45040 (engel@engelandmartin.com) and Bertha L. Burruezo and Carlos J. Burruezo, 941 Lake Baldwin Lane, Orlando, Florida 3281-6438 (bertha@burruezolaw.com; carlos@burruezolaw.com).

_____
ATTORNEY