# SUPPLEMENTAL EXPERT RESPONSE

## *Doe v. Rollins College*
## Case No. 6:18-cv-01069

## July 31, 2019

**By: Professor Peter F. Lake**

**CONFIDENTIAL**

# INDEX OF DOCUMENTS
# REVIEWED BY
# PROFESSOR PETER F. LAKE

## <u>Items Provided by Defense Counsel</u>

- Deena Wallace Deposition Transcript from June 19, 2019 and Exhibits.
- Deena Wallace [on behalf of Rollins College], *Investigative Report in the Matter of Daniel Sang ("Responding" Party) and Jane Roe ("Reporting Party")*, (Dec. 12, 2017).
- Defendant's Second Supplemental Response to Plaintiff's First Set of Interrogatories dated May 3, 2019 and Case Files No. 1 – 12.
- KC Johnson,  Expert Report *Re: Doe v. Rollins College, Case No. 6:18-cv-01069* dated February 28, 2019.
- KC Johnson, Supplemental Expert Report *Re: Doe v. Rollins College, Case No. 6:18-cv-01069* dated July 5, 2019 (includes KC Johnson Curriculum Vitae).
- Oriana Jimenez (Guevara) Deposition Transcript from April 15, 2019.
- Rollins College, *Title IX: Sexual Misconduct and Harassment Policy* (January 2015) (*Rollins/Doe* 000686).

## <u>Other Items Reviewed by Professor Lake</u>

- Daigle, Leah & Fisher, Bonnie & T Cullen, Francis. (2008). *The Violent and Sexual Victimization of College Women: Is Repeat Victimization a Problem?* Journal of Interpersonal Violence. 23. 1296-313. 10.1177/0886260508314293.
- *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).
- *Doe v. Allee*, 30 Cal.App.5th 1036 (2019).
- *Doe v. Ohio State Univ.*, 311 F.Supp.3d 881 (2018).
- *Doe v. Purdue University*, No. 17-3565 (7th Cir. 2019), https://law.justia.com/cases/federal/appellate-courts/ca7/17-3565/17-3565-2019-06-28.html.
- Florida Supreme Court, *3.9 Weighing the Evidence* (2013), *available at* https://www.floridasupremecourt.org/content/download/244032/2149025/p1c3s3.9.rtf.
- Foubert, J.D., Clark-Taylor, A., & Wall, A. (2019).  "Is campus rape primarily a serial or single time problem? Evidence from a multi-campus study."  Violence Against Women. DOI: 10.1177/1077801219833820.
- *Goss v. Lopez*, 419 U.S. 565 (1975).
- Hierophant Enterprises, Inc., *Observations and Suggestions from Rollins Visits in 2014 and 2017.*

1

- KC Johnson, *A Federal Court Takes on Title IX*, Minding the Campus (July 24, 2019), available at https://www.mindingthecampus.org/2019/07/24/a-federal-court-takes-on-title-ix/.
- KC Johnson & Stuart Taylor, *The Title IX Training Travesty*, Washington Examiner (Nov. 10, 2017), https://www.washingtonexaminer.com/weekly-standard/the-title-ix-training-travesty.
- Krebs, et al (2016). Campus Climate Survey Validation Study: Final Technical Report. Retrieved from the Bureau of Justice Statistics: https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf.
- Legal Dictionary, *Preponderance of Evidence*, https://legaldictionary.net/preponderance-of-evidence/ (last accessed July 23, 2019).
- Peter Lake, *Expert Response: Doe v. Rollins College, Case No. 6:18-cv-01069* (March 29, 2019).
- Peter Lake, *The Four Corners of Title IX Regulatory Compliance: A Primer for American Colleges and Universities* (Hierophant Enterprises, Inc. 2017).
- Rollins Honor Code, Code of Community Standards: A Commitment to Honesty, *available at* https://www.rollins.edu/honor-code/code-of-community-standards/index.html (last accessed July 28, 2019).
- *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774 (2015).
- U.S. Department of Education Office for Civil Rights, *Title IX Resource Guide* (April 2015).
- Wetherill, R. and Fromme, K., *Alcohol-Induced Blackouts: A Review of Recent Clinical Research with Practical Implications and Recommendations for Future Studies*, Alcohol Clin Exp Res. 2016 May; 40(5): 922–935. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4844761/pdf/nihms762300.pdf.
- White House Council on Women and Girls, *Rape and Sexual Assault: A Renewed Call to Action* (January 2014).
- White House Task Force to Protect Students from Sexual Assault*, Not Alone* (April 2014).

_____

## Overview

In my Expert Response dated March 29, 2019, I reserved the right to supplement my response based upon new information or additional opinions offered by plaintiff's expert. I have received a supplemental expert disclosure by Professor KC Johnson dated July 5, 2019, served via email to defense counsel, Mark Alexander, on the same day. I have also since been deposed on July 3, 2019 and had the opportunity to review additional materials listed above.

I offer this supplemental expert response in light of these materials, and in response to KC Johnson's Supplemental Expert Report dated July 5, 2019 (Johnson Supplement).

I note that I reaffirm (and supplement in this report) the opinions in my Expert Response dated March 29, 2019. Here I restate my original opinions, which I have not altered in this report in response to the Johnson Supplement:

> I do not share Professor Johnson's concerns about thoroughness and factual accuracy, procedural fairness, training and trauma, and gender bias in training. Instead, I observed evidence of a prompt, equitable and impartial resolution of a contested matter on campus. I express my concerns about the potential for opening the floodgates of federal court litigation regarding contested Title IX matters on private college campuses simply because an impacted individual disagrees with a final resolution and/or because an impacted individual merely raises the possibility of bias (which, as my report indicates, I do not detect here). I do not observe any basis for the claim that there was an erroneous outcome in this matter; and I do not believe it is fair to ask a private college, acting in good faith in Title IX compliance efforts, to be called to account under public law "due process" standards articulated in other jurisdictions *after* relevant events in this matter—particularly regarding procedures that Rollins College was guided *not* to use by federal regulators.   Private colleges are not courts—particularly quasi-criminal courts. Title IX exists to combat sex discrimination, and not to create such courts on private college campuses under the supervision of federal courts.[1]

The Johnson Supplement addresses the following topics, which appear to connect to the opinions he offered in his initial report, although organized differently:

*Gender Breakdown of Reports*[2]
*Title IX Coordinator Jimenez & the Shading of Reports*[3]
*Treatment of Past Sexual History of the Parties*[4]
*Legal Issues and the Title IX Coordinator's Neutrality*[5]
*Transparency and Title IX Training*[6]
*Training Transparency & Rollins College*[7]
*Trauma-Informed Training*[8]

---

[1] Peter Lake, *Expert Response: Doe v. Rollins College, Case No. 6:18-cv-01069*  (March 29, 2019), at 33.
[2] KC Johnson, *Supplemental Expert Report Re: Doe v. Rollins College, Case No. 6:18-cv-01069* (July 5, 2019), at 1 – 3.
[3] *Id.* at 4 – 6.
[4] *Id.* at 6 – 8.
[5] *Id.* at 8 – 9.
[6] *Id.* at 9 – 11.
[7] *Id.* at 11 – 12.
[8] *Id.* at 12 – 13.

*Debunking of Lisak Study*[9]
*Single Investigator*[10]
*Investigative Criteria and Rollins Procedures*[11]
*Gender Bias*[12]

I shall take up each issue *seriatim*, *infra*.

I emphasize that none of the newly offered opinions from Professor Johnson lead me to alter
my original opinions in this matter. The opinions in this report, which is my second report on
the matter, supplement and complement my original opinions. In light of a review of his
supplemental report, and some other materials listed above, I am able to (1) opine with more
particularity regarding the insufficient foundations of many of Professor Johnson's opinions,
and (2) offer my supplemental opinion—consistent with opinions in my original report—that
Rollins College provided a prompt, equitable and impartial resolution of this matter.

I wish to point out that Professor Johnson again offers *no opinion that the plaintiff was innocent*
and disregarding substantial information that the plaintiff was in violation of Rollins College
policies; but he instead raises issues that are not relevant to an analysis of applicable objective
standards in this matter. I struggle to see the purpose(s) of Professor Johnson's supplemental
report in light of his failure to opine on the innocence of the plaintiff. Even, *arguendo,* if Rollins
College were somehow biased, not impartial or unfair; had relied upon improperly trained
administrators; used improper procedures and/or investigative techniques (including trauma-
informed techniques); and relied upon "debunked" studies relating to sexual predation in
training materials—all of which I disagree with (and, to the contrary, I have reviewed evidence
that supports exactly the opposite conclusions)—there is substantial information that I have
reviewed that supports Rollins College's final resolution of this matter under its policies.[13]

---

[9] *Id.* at 13 – 15.
[10] *Id.* at 15 – 18.
[11] *Id.* at 18 – 20.
[12] *Id.* at 20 – 22.
[13] I note that in a very recent opinion from the Seventh Circuit Court of Appeals, the Court noted that a variety of
theories of potential liability have been considered by lower federal courts:

> Some circuits use formal doctrinal tests to identify general bias in the context of
> university discipline. For example, the Second Circuit channels such claims into
> two general categories. In what has come to be called the "erroneous outcome"
> category, the plaintiff must show that he "was innocent and wrongly found to
> have committed the offense." The other category, "selective enforcement,"
> requires a plaintiff to prove that "regardless of [his] guilt or innocence, the
> severity of the penalty and/or the decision to initiate the proceeding was
> affected by the student's gender."
>
> We see no need to superimpose doctrinal tests on the statute. All of these
> categories simply describe ways in which a plaintiff might show that sex was a
> motivating factor in a university's decision to discipline a student. We prefer to
> ask the question more directly: do the alleged facts, if true, raise a plausible
> inference that the university discriminated against John "on the basis of sex"?

Professor Johnson's opinions in both of his reports only *speculate about the possibility* of such
error; and the foundations of those speculative opinions in both reports by Professor Johnson
are inadequate, misleading and/or inaccurate.

### *Gender Breakdown of Reports*

Professor Johnson raises two issues in this section of his supplemental response. First, he states
the following:

> I initially observe that every case investigated by Rollins involved a
> male respondent. In only one case was there a male complainant;
> that case involved a same-sex allegation of misconduct. The fact
> that Rollins did not conduct any investigations into alleged sexual
> misconduct of a female student during the period covered in
> discovery *seems highly unusual* given that the institution' student
> population is 60% female.
>
> . . .
>
> This observation considers the fact that, according to statistics,
> most victims of sexual misconduct are female and the majority of
> sex offenders are male. *Recent studies have suggested* that the
> prevalence of female sex offenders may be higher than generally
> perceived.[14]

I note the fact that Professor Johnson's belief that something "seems highly unusual" has no
clear relationship to any applicable objective standard in this matter; nor does he attempt to
relate these opinions to any such standard. I decline the opportunity to speculate on the
purposes for which these opinions are offered, of course, reserving the right to offer additional
opinions should he do so. For whatever purpose these opinions are offered, I do wish to
express my concerns about them.

Professor Johnson appears to draw these conclusions from his review of additional materials
produced in this matter during discovery, after he submitted his original expert report in
February 2019. This additional discovery material included twelve investigations occurring over
a period of approximately twenty months at Rollins College from November 2014 – July 2016. [15]

---

*Doe v. Purdue University*, No. 17-3565 (7th Cir. 2019) at 25 (internal citations omitted). Although this decision is
from the Seventh Circuit, if such a standard were applicable in this matter, I now opine that I have reviewed no
information that suggests that Rollins College discriminated on the basis of sex in this matter or that sex was a
motivating factor in Rollins College's decision to discipline the plaintiff. To the contrary, the information I have
reviewed supports the opposite—the conduct of the plaintiff motivated Rollins College to discipline him.

[14] *Johnson Supplement*, *supra* note 2, at 1 - 3 (internal citations omitted) (emphasis added).

[15] *See id.* at 1 n.1; *id.* at 2 – 3. I note that in his initial report dated February 28, 2019, Professor Johnson criticized
the work of David Lisak on the prevalence of sexual predation in part due to the small sample size of his study, and

Professor Johnson opines that the absence of any investigation regarding a female respondent "seems highly unusual" without articulating any clear baseline for such a conclusion: he merely points to the fact that the student population at Rollins College is majority female and to one study regarding female sexual perpetration.[16]  I note that the population of Rollins College is relatively small compared, for example, to large state institutions; and this would tend to suggest, as the facts of this case support, that the frequency of acts of sexual violence reported to a Title IX system would be relatively few in number overall if compared to larger institutions. In general, there are studies suggesting reporting rates nationally appear to remain low,[17] and men are victimized less frequently.[18]  I therefore find nothing "unusual" in the sample considered by Professor Johnson; and I question the foundation of Professor Johnson's opinion here. It is possible that there were no men victimized by women in this sample period and thus nothing to report or investigate; and possible, perhaps even likely, that if any were male victims of female perpetration, those men chose (regrettably and for whatever reason) *not* to report to the Title IX system at Rollins College. There is no evidence that I have reviewed that indicates that Rollins College failed to respond in any way to an actual report of sexual violence perpetrated by a female on a male student. I am very concerned about male victimization and low reporting rates generally and nationally, but there is no foundation to impugn Rollins College in this matter.

Professor Johnson concedes, according to some unspecified statistics, that most victims of sexual violence are women, and most perpetrators are male (which would also shed light on the Rollins sample *not* being "unusual").  I will assume that this is not merely a fortunate speculation, and that Professor Johnson is aware of data that I am aware of such as the following:  Some studies show that about 1 in 16, or about 6% - 7%, of male college students experience sexual assault.[19] And, only about 12.5% of *all* rape incidents, for example, are reported to any type of school official.[20] So, while it appears male reporting rates of sexual assault may have been less well studied by national researchers as compared to female reporting rates, one can deduce that a lower incidence of male sexual assault coupled with very low reporting rates overall would result in campuses generally receiving fewer reports of

---

also for its methodology.  *See* KC Johnson, *Re: Doe v. Rollins College, Case No. 6:18-cv-01069* (February 28, 2019), at 6 – 9.

[16] *See Johnson Supplement*, *supra* note 2, at 3 n.4.

[17] "[O]nly 2% of incapacitated sexual assault survivors, and 13% of forcible rape survivors, report the crime to campus or local law enforcement." White House Task Force to Protect Students from Sexual Assault*, Not Alone* (April 2014), at 7 (citing Krebs, C.P., Lindquist, C.H., Warner, T.D., Fisher, B.S., & Martin, S.L. (2007). The Campus Sexual Assault (CSA) Study. Washington, DC: National Institute of Justice, U.S. Department of Justice).

[18] "The CSA Study found that 6.1% of college males were victims of ether attempted or completed sexual assault." *Not Alone, supra* note 17, at 6 n.5.  This is in comparison to the oft cited 1 in 5 statistic for women (approximately 20% of women are sexually assaulted while in college). *See id.* at 6.

[19] *See* 2007 CSA Study, *supra* note 17.  *See also* Krebs, et al (2016). Campus Climate Survey Validation Study: Final Technical Report. Retrieved from the Bureau of Justice Statistics: https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf.

[20] *Id.*

female-on-male sexual assault—and perhaps none—on a very small college campus during discrete periods of time in which a small number of reported cases arise.

If such data is accurate, the combination of a small student population and a short sample period leads me to conclude that there is nothing on the face of the information I have reviewed that makes the absence of an investigation of a report by a male student victimized by a female student "unusual" in this sample.

I wish to emphasize that I have reviewed no materials that indicate that Rollins College failed to respond to any male student who provided actual notice of sexual violence. Indeed, even in this small sample, there is evidence that Rollins College responded to the victimization of one male student who reported being victimized by another male student. Surely, the fact that Rollins College responded to a situation involving potential male victimization should not be discounted simply because the perpetrator was another male; indeed, the fact that Professor Johnson appears to do so concerns me as it potentially reflects a heteronormative bias in analyzing data. I observe that in his supplemental report's "conclusion," Professor Johnson states: "In my opinion, Rollins has acted in a manner that favored female reporting parties and disadvantaged male responding parties."[21] Although he does not link this conclusion specifically to this section of his report, under the assumption that he has intended this section of his report to support that conclusion, it is my opinion that it does not support that conclusion. There is no evidence of "favoritism"; nothing in the information I have reviewed supports the imputation of a motive or purpose "to favor." Indeed, there is clear evidence that Rollins College responded to potential male victimization.

Second, Professor Johnson states: "More importantly, in several cases, Rollins failed to investigate allegations and information that female students engaged in sexual activity with male students who were intoxicated and, as a result, may have been unable to provide voluntary consents to sexual activity."[22]  Professor Johnson suggests that there were "several cases," but references only two investigations, No. 2 and No. 12.[23]

There are three aspects of Professor Johnson's opinions here that are problematic.

First, whatever occurred in these two investigations, No. 2 and No. 12, has no bearing on the instant matter as, to the best of my knowledge, the respondent in this matter has never claimed being victimized by anyone, let alone the reporting party in this matter. And, I will note that Deena Wallace was not the investigator for either investigation No. 2 or No. 12.

Second, the description of Investigation No. 2 as involving "students engaged in sexual activity" at best begs the question by assuming the outcome of the investigation was erroneous and at worst implies something perverse—that sexual assault can be properly described as engaging in

---

[21] *Johnson Supplement*, *supra* note 2, at 22.
[22] *Id.* at 3.
[23] *Id.*

7

"sexual activity." Sexual assault is not a mutual affray, it is an act of violence committed by one person upon another. Being intoxicated is no defense to committing sexual assault or intimate partner violence. Professor Johnson draws the unsupported conclusion that "Rollins never investigated whether the female student may have committed sexual misconduct," arguing both parties had consumed alcohol.[24] However, by investigating the facts of the case, Rollins College's investigator concluded that a sexual assault had occurred—which perforce negates the possibility that the victim either engaged in "sexual activity" with respect to that encounter (the investigators in case No. 2 never use that phrase), or somehow victimized an aggressor. The opinion that Rollins College "never investigated" is argumentative—that Rollins reached the wrong conclusion; and counterfactual—Rollins College *did* investigate the matter and concluded that the respondent was an aggressor and violated Rollins' policies based upon the preponderance of the evidence.

Third, in both matters, Nos. 2 and 12, Rollins College's investigators evaluated the evidence.[25] I have reviewed no information even suggesting the possibility that Rollins College investigators chose to reject a plausible narrative in the investigation itself that the reporters themselves engaged in sexual misconduct. Professor Johnson's critique of investigation No. 12 is particularly curious given that the appeals process reversed a determination of responsibility against a male student—hardly evidence of favorability to female reporters against male respondents at Rollins College.

## *Title IX Coordinator Jimenez & the Shading[26] of Reports*

In this highly argumentative section of his report, Professor Johnson continues to attempt to cast Oriana Jimenez, the Title IX coordinator, in the role of "editor"[27] who was controlling the outcome of the investigation, ignoring my critique of that characterization in my original report. This is not a mere semantics issue related to the term "edit." Professor Johnson all but ignores the substance of my discussion of the role of the Title IX coordinator in my original report, save for a footnote that states:

> Yet Obama-era guidance from 2014, which the 2015 guidance did not supersede, explicitly noted that the Title IX coordinator was not obligated to perform *any* direct role in the investigation, much less as a surreptitious editor. ("[N]either Title IX nor the DCL specifies

---

[24] *Id.*

[25] The investigators in matter No. 2 were Kenneth Miller and Maria Martinez. The investigator in matter No. 12 was Jessica Narducci.

[26] The use of the term "shading," which is not repeated in text, would appear to imply some improper motive or motive to distort or darken the truth by Ms. Jimenez. There is no information that I have reviewed that would support the existence of such a motive. As Ms. Jimenez states in her deposition, when asked about her duties as the Title IX Director, Ms. Jimenez states that one of her duties was to "oversee investigations." Oriana Jimenez Deposition, at 16: 15-20. Ms. Jimenez was simply doing her job, as discussed further, *infra*.

[27] See *Johnson Supplement*, *supra* note 2, at pages 4 – 6 for numerous references to Jimenez's "edits" and "editing."

8

who should conduct the investigation. It could be the Title IX coordinator, provided there are no conflicts of interest, but it does not have to be." OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE (2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf, at 25.) In the event, as Professor Lake implicitly concedes, nothing in the 2015 guidance required Jimenez to act as a stealth editor, toughening the substance of reports against the respondent.[28]

This retort displays Professor Johnson's profound lack of understanding of federal guidance from the U.S. Department of Education's Office for Civil Rights (OCR) at the time. It is true that OCR has never *guided* that the Title IX coordinator *must* be an *investigator,* but OCR has guided that it *may be permissible to combine functions under certain conditions*. However, as I pointed out in my original report, OCR expects the Title IX coordinator to perform the function of a coordinator, which includes oversight and review of work not performed by the Title IX coordinator—including the work of an independent investigator.[29]

Reviewing work in transit is not controlling the outcome of an investigation, nor investigating. I note that OCR has never described or articulated a role for an "editor" in any Title IX guidance document of which I am aware: reviewing work in transit is not "conducting an investigation" for purposes of OCR guidance. I also note that I do not "implicitly concede" any such thing as Professor Johnson suggests: To clarify, I explicitly reject the characterization of the Title IX coordinator in this matter acting as "stealth editor"—she was not performing an editorial function in the sense of directing a final resolution in this matter and I fail to see how any of her actions were taken in "stealth" (yet another implicit imputation—here of a motive to hide or suppress—without foundation in the record)—or "toughening" anything against the respondent.[30]

Review efforts by a Title IX coordinator strengthen the accuracy and exposition of a report; the fact that a clearer and more accurate report may implicate the violation of a policy by the

---

[28] *Johnson Supplement*, *supra* note 2, at 6 n.19.

[29] Again, as I state in my original report:

> [B]ased on my own experience [as a former Title IX coordinator] and in my conversations with others who have held the position: 'Title IX coordinators often interact with investigators before, during and after an investigation to review work in-progress and completed work. . . . Title IX coordinators will inevitably find themselves evaluating investigative staff for the overall quality of their work in the system. The review and monitoring functions are a feature of the Title IX coordinator's ultimate oversight responsibilities of a campus Title IX response system.

Lake, 3/29/19 *Expert Response, supra* note 1, at 12.

[30] Moreover, stating that I have "implicitly conceded" that "nothing in the 2015 required stealth editing" is an assertion that barely deserves a response. *There never has been such a thing—it makes no sense at all to think OCR would **require** "stealth editing," and thus OCR never has done so.*

9

respondent does not mean that the review function was performed with any improper motive, particularly a discriminatory motive.[31] It is precisely this type of imputation of improper motive without foundation that has repeatedly concerned me in reading Professor Johnson's analysis in both of his reports. I should not need to point out that review and appeals processes such as existed at Rollins College can improve clarity and accuracy of final investigative reports; and lack of accuracy and clarity could impact the interests of respondents, reporters, witnesses and members of the Rollins College community. Professor Johnson has failed utterly to produce even a scintilla of information suggesting Oriana Jimenez was motivated by anything other than to do her job faithfully—as she so testified in her deposition on April 15, 2019:

Page 142

1    Q.  Okay.  Exhibit 47 is an e-mail, it looks like,
2  forwarded around February 12th of 2018, to Ms. Wallace.
3  Do you remember sending this e-mail?
4    A.  Yes, I do.
5    Q.  Okay.  And attached to this are various edits
6  that you made in the report, right?
7    A.  Yes.  I see commentary in the margins that I
8  added.
9    Q.  There's also things underlined that you added,
10  too, right?
11    A.  Yes.  Correct.
12    Q.  So, why did you provide edits to this report?
13    A.  Because, the final responsibility for this
14  report is mine.
15    Q.  What do you mean by, "final responsibility?"
16    A.  I'm responsible for this product.
17    Q.  Okay.  So, you're also responsible for the
18  conclusions in there?
19    A.  That's not what I said.
20    Q.  Well, I'm trying to understand.  What do you
21  mean, you're responsible for the product, but not the
22  conclusions?
23    A.  Our policy is very clear who's responsible for
24  making a conclusion in an investigation, and it's not
25  the Title IX Coordinator.  As having oversight over the

Page 143

1  investigation, the quality of the work product
2  associated with the investigation is my responsibility.
3    Q.  Did you include information that you didn't
4  have firsthand knowledge about, in your edits?
5    A.  No, I don't believe so.
6    Q.  Okay.  Well, let's look at, for example, on
7  Page 21.  I'm sorry.
8    MS. DEGANCE:  What page?
9  BY MR. ENGEL:
10    Q.  So, did you -- were your edits intended to be
11  substantive, or merely stylistic?
12    A.  Probably, both.
13    Q.  Well, why would you add substantive comments,
14  if you didn't conduct an investigation?
15    A.  Any commentary I made was only to make the
16  report understandable to the students.  An 18-year-old
17  needed to understand this report, and it needed to be
18  thorough and complete.
19    Q.  So, for example, if you look at Page 3, the
20  second paragraph, beginning, "Early November 2017," the
21  original language was, "In an attempt to investigate
22  this allegation further," and you changed it to, "Due
23  to a similarity between what the caller stated and the
24  reporter's original sharing of the information."  Why
25  did you make that change?

---

[31] It is unfortunately all too easy to cast aspersions on investigators and decision-makers by claiming undifferentiated bias, improper motivation, unfairness, lack of impartiality, etc. I would like to note something that the Seventh Circuit recently stated, that "[t]his burden is 'heavy indeed,' typically requiring evidence that 'the adjudicator had a pecuniary interest in the outcome of the case, or that he was previously the target of the plaintiff's abuse or criticism.'" *Doe v. Purdue University*, *supra* note 13, at 19.

10

```
 1    A.  Because, it's more specific.
 2    Q.  So, if we look at Page 60, for example, the
 3  first full paragraph, is that -- why did you add the
 4  words, "But, otherwise consensual," there?
 5    A.  Because, some people will infer that a drunken
 6  hookup cannot constitute consent.
 7    Q.  And in the next paragraph, you added the
 8  language that the reporter felt like, quote, "Felt like
 9  she no longer had anything more to lose."  What was the
10  source of that information?
11    A.  The reporter.
12    Q.  Okay.  And that was information the reporter
13  provided to you?
14    A.  Correct.
15    Q.  Okay.  So, were you interviewed as a witness
16  during this investigation?
17    A.  No.  I provided my notes to the investigator.
18  I believe I gave my handwritten notes.
19    Q.  Okay.  Did the investigator record the
20  interview with you?
21    A.  No.  I just said the investigator did not
22  interview me for this investigation.  I gave the
23  investigator all of my notes from my conversations.
24    Q.  So, let's look at what was previously marked
25  Exhibit 10.  That has the investigation list.  Of
```

Jimenez actually testified in a way consistent with her responsibilities as Title IX coordinator under federal regulations and guidance.[32]  And, as Professor Johnson includes in his supplemental report, Rollins training materials described Ms. Jimenez as being "a neutral third party throughout any investigations. . . ."[33]

---

[32] Federal regulations require a campus to designate a "responsible employee" (i.e. a Title IX coordinator):

> Each recipient shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part. The recipient shall notify all its students and employees of the name, office address and telephone number of the employee or employees appointed pursuant to this paragraph.

C.F.R. § 106.8(a).  Subsequent guidance from the U.S. Department of Education Office for Civil Rights states:

> [T]he Title IX coordinator is responsible for coordinating the grievance process and making certain that individual complaints are handled properly.  This coordination responsibility may include informing all parties regarding the process, notifying all parties regarding grievance decisions and of the right to and procedures for appeal, if any; monitoring compliance with all of the requirements and timelines specified in the grievance procedures; and maintaining grievance and compliance records and files.

U.S. Department of Education Office for Civil Rights, *Title IX Resource Guide* (April 2015).  The Title IX coordinator has ultimate oversight responsibilities for the entire campus Title IX response system.

[33] *Johnson Supplement*, *supra* note 2, at 5 (referencing *Rollins/Doe 002430*).

I have also reviewed each of the italicized proposed changes referenced by Professor Johnson described as resulting in "at least a slight toughening of the report against the respondent,"[34] and described also as "Jimenez's habit for using her edits to toughen the case against the respondent,"[35] as presenting "the evidence against the accused student more forcefully,"[36] "more strongly,"[37] and as "surreptitious editing."[38] I have several comments here.

First, Professor Johnson, despite the profuse use of argumentative adverbs and adjectives, fails to address the obvious problem with his analysis, which I raised in my initial report:

> I do not share Professor Johnson's various concerns, and in my expert opinion nothing I have reviewed leads me to the conclusion that there was an erroneous outcome (or unfairness) in this matter, if indeed that is an applicable legal standard. I further opine that Professor Johnson has not offered an expert opinion that plaintiff is innocent *and therefore* wrongly convicted; nor has Professor Johnson causally connected any purported flawed outcome to gender bias. Instead, Professor Johnson argues that the Plaintiff *may, or must, have been* wrongly found to have committed an offense because of purported gender bias. This chain of reasoning reflects a critical flaw in his report: innocence cannot be demonstrated by merely raising questions about bias. My review of the materials provided does not indicate that Rollins or any of its agents were gender biased in their decision-making; moreover, even postulating that there were gender bias present there is no support in the materials I reviewed for me to offer the opinion that the plaintiff was *innocent* and therefore wrongly found to have committed an offense, whatever the motives of Rollins or its agents.[39]

The plaintiff here argues for the adoption and use of an erroneous outcome standard and at least must assert and establish that the result was in fact *erroneous*. Even if the Title IX coordinator somehow "toughened" the report, which I disagree occurred (*see infra*), that does not establish that Rollins College somehow reached an erroneous conclusion. Professor Johnson's arguments proceed on the implicit assumption that plaintiff was innocent; but it is notable, and I note and have noted, that Professor Johnson now in two lengthy reports has never offered his opinion that plaintiff *was innocent*. "Toughening" a report (and again I do not believe that was the case here) that contains a finding of a violation is potentially desirable if the respondent is responsible; being more precise about why someone is responsible may help

---

[34] *Johnson Supplement*, *supra* note 2, at 5.

[35] *Id.* at 6.

[36] *Id.* at 4.

[37] *Id.* at 5.

[38] *Id.*

[39] Lake, 3/29/19 *Expert Response, supra* note 1, at 7.

respondents understand their transgressions in and against the Rollins College community, which serves a critical educational function at an educational institution.

Second, the argumentative characterization that something surreptitious occurred appears to be based solely on Professor Johnson's assertion that, "In the second report, as in Doe's, Jimenez made numerous alterations in the text, presumably without the accused student's knowledge."[40] That assertion is, on its face, speculative. Moreover, the respondent *did* view the final report. It is not common practice to disseminate each and every draft of a report; there was nothing "surreptitious" about Rollins College's practices. I will again point out that there is nothing in the information I have reviewed that even suggests that the Title IX coordinator had *any* improper motives.

Third, Professor Johnson acknowledges that many of Ms. Jimenez's suggested changes were "related to the flow, forgotten words, or such purely editorial/grammatical matters,"[41] albeit without tracking those changes specifically. These suggested changes illustrate one major feature of a review function—basic proofreading. However, Professor Johnson believes that other suggested changes, which he italicizes, "shifted tone or content"[42] apparently connecting that to his argument that the suggestions made by the Title IX coordinator "shaded" or "toughened" the report against the respondent. I reiterate that there is no information whatsoever that suggests that there was any intent to "shade" or "toughen," etc. the investigative report in favor of any individual. The italicized suggestions, to the contrary, support my opinion that the Title IX coordinator was doing her job, performing the guided oversight and review function by offering suggestions to clarify and improve the precision and accuracy of the final report. Her own testimony is consistent with this, as discussed *supra*. Indeed, several of the suggestions demonstrate that the Title IX coordinator carefully reviewed the draft report and Rollins College's own policies, offering suggestions to clarify statements of fact in light of other facts in the draft report, and clarifying conclusions in light of Rollins' policy language. These were not suggestions based on independent review of the matter or inserting new facts. There is no information that I have reviewed that suggests that the Title IX coordinator was performing any investigatory function or intended to do so. To the contrary, the suggestions were in the nature of finalizing documents to make them clearer and more precise. I will comment that as a matter of public policy, I would be concerned with any rule that would dissuade private colleges from proofreading the work of investigators, or that would chill review functions that can, and do, improve the precision and accuracy of final reports as expressions of an institution through its agents. Finally, I will note that Deena Wallace testified that Ms. Jimenez did not provide her with any "substantive" edits to the investigative report in this matter involving Doe.[43]

---

[40] *Johnson Supplement*, *supra* note 2, at 4.
[41] *Id.*
[42] *Id.*
[43] *See* Deena Wallace Deposition at 151: 19-21.

*Treatment of Past Sexual History of the Parties*

In this section of his supplemental report Professor Johnson again mischaracterizes the roles of the Title IX coordinator and investigator[44] and offers an argumentative, and misguided critique of use of past history in investigative processes.[45] At the outset let us consider Rollins College's actual policy language:

> During the investigation process, the Title IX Investigator will determine whether information concerning the prior sexual history of either party is relevant.  In general, in a case where the responding party raises consent as a defense, any prior consensual relationship between the parties may be relevant. Any other prior sexual history of the reporting party is typically not relevant and may not be permitted. Prior sexual history of the responding party may be relevant where there is evidence of a pattern of misconduct that may be relevant in the determination of responsibility assigning of corrective action.[46]

In light of those policies consider Professor Johnson's critique of a passage from *Rollins/Doe* 004673:

> Not only did Jimenez not excise this borderline voyeuristic discussion of the male respondent's past sexual history (with women other than the complainant), she edited it in ways that intensified the punch. And she OK'd using the male student's

---

[44] In his supplemental report on pages 6 – 7, Professor Johnson again tries to cast Ms. Jimenez as a controlling editor using terms and phrases such as "editing style," "edited," "allowed," "intensified," "not excise," and "ordered."  I reiterate my earlier opinions on this.

[45] After reading this critique I wonder if Professor Johnson believes that prior sexual history is relevant in Title IX investigations. He appears to favor the view that the prevalence of sexual violence, and serial sexual violence, is lower than many studies suggest. For example, in his 2017 book, *The Campus Rape Frenzy: The Attack on Due Process at America's Universities*, in a section titled "Misleading Through Statistics," Mr. Johnson and his co-author, Stuart Taylor, Jr., state that the "one in five statistic," discussed *supra* on page 6 n.18 of this report, is a "myth." *See Rape Frenzy,* at 43.  *Rape Frenzy* also disfavors David Lisak and his research on serial sexual predation. *See id.* at 56 – 58. I am curious how Professor Johnson will critique the new sexual predation study, published in 2019, that perhaps substantially corroborates some of Lisak's conclusions.  The study found that "[m]ore than 87% of alcohol-involved sexual assault was committed by serial perpetrators."  *See* Foubert, J.D., Clark-Taylor, A., & Wall, A. (2019).  "Is campus rape primarily a serial or single time problem? Evidence from a multi-campus study."  Violence Against Women. DOI: 10.1177/1077801219833820.  Finally, I note that federal regulators during the operational timeframe of this matter encouraged schools to address issues of serial sexual violence, offering explicit guidance on this precise point. *See* White House Council on Women and Girls, *Rape and Sexual Assault: A Renewed Call to Action* (January 2014).  "Notably, campus perpetrators are often serial offenders.  One study [the Lisak study] found that 7% of college men admitted to committing rape or attempted rape, and 63% of these men admitted to committing multiple offenses, averaging six rapes each." *Id.* at 14.

[46] Rollins College, *Title IX: Sexual Misconduct and Harassment Policy* (January 2015) (*Rollins/Doe* 000686).

14

consensual past sexual history as a way of diminishing his
credibility.[47]

The suggested changes to the draft report offered by Ms. Jimenez are both clarifying and
supported by information I have reviewed related to this investigative report made available to
me.  (I note that Professor Johnson does not opine that the passage reviewed is *incorrect or
inaccurate*; I do not understand what Professor Johnson means to convey by describing a
"borderline voyeuristic discussion.") Moreover, the reliance upon past sexual history was
entirely consistent with Rollins College's own policies, which allow this information to be
considered, as stated above, "where there is evidence of a pattern of misconduct that may be
relevant in the determination of responsibility."

Professor Johnson then makes the following argument:  "Imagine if Wallace had produced a
report suggesting that a female complainant had a habit of sleeping around on campus, and
then had used the female student's sexual past as a lever to suggest she wasn't credible in her
comments about the incident at hand."[48] Here Professor Johnson completely misses the point:
prior history of sexual aggression *is* relevant in assessing whether or not an individual properly
*obtained* affirmative consent from another, particularly where a pattern of prior behavior is
similar to one in question. And, I note that a Title IX investigation at a private college such as
Rollins College is not proceeding in criminal court under criminal court evidentiary standards.
Rollins College has flexibility to tailor its responses to sex discrimination[49] including how to
weigh and evaluate information; and as I have noted earlier, Rollins College policies are gender
neutral. After review of the information provided to me in this matter, I see no information
leading me to conclude that those policies were applied other than in a gender neutral way.[50]
(The fact an application of a policy applies differentially—based upon the specific facts of an

---

[47] *Johnson Supplement*, *supra* note 2, at 6.

[48] *Id.*

[49] *See* language in *Davis*, as quoted *infra*, on page 35 of this report.

[50] In his supplemental report, Professor Johnson attempts to argue, as he has in other portions of his report, that
Rollins College administrators took inconsistent positions or did not follow or understand their own policies. My
review of the materials provided discloses nothing of the sort. Professor Johnson states:

> In her deposition, *Jimenez herself* appears to have deemed the inclusion of this
> material (in a report she nonetheless edited and approved) as out of line. She
> commented that it might be acceptable to ask about "prior relationships" of the
> accused student (but not, it seems, the accuser)—though not about the accused
> student's (consensual) "sexual activity." Yet Wallace did precisely that, and
> Jimenez approved.

*Johnson Supplement*, *supra* note 2, at 6 n.20.
Deena Wallace's testimony referenced by Professor Johnson in his supplemental report shows she understood
Rollins College policies and applied them. "According to her deposition, Wallace has never asked a complainant
about prior boyfriends/girlfriends or prior sexual activity." *Id*. at 6 n.21. The issues Professor Johnson raises with
Ms. Jimenez's testimony are likewise misinformed. Information regarding prior sexual history would only be
relevant if such history were relevant under Rollins College policies; Ms. Jimenez's testimony is in line with Rollins
College policies.

individual matter—in no way suggests that the application of a policy was not gender neutral.)[51]
Professor Johnson misunderstands Rollins' policies regarding the treatment of prior sexual history, and the application of those policies. He is confused; there is no information I have reviewed that suggests that Rollins College administrators did not understand Rollins College policies.

## Legal Issues and the Title IX Coordinator's Neutrality

In this section of his response, Professor Johnson attempts to make two points.

First, Professor Johnson curiously challenges the "neutrality" of the Title IX coordinator with respect to "edits"[52] in a report from *another, entirely unrelated* matter: "She [Ms. Jimenez] offered the following commentary to one draft report, recommending an assertion not in the name of accuracy but due to a fear that otherwise, the respondents would have a chance to 'jump all over' an issue."[53]

I begin by noting that I do not understand how or why Professor Johnson considers his opinions here relevant to the instant matter, other than to try to cast the Title IX coordinator incorrectly as an "advocate"[54] performing an "editorial" function, with asserted motives that have no foundation in any materials I have reviewed. There is no evidence that Ms. Jimenez was "fearful" of anything or so motivated. Professor Johnson persists in attributing motives to individuals such as Ms. Jimenez without information to support such assertions.

Here is the comment that was offered by Ms. Jimenez:

> Multiple witnesses mentioned that [] was very talkative at some point in time while she was in the room, does she remember this at all? I want to make sure we don't omit that detail because the

---

[51] On page 7 of his supplemental report, Professor Johnson essentially raises the same misguided arguments regarding *other* investigations with other investigators with no obvious relevance to the matter at hand. One comment offered by the Title IX coordinator sought clarification; the other two were entirely consistent with Rollins College's policy on the use of prior sexual history. Professor Johnson makes the following unclear point: "if the respondent had known about either of these past events, he might have been able to explore whether her reaction to the incident with him was influenced by the previous incident." *Id.* at 7 n.23. This comment is disturbing if Professor Johnson is implying that a victim's past sexual history can be probative of implied consent to, or ratification of, a specific sexual contact or that a victim is less credible in reporting a current act of sexual violence because that victim has been victimized before by others. The former would essentially shift the burden to victims to show that they affirmatively did not give consent if they have prior sexual history; the latter would diminish the rights of serial victims— I point out that there are statistics that suggest that previously victimized individuals are more likely to be victims in subsequent situations. *See generally* Daigle, Leah & Fisher, Bonnie & T Cullen, Francis. (2008). *The Violent and Sexual Victimization of College Women: Is Repeat Victimization a Problem?* Journal of Interpersonal Violence. 23. 1296-313. 10.1177/0886260508314293.
[52] *Johnson Supplement, supra* note 2, at 8. I repeat my concerns articulated *supra* here regarding the characterization as "edits" controlling the final outcome in this matter.
[53] *Id.*
[54] *Id.*

16

> respondents will jump all over that as their proof that she was alert
> and sober and that they  could not reasonably tell that she was
> intoxicated.[55]

If anything, this comment supports the perspective that Oriana Jimenez, in an effort to improve
the accuracy of a report, recognized that facts that might be favorable to a respondent's
perception of an incident should be included in a report—and that failure to do so would be
corrected on appeal if not addressed in the final report. I fail to see how this disfavors a
respondent.

Second, Professor Johnson offers his opinions on the preponderance of the evidence standard
and its use at Rollins College. I begin by referring back to my original report with respect to
evidentiary issues and the conduct of an investigation and hearing.  In that report I state: "The
fact that respondents are entitled to a presumption of not being responsible for a code
violation until proven responsible under a preponderance of the evidence standard does not
mean that a college must establish code violations beyond a reasonable doubt (as *in* a criminal
case)."[56]

Here, Professor Johnson relies upon an "edit" relating to *Rollins/Doe* 000071, a matter entirely
unrelated to the instant matter:

> The Office of [sic] Civil Rights has mandated that Title IX
> investigations should be evaluated with a "Preponderance of the
> Evidence" standard. Reserved for civil matters, Preponderance of
> the Evidence is one of the easier burdens of proof to meet,
> requiring a "more likely than not" or "51% chance of occurring."
> The Reporting Party may start with a presumption of truthfulness
> due to the assumption of good faith in reporting awarded to
> individuals who come forward to report sexual misconduct.
> Although a Reporting Party may have a presumption of
> truthfulness, that, by itself, does not automatically establish a
> preponderance of the evidence.[57]

Then, Professor Johnson makes the following convoluted argument:

> This is a peculiar definition of preponderance. During Jimenez's
> tenure, Rollins' public Title IX procedures didn't indicate that the
> college conferred a "presumption of truthfulness" to Title IX
> complaints, because of what the office apparently considered the
> "assumption of good faith in reporting awarded to individuals who

---

[55] *Id.*
[56] Lake, 3/29/19 *Expert Response, supra* note 1, at 21.
[57] *Johnson Supplement*, *supra* note 2, at 8 – 9.  Again, I do not understand the relevance of his opinions here.

17

come forward *to report sexual misconduct*." [emphasis added] (It is
unclear whether Rollins provides this presumption to complainants
outside of Title IX cases.) While the "presumption of truthfulness"
might not automatically establish a preponderance of the
evidence, it comes awfully close—especially since there's no
indication (in the discovery files or in publicly available items) that
Rollins' Title IX office confers a "presumption of truthfulness" on
respondents.[58]

There is nothing "peculiar" about characterizing the preponderance of the evidence with
accurate statements consistent with the application of that standard.[59] It is particularly strange
that Professor Johnson makes the following comment: "This admission contrasts to Professor
Lake's unsupported assertion that 'respondents are entitled to a presumption of not being
responsible for a code violation.' This language is absent from the Rollins policies and
procedures."[60] My assertion is not "unsupported," it is based upon Rollins Code: it as an
obvious deduction from the preponderance of the evidence standard and the fact that Rollins
College students do not carry the burden of proof to demonstrate that they did not violate a
rule, and that the investigator can only determine responsibility for a violation if it is more likely
than not that a violation occurred. I might assume that Professor Johnson's lack of operational
experience in student discipline and lack of formal legal training and legal education accounts
for his opinion here.[61]

I am also confused by Professor Johnson's concern. My opinion here relates to common
practices in the field that protect the rights of students to enter an investigatory and hearing
process with no presumptions against them simply because they have been identified in a role.
My opinions here also correlate to, or otherwise are consistent with, the statements in
*Rollins/Doe* 000071, and do not "contrast" with them.  Professor Johnson seems to take
particular issue with the articulation of "presumption of truthfulness," which he believes
"comes awfully close" (whatever that might mean; and I view the concept of "coming awfully
close" to meeting a "more likely than not" standard of proof to be nonsensical) to establishing
preponderance of the evidence. For one thing, the mere presumption of credibility of a witness
could never establish a violation of rule under a preponderance of the evidence standard on its
own.  Merely presenting a witness is not testimony of that witness and establishes nothing
other than their presence as a proffered witness. Again, these sorts of things are obvious to
anyone who has been educated as a lawyer, and practiced law.  Moreover, it is fair and
reasonable to assess credibility and reliability, *vel non*, upon what and how a witness testifies

---

[58] *Id.* at 9.

[59] "Used in civil court cases, this standard of proof must convince the judge or jury that the facts as presented by
the plaintiff are more likely than not to be true. In most cases, this means that there must be at least a 51 percent
likelihood that the facts are true." Legal Dictionary, *Preponderance of Evidence*,
https://legaldictionary.net/preponderance-of-evidence/ (*last accessed* July 23, 2019).

[60] *Johnson Supplement*, *supra* note 2, at 9.

[61] I note Professor Johnson's *Curriculum Vitae* lists no J.D. degree and no experience as a student affairs
administrator, student conduct officer, Title IX coordinator, Title IX investigator, or the like.

and not upon the mere fact that they were called to testify. It is of course entirely appropriate to consider a witness' interest in a matter in *assessing* credibility once the witness is testifying. Consider standard jury instructions in use in Florida—approved by the Supreme Court—that state this about witness reliability:

> It is up to you to decide what evidence is reliable. You should use your common sense in deciding which is the best evidence and which evidence should not be relied upon in considering your verdict. You may find some of the evidence not reliable, or less reliable than other evidence.

> You should consider how the witnesses acted, as well as what they said. Some things you should consider are:

> 1. Did the witness seem to have an opportunity to see and know the things about which the witness testified?

> 2. Did the witness seem to have an accurate memory?

> 3. Was the witness honest and straightforward in answering the attorneys' questions?

> 4. Did the witness have some interest in how the case should be decided?

> 5. Does the witness's testimony agree with the other testimony and other evidence in the case?

> *Give as applicable.*
> 6. Has the witness been offered or received any money, preferred treatment, or other benefit in order to get the witness to testify?

> 7. Had any pressure or threat been used against the witness that affected the truth of the witness's testimony?

> 8. Did the witness at some other time make a statement that is inconsistent with the testimony [he] [she] gave in court?

> 9. Has the witness been convicted of a [felony] [misdemeanor involving [dishonesty] [false statement]]?

> 10. Does the witness have a general reputation for [dishonesty] [truthfulness]?

19

> Whether the State has met its burden of proof does not depend
> upon the number of witnesses it has called or upon the number of
> exhibits it has offered, but instead upon the nature and quality of
> the evidence presented.[62]

There is no reason to assume a "reporter" or "respondent" is not reliable until they actually testify in a way that calls reliability into question. I will note that Rollins College students are duty bound to tell the truth in Rollins College official functions.[63]

## _Transparency and Title IX Training/Training Transparency & Rollins College_

Professor Johnson's supplemental report features two subsections with essentially the same titles and content. I will address them under one heading to compensate for what appears might have been an editorial oversight.

Professor Johnson's opinions in these sections appear to offer two supplemental opinions, both essentially tracking opinions in his original report. The first is this:

> More generally, Professor Lake's report never challenges my
> previous assertion that '[n]o college or university, to the best of my
> knowledge, has voluntarily made public the contents of its training
> materials.' He further provides no citation for his assertion that 'a
> great deal of training material is readily available online—and not
> because of some accidental release by colleges or vendors who
> seek to train in secrecy.' Indeed, his report fails to list even _one_
> college or university that publicly posts its Title IX adjudication
> training materials—or even provides this material, as a matter of
> course, to accused students facing charges under Title IX.[64]

The statement in his original report is inaccurate and remains so: moreover, I did challenge his original assertion in my initial report.[65] His assertion that I did not is false. He does challenge my

---

[62] The Florida Supreme Court, _3.9 Weighing the Evidence_ (2013), available at https://www.floridasupremecourt.org/content/download/244032/2149025/p1c3s3.9.rtf.

[63] The Rollins Honor Code, Code of Community Standards: A Commitment to Honesty states:

> The College expects students to be truthful and honest in all interactions.
> Providing false information hinders the College's ability to operate effectively
> and keep members of our community safe. This expectation of honesty applies
> not only to face-to-face conversations, but also to written documentation
> provided to the College. Students are frequently asked to fill out paperwork,
> such as applications, drop/add forms, and parking decals. Misrepresenting
> information on any document will not be tolerated.

_Available at_ https://www.rollins.edu/honor-code/code-of-community-standards/index.html (last accessed July 28, 2019).

[64] _Johnson Supplement_, _supra_ note 2, at 11 (internal citations omitted).

[65] _See_ Lake, 3/29/19 _Expert Response, supra_ note 1, at 22.

20

opinion that training materials are available publicly, criticizing that I failed to list even one
college that does so. I offered my original opinion based on knowledge and experience in the
field; my assertion is obviously true. I have attempted to limit independent inquiry in this
matter, but in response I now report that I performed a brief (a matter of minutes) Google
search on July 24, 2019[66] and promptly located reference to the following Title IX-related
training materials (actual PowerPoint presentations) available publicly online:

- San Francisco State University, https://titleix.sfsu.edu/Materials
- Valparaiso University, https://www.valpo.edu/titleix/files/2014/11/2014.11.13-Title-IX-PowerPoint.pdf
- University of Nebraska Medical Center,
  https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.unmc.edu%2Ftitleix%2F_documents%2Ftraining-responsible_employees.pps
- Lincoln University,
  https://view.officeapps.live.com/op/view.aspx?src=http%3A%2F%2Fip.missouri.edu%2Fdocs%2Ftitle%2FLU%2520Clery%2520Act%2520%26%2520Title%2520IX%2520%28Fall%2520Faculty%2520Institute%2520August%25209%2C%25202014%29.pptx
- University of Portland,
  https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.up.edu%2Fhr%2Ffiles%2Funlawful_discrimination_sexual_harassment.pptx
- Southwest Virginia Community College, https://sw.edu/wp-content/uploads/Title-IX-training-for-students-SWCC-2017.pptx
- The College at Brockport,
  https://www.brockport.edu/about/title_ix/docs/Title_IX_and_Clery_Faculty_Staff_Training.pdf
- City University of New York (CUNY), https://www.gc.cuny.edu/CUNY_GC/media/CUNY-Graduate-Center/PDF/Compliance%20and%20Diversity/Title-IX-Presentation-for-Students-2017-18.pdf
- Wake Forest University,
  https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fbusiness.wfu.edu%2Fwp-content%2Fuploads%2F2015%2F02%2FSchool-of-Business-Title-IX-Training.pptx
- Wayne State,
  https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fprovost.wayne.edu%2Fdocs%2Ftitle_ix_info_for_faculty-chairs.pptx

Moreover, public universities throughout the United States are subject to various public records
requests and sunshine laws, which would give the public access to a wide array of material. In
one instance, I presented to the Board of Trustees at the University of Kentucky in October
2016 in a live broadcast to the public pursuant to such laws. I will note that I am now aware

---

[66] I make no representation that this search is anything more than what it was—a brief check.

that Professor Johnson is a prolific critic of colleges and universities, particularly with respect to transparency issues.[67]

Many trainings of Title IX coordinators, Title IX investigators and adjudicators are purchased from trainers in the field such as myself and/or are offered through groups such as ACPA-College Student Educators International and the Association of Title IX Administrators (ATIXA). Some trainers offer training as part of their proprietary business practices.  It is not surprising that many of these types of training materials are not available *publicly and for free* because the material is copyrighted and proprietary material.

Second, Professor Johnson amplifies his argumentative assertion that universities attempt to "conceal training materials."[68] This appears, in and of itself, to be entirely irrelevant in this matter, as the conduct *vel non* of other universities demonstrates nothing material in this matter. After a brief review of some Professor Johnson's public utterances and writings, I detect that his opinion here is connected with themes of his work in the field. I do opine, however, that Professor Johnson's insistence on pursuing this line of inquiry here, and the connection to his other work, may cast light upon the impartiality of *his* opinions in this matter. [69]

I wrote in my original report that I am "unaware of any campus effort attempting to conceal training materials."[70] I testified in my deposition to the same effect.[71] I was, in both instances, also unaware of the discovery issues in the two cases Professor Johnson references in his report, *Montague v. Yale University* and *Doe v. Johnson & Wales University*.[72]  I do not routinely

---

[67] *See, e.g.*, KC Johnson & Stuart Taylor, *The Title IX Training Travesty*, Washington Examiner (Nov. 10, 2017), https://www.washingtonexaminer.com/weekly-standard/the-title-ix-training-travesty. In that piece he refers to a variety of training materials at various colleges and universities, which he may, or may not, have obtained in the public domain.

[68] *Johnson Supplement*, *supra* note 2, at 9.

[69] *See generally Rape Frenzy*, *supra* note 44; KC Johnson's Twitter feed appears to feature analysis of male respondent's rights issues, often highlighting decisions adverse to universities in matters brought by males against universities.  Indeed, in one article authored by Professor Johnson discussing the recent case involving Purdue University, the following graphic appears at the top of his article, showing a woman putting a man in an "arm bar."



*See* KC Johnson, *A Federal Court Takes on Title IX*, Minding the Campus (July 24, 2019), available at https://www.mindingthecampus.org/2019/07/24/a-federal-court-takes-on-title-ix/.

[70] Lake, 3/29/19 *Expert Response, supra* note 1, at 22.

[71] Lake Deposition at 136 – 140.

[72] *Johnson Supplement*, *supra* note 2, at 9. I do insist that Professor Johnson clarify one opinion in his report: "Again, Professor Lake asserted that he was 'unaware of *any* campus effort attempting to conceal training

follow discovery matters in every case against every college; I do not share Professor Johnson's perspective that colleges regularly attempt to *conceal* training materials, as this is an unfair assessment. Professor Johnson appears to review and sample discovery issues from around the country in matters related to Title IX to construct what I believe to be a generally unreliable narrative about the practices and motives of institutions of higher education in allegedly mistreating males. I have not conducted an independent review of these two cases, but I will note that transparency issues in litigation are not evidence of an attempt by any college to "conceal" information. For example, materials protected by attorney-client privilege are neither "concealed" materials nor training materials—they are legitimately private materials, and legal advice and counsel. (An equivalent error would arise if I were to accuse (and I do not) Professor Johnson of "concealing training" by lawyers of him in this matter to coach "expert" opinions that look like couched, legal arguments in the guise of opinions by an expert who has no formal legal training or legal experience. Conversations Mr. Johnson has had, if any, with legal counsel in this matter may be privileged; and I will assume that my colleague has issued opinions truthfully and from his own knowledge and or experience. I make this point purely for illustration.)  Thus, on its face, and simply from reading Professor Johnson's report, it appears to me at this time that the matter at Yale raised such issues, and perhaps others relating to confidentiality.

An even clearer example of misconstruing "concealment" appears from Professor Johnson's treatment of the Johnson & Wales matter about which he makes the following assertion:

> *Johnson & Wales University*, meanwhile, offered an even clearer case of concealment. Shortly after the school brought a Title IX complaint against him, Doe hired a lawyer. The lawyer searched the JWU website for the adjudication panel's training material; none was available. And so he requested it from the JWU Title IX office, which denied him the request without explanation.
>
> In the resulting opinion denying JWU's motion to dismiss, issued from the bench, the judge remarked, "The fact that Mr. Doe asked for training material during the appeals process and it *wasn't obtained or given to him* qualifies to me for why the Court's willing to accept less than it would otherwise expect at the pleading stage of this."[73]

---

materials.' His statement does not appear consistent with the documented events at either Yale or Johnson & Wales." *Id.* at 11 (internal citation omitted). I assume he is not intimating that I offered an opinion falsely; I did not offer an opinion that there have never been attempts to conceal training information.  I simply testified that I was not aware of any. I will connect this to his comment that he was "surprised" that that I opined the way I did in the original report followed by his immediate reference to the two cases, which cases I note that I was asked about in my deposition even though neither were provided to me to review in this matter until this supplemental response. I am not sure what Professor Johnson is insinuating with his "surprise," but he must correct any intimation, if any, that I did not opine to the best of my knowledge, truthfully and in good faith.

[73] *Id.* (internal citations omitted).

First of all, the fact that an institution does not post its materials online does not demonstrate that the institution is *concealing* those materials.[74] Second, battles over what or what does not become information in a legal case is a discovery issue; there are all sorts of reasons counsel in an adversarial proceeding would resist discovery, including but not limited to confidentiality issues such as FERPA-protected student data and proprietary information. Moreover, the fact that a student in an appeals process on campus seeks material does not mean that material is relevant or probative of anything in any specific matter; and I reiterate that there are no training requirements, or requirements for specific training under any applicable objective standards *in this matter.* I will not speculate as to what did or did not occur in the Johnson & Wales matter, or the motivations of counsel or interested parties, except to note that as with many of these matters what I am able to discern arises from pleadings and preliminary rulings in advance to any findings of fact. I am concerned that Professor Johnson's lack of formal legal training and experience may lead him to make a common error—reading too much into a legal proceeding without understanding the nature of the information presented. Plaintiffs are entitled to wide latitude in constructing legal complaints for instance; decisions rendered under a motion to dismiss typically interpret assertions of fact *as if true* in testing *legal* sufficiency of a complaint. This does not make the assertions in a complaint fact or findings of fact: constructing opinions that an institution actually concealed something from mere allegations that the institution did, or from a ruling on motion to dismiss, rests upon shaky foundation.

Professor Johnson goes on make a variety of problematic assertions regarding transparency specifically relating to Rollins College that I address here:

- Professor Johnson draws attention to one, and only one, document produced by me that does contain the words "For training purposes only—Please keep confidential." This document was not authored by me and was provided to me, with unrestricted permission for use from its author—who is thanked in the document for giving me permission to use in some of my Title IX training sessions (and hence Rollins College, as a participant in that training, was and is free to do with the document as they wish). The quoted words are original *to the author's* document and were included originally for purposes for which I have no knowledge, except perhaps to protect to the work as the author's original work requiring attribution if used by another. I will point out again that some, but not all, training material is proprietary. Originators may wish protect rights to sell and disseminate materials, or even protect the dissemination of material broadly until prepared to do so. This is all perfectly lawful, and an institution—as many do—relying on such materials is not "concealing" anything but respecting basic rights to control one's own materials. For example, I am not "concealing" my Title IX Primer because I charge a modest amount for it; in fact, I have *advertised* it.

[74] Hence Professor Johnson's statements that, "Rollins, even now, does not make its Title IX adjudication training material public. There is no evidence from the material turned over in discovery that Professor Lake has ever recommended that it do so," do not demonstrate any intention or attempt *to conceal*. *Id.* Moreover, I do not recall Rollins College ever asking me to make any recommendation of any kind specifically regarding posting training materials *online*.

24

- Professor Johnson makes an extended "concealment" argument set up by this comment: "Professor Lake's report itself illustrates the contrast between what's *publicly available* regarding Title IX training to an accused student (or member of the public, for that matter) and what's concealed."[75] Professor Johnson conducted some form of search—presumably on Rollins College's *current* website (notably many years after the matter in question) and found it difficult to locate all of the materials produced in this case relating to my consultations at Rollins College. Attempting to establish the absence of something on a website years ago by a current search is a questionable methodology. Moreover, I cannot verify Professor Johnson's results and have not attempted to do so. His conclusion from his search is as follows: "It would take reading Professor Lake's expert report for an accused student to learn of Professor Lake's role in providing scenarios that he says he offered to Deena Wallace, or preparing slides that he says he featured in training of Rollins Title IX officials."[76] However, there are many potential ways an individual might have learned more about my consultations at Rollins College. Professor Johnson only attempted one way, and a questionable way at that. I reiterate that none of this proves "concealment" or an "attempt to conceal"; in fact, he located reference to my visits, which discredits any such inference.

- Professor Johnson makes the following assertion:

  > Professor Lake suggests that this lack of transparency is no problem, since his "Primer, which is widely used in the field for a number of purposes including training, for example, is available for sale at a modest price." Given how he appears on the Rollins website, how could Doe (or any other accused student) possibly have known that Professor Lake was involved in Title IX training at the college, so as to track down his Primer for a "modest price" in hopes of preparing for his conference with the single investigator?[77]

  First, I have never asserted or suggested that "lack of transparency is no problem." Second, Professor Johnson poses what appears to be a rhetorical question, which I will attempt to address as an affirmative statement. I am unclear as to how or why a student would want to, need to, or use training materials to prepare for *an investigation* as a fact witness. The truth is the truth; a fact a fact. It is not entirely clear how Professor Johnson might have imagined the plaintiff using such materials in an appeal, in light of Rollins College's actual appeals standards at the time.[78] No actual objective metric

---

[75] *Id.* at 11 – 12.
[76] *Id.* at 12.
[77] *Id.* (internal citation omitted).
[78] At the time of this incident, the standards for appeal were:
- Procedural misconduct during the investigation.
- The sanction(s) imposed is/are inappropriate for the violation of College policy.
- The preponderance of evidence standard was or was not met.

applicable in this matter required Rollins College to provide any participant in a grievance process at Rollins College training materials at any time, for any purpose. Finally, I am concerned that what Professor Johnson is suggesting with this rhetorical question is questionable at best. The plaintiff was under investigation for violating Rollins College policy. It is not the investigator who was being investigated.

If the now plaintiff (then respondent) had contemporaneous concerns about bias, fairness, adequacy of personnel or the like, there were options available to raise those issues including filing a Title IX grievance against Rollins College administrators or seeking investigation of Rollins College's practices with the Departments of Education or Justice. (I do not know whether Plaintiff did avail himself of these opportunities, but I have reviewed no information indicating so.) This is more than a concern about exhaustion of administrative remedies or laches, which is for the Court to consider if raised by the parties. My point is that Professor Johnson suggests turning the tables on an internal private college investigation, turning it into an investigation of the investigator with the presumption of incompetence or ill-motive. The fact that the respondent only chose to raise such points *after being found responsible by the investigator* leads me to question the purpose for which these arguments are being made, and why here through the mouthpiece of an expert report. The plaintiff is and was entitled to protest his innocence or lack of responsibility under Rollins College policies; Professor Johnson does neither. A miscarriage of justice is at risk if a truly responsible student is somehow exonerated. And, Rollins College is a private college, with correlative duties to protect the safety and integrity of its campus, particularly from individuals with a known and foreseeable history of sexual aggression; it enjoys basic rights like any private association or business entity to set and enforce standards to determine who may and who may not remain in good standing at the institution. Professor Johnson is highly critical of Rollins College and its administrators but neglects to acknowledge that Rollins College made significant and longitudinal commitments to hire qualified personnel, and provided training and a process that at the time no court or regulator had questioned as being fundamentally unfair in specific application or as a general type of practice. I find it instructive that, to my knowledge, no regulator, accreditor or any external agency with governmental authority has had questions or concerns about the operative facts of this matter.

### Trauma-Informed Training

Professor Johnson neglects to directly address the central point of my response to his report, presumably because he cannot. *There are no trauma-informed, or credibility training requirements under applicable objective standards in this matter*, and even with respect to Department of Education guidance and resolution agreements, there are *no specific* standards for trauma-informed training or credibility assessments. Professor Johnson's bald assertions that Rollins College provides "little actual training," etc. are assertions without foundation in

---

*Rollins Policy, supra* note 46 (*Rollins/Doe* 000687).

the information I have reviewed, inconsistent with my personal knowledge, and are not relevant to this matter.

Notably, Professor Johnson utterly fails to offer *any* objective standard to evaluate what sufficient training would look like. He does not even offer a preferred training vendor, materials or methodology for any training. His report is devoid *even* of reference to any practices he deems promising.

Instead, deflecting away from actual issues in this matter, he offers the following specious critique of Deena Wallace's testimony:[79]

> In her deposition, Deena Wallace appeared to concede as much. She noted that "if you describe somebody suffering trauma and somebody lying, there could be a lot of overlaps." She identified no training that she had received from Rollins on how to distinguish between the two, and instead relied on her personal investigative experience, her questions of witnesses, and what she somewhat

---

[79] Professor Johnson's additional critique of Ms. Jimenez's testimony is taken so out of context that is hardly worth addressing except to emphasize that the supplemental report has characteristics of an argumentative legal document from an interested advocate. He states: "Or, as Jimenez blandly commented when asked about using trauma-informed training, 'I don't see why that would affect the assessment of credibility.' The person who described herself as having 'final responsibility for this report' appears never to have even considered there might be a problem here." *Johnson Supplement, supra* note 2, at 13. Consider now the actual questions asked of Ms. Jimenez and her actual testimony regarding trauma that indicates she was discussing trauma in terms of the traumatic impact—potentially—on individuals involved in an investigation, by the investigative process itself:

Page 27

```
1    Q.  And in what context were they doing that?
2  Professionally?
3         MS. DEGANCE:  Objection to the form of the
4  question.
5  BY MR. ENGEL:
6    Q.  I mean, were they doing it for the schools, or
7  did they work as prosecutors, then, if they're lawyers?
8  Defense attorneys?
9    A.  Yeah.  Two of my investigators were state
10 prosecutors.
11   Q.  And who were those?
12   A.  Deena Wallace, I believe, may have been, and
13 Jessica Narducci.
14   Q.  Did Rollins College conduct trauma informed
15 investigations?
16   A.  Yes, we did.
17   Q.  And what does that mean?
18   A.  That means that the process is centered around
19 the people involved and not around our needs for
20 convenience.
21   Q.  Explain that, a little bit more.
22        MS. DEGANCE:  Object to the form.
23        THE WITNESS:  You go through the process,
24 acknowledging that the parties are experiencing a
25 traumatic event, meaning, going through an
```

Page 28

```
1    investigation, in and of itself, is a traumatic
2    experience.  And, so, you must offer them certain
3    resources, and support services, throughout the
4    process, and make that available to them.
5  BY MR. ENGEL:
6    Q.  How does conducting trauma informed
7  investigations affect the assessment of credibility?
8         MS. DEGANCE:  Object to the form.
9         THE WITNESS:  How does conducting trauma
10 informed investigations affect assessing
11 credibility?
12        MR. ENGEL:  Yeah.
13        THE WITNESS:  I don't see why that would affect
14 the assessment of credibility.
15 BY MR. ENGEL:
16   Q.  Did you receive, when you were Title IX
17 Director, any training on gender bias?
18   A.  I can't specifically recall, right now.  But,
19 again, all of the conferences and trainings we went to
20 were more premised on those types of factors.  They all
21 included those educational components.
22   Q.  If I've got our timeline right, what year did
23 you start as the Title IX Director at Rollins?
24   A.  2015.
25   Q.  And what was the -- starting in 2015, the
```

cryptically called a student's display of "appropriate emotion."
Wallace then had added, in this exchange:

**Q:** How do you respond to the criticism that the training in trauma
is just a way for adjudicators to interpret any behavior as consistent
with sexual assault?

After an objection and a re-rereading of the question, Wallace
replied:

**THE WITNESS:** *I guess I would agree with that criticism*. [emphasis
added] I would hope that adjudicators wouldn't flat out do that. I
mean, I certainly don't in my practice, and I would agree with that
criticism.[80]

Deena Wallace did not actually "concede" anything in her testimony, nor does she appear to do
so. Deena Wallace is correct; a fabricated account and some accounts from witnesses who
have been traumatized are not reliable—there are, as she said, "overlaps." (What Professor
Johnson conveniently leaves out of the quotation regarding "overlaps" between purposely false
information and some information given by a witness after experiencing a traumatic event is
Ms. Wallace's comment, "so that's why it is important . . .to have some corroborating
evidence."[81]) Of course, a fabricated account is also not credible; a trauma-informed account
may be credible in the sense that the witness sincerely believes what they recall even if it turns
out that the information is not reliable. I would point out that Deena Wallace's personal
investigative experience is considerable, and not to be discounted the way Professor Johnson
does. An attempt to cast her as ill-informed as a result of inadequate training is not supported
in the materials I have reviewed or from my personal experiences with and knowledge
regarding Deena Wallace's competency. Finally, the above-quoted interchange is
misinterpreted by Professor Johnson. I interpret her attempt to be cooperative and answer an
objected to, objectionable, argumentative question, as recognizing the obvious—that it would
be inappropriate to use trauma research inappropriately.[82] Deena Wallace, in the face of a
problematic question, nonetheless *affirmatively disavows such use* in the quoted testimony.
Yet, inexplicable from this Professor Johnson draws a compete non-sequitur: "In the end, in a
type of 'heads-I-win-tails-you-lose' approach, the college's training seems to designate virtually
any conduct by the complainant's as consistent with the complainant's version of events."[83]
The very quote he relies upon disproves his point. I add as one final note that even if, counter-
factually, both Deena Wallace and Oriana Jimenez both lacked adequate trauma training and

---

[80] *Id.*
[81] Wallace Deposition at 171:1-4.
[82] I note that Professor Johnson ignores the portions of my initial report that make the point that the appropriate
use of trauma-informed training was part of Rollins College actual training.  *See* Lake, 3/29/19 *Expert Response,
supra* note 1, at 22 - 29.
[83] *Johnson Supplement*, *supra* note 2, at 13.

understanding or somehow misused testimony (which they did not), the matter was subject to appeal where such issues could have been raised and addressed.

*Debunking of Lisak Study*

In his original report, Professor Johnson attempted to argue that Rollins College training materials were somehow skewed against respondents' rights. He may or may not have been aware at the time of the iteration of his original report, as I pointed out in my original report, that Rollins College administrators were exposed *to his own work in the field, by me*. In the supplemental report he now shifts the focus of his opinions and speculates as follows:

> As a professor, I always hope that students in my classes—and fellow academics in attendance at conferences—read every page of an assigned book or a conference paper, including footnotes. I'd also like to think that—having read every page and every footnote—my audience *then* also checks every publication listed in every footnote and reads each of those. I suspect Professor Lake would agree with me that this outcome rarely, if ever, occurs.

> There are two possible explanations as to how the Lisak stats were included in Jimenez-prepared training slides. First, Rollins' Title IX Coordinator (who oversaw the Title IX training at Rollins) read every word of Professor Lake's primer, including page 195; *then* read the footnotes on page 195; and *then* read the material footnoted to understand the extent of the debate (which Professor Lake's text doesn't detail). *Then*, after having done all that, she *still* decided Lisak's debunked figure was worthy for training purposes.

> Or, in the alternative, Jimenez simply never saw the footnote on page 195. In her deposition, Jimenez confessed that she obtained statistics about the percentage of false rape allegations "from research I located on the Internet" at an unspecified location. She added, "I don't know why I would" have examined "research" that she had cited in training materials. So her having used the undermined Lisak stats in Rollins training sessions without connecting them any way to page 195 of Professor Lake's Primer appears to be the far likelier scenario.[84]

His opinions have now shifted to a new, irrelevant, narrative—even if Rollins College administrators were presented with fair and balanced information, they either did not acquire the information, understand it, remember it or use it in a way Professor Johnson prefers. I am unwilling to speculate on the actual knowledge of the fact witnesses here absent their specific

---

[84] *Id.* at 14 (internal citations omitted).

testimony in this matter and am unclear on why opinions of this sort here have any bearing in
this matter.[85]

Professor Johnson also ascribes a "preferred narrative" to me: "That said, Professor Lake's
preferred narrative (that Jimenez knew the Lisak study had been undercut but used it for
training purposes anyway) is far worse for Rollins on this point."[86] This statement is false and
defamatory. Professor Johnson should withdraw this unfounded statement about my
preferences and any false implication that I knowingly provided disproven information to a
client and represented it as not false. I will remind Professor Johnson that we are both
academics and subject to standards of academic discourse beyond those in litigation. I will
regard any refusal to withdraw this statement as a failure to comply with applicable norms of
professional behavior for academics and will offer my opinion that this fact alone would call
into question the foundations of all his opinions, which arguably rest upon his academic
standing and achievement. I will point out that although Professor Johnson *believes* that the
Lisak study has been "undercut," he ignores the recent study I referenced in my original report
that may suggest that Lisak's findings were not inaccurate.[87] As I have pointed out, the federal
government itself seems to have been influenced by Lisak's work, making it worthy of notice
and discussion even if ultimately and arguably discredited—perhaps especially so. I again point

---

[85] At one point, Professor Johnson displays his penchant for reading too much into actual testimony and drawing
unsupportable inferences. Consider the following where Professor Johnson draws the conclusion that Deena
Wallace, the investigator, did not interact with the training I provided in a meaningful way:

> In the case of Deena Wallace, we *know* that it didn't occur. From her deposition:
> **Q**: Do you recall being exposed to debates surrounding rape statistics?
> **A**: No. That doesn't stick out in my mind.
> Wallace admitted that she might have "tuned out" that section of the training.

*Id.* at 14 n.53. The witness testified that she did not recall what she may, or may not, have once known, and was
lured into speculating as to why she did not have present recollection. This proves nothing about her actual
knowledge at the time of the training and/or investigation. I should also point out that if in fact Deena Wallace had
no present recollection of any rape statistics at the time of her investigation, then it would have been impossible
for her to have been influenced in any way at that time by any such statistics at that time. And, I might add that
the fact that Oriana Jimenez testified that she had gained some knowledge herself from her own research on the
internet is not surprising as some of what I provided in my slides has been available in various forms on the
internet, including references to Professor Johnson's own book.
[86] *Id.* at 14.
[87] Foubert, J.D., Clark-Taylor, A., & Wall, A. (2019). "Is campus rape primarily a serial or single time problem?
Evidence from a multi-campus study." Violence Against Women. DOI: 10.1177/1077801219833820. Consider the
following from the study:

> We examined the prevalence and repeat offenses of college men, including
> fraternity men and student athletes, taking advantage of someone sexually while
> under the influence of alcohol. Preexisting data from the Core Alcohol and Other
> Drug Survey included a sample of 12,624 college men at 49 community and 4-
> year colleges. Results provide further evidence that the problem of campus rape
> is largely one of serial perpetration. *More than 87% of alcohol-involved sexual
> assault was committed by serial perpetrators.* Fraternity men and student
> athletes were significantly more likely to commit alcohol-involved sexual assault
> than other men on campus.

*Id.* at 1 (emphasis added).

out that I am not a research scientist and have no intention to debate Professor Johnson on the
merits or demerits of his work or others, as I stated in my original report.[88]

### Single Investigator

In this section of his report Professor Johnson essentially offers his argumentative opinions
regarding the single investigator model, much of which reads to me like a legal brief.[89]
Professor Johnson makes the following statement: "Professor Lake contends that 'a hearing
under a single investigator model is a hearing.' This sort of wordplay is unpersuasive."[90]

I do not simply "contend" that a single investigator model can be a form of a hearing—this is a
legal fact. It is not the only form a hearing can take; a hearing can take many forms including
the form where an investigator reports facts to a final decision-maker (panel or individual).
Professor Johnson does not comprehend that fair and due process requirements, to the extent
applicable at all in this matter, are founded on notice and *an opportunity to be heard*.[91] This is
not "wordplay," it is the law. The fact that a hearing in front of a single investigator is
"counterintuitive" to Professor Johnson[92] must be the result of either unwillingness to accept
basic legal principles, or the inability to comprehend legal materials sufficiently.  Recent cases
like *Doe v. Allee*[93] coming from lower courts signal that some judges *prefer* one hearing model

---

[88] Thus, Professor Johnson's statements that it is "hard to conceive of a good explanation as to why such training
would have been used at *Rollins*. Professor Lake's report didn't challenge that point," are spurious. *Johnson
Supplement*, *supra* note 2, at 14 – 15.

[89] Professor Johnson cites and quotes the handful of legal cases that support the position the plaintiff takes in this
case. I do not intend to offer a quasi-reply brief and will try to limit my response here to expert opinions in this
matter. I will note that Professor Johnson suggests that there are an "array of opinions from California appellate
courts," which is misleading. *Id.* at 15. To date only the Second California Appellate District Court has ruled
consistent with *Doe v . Allee*, 30 Cal.App.5th 1036 (2019). I will also note that the handful of legal cases referenced
in his report all come from courts other than courts of final resort. It is not clear that the California Supreme Court
will or will not ultimately accept *Doe v. Allee,* for example. I also will point out that I never "insinuated" (as
Professor Johnson suggests on page 16 of his supplemental report) that judicial opposition to the single
investigator model is "confined to the Sixth Circuit (or California)." It was my response to Professor Johnson's
statement in his original report that prompted my specific mentions of the Sixth Circuit and California:

> Rollins previously used a live-hearing model to adjudicate sexual misconduct
> cases. Each of the parties (along with witnesses) appeared before a tribunal,
> which would question them, assess their credibility, and attempt to discern the
> facts. While the Eleventh Circuit has not directly addressed this issue in the
> context of sexual misconduct allegations, private colleges and universities in the
> Sixth Circuit risk lawsuits under Title IX if they do not provide accused students
> with a live hearing; most colleges in California, responding to a series of state
> court decisions, also now use the live-hearing model.

KC Johnson, *Expert Report Doe v. Rollins College* (February 28, 2019), at 12.  I was merely addressing the courts
referenced by Professor Johnson.

[90] *Johnson Supplement*, *supra* note 2, at 15.

[91] "[A]t the very minimum ... students facing suspension and the consequent interference with a protected
property interest must be given some kind of notice and afforded some kind of hearing." *Goss v. Lopez*, 419 U.S.
565 (1975).

[92] *Johnson Supplement*, *supra* note 2, at 16.

[93] 30 Cal.App.5th 1036 (2019).

over another in certain contexts. However, the fact that one model of a hearing is preferred does not mean that that other forms of hearings are not a hearing. I should point out that *Doe v. Allee* might well permit *a* neutral fact-finder—thus potentially a single individual—to conduct a live hearing with cross-examination of witnesses presented by a respondent and a reporter, which would still be a *single decision-maker* model.[94]

Consider what the Seventh Circuit held in a case against Purdue regarding the use of single investigator model:

> John also faults Sermersheim for being in charge of both the investigation and adjudication of his case. *We have held, however, that blending these two functions in the university context does not necessarily render a process unfair. . . .* To rebut the presumption that university administrators are "honest and impartial," a plaintiff must "lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." This burden is "heavy indeed," typically requiring evidence that "the adjudicator had a pecuniary interest in the outcome of the case, or that he was previously the target of the plaintiff's abuse or criticism."[95]

It is my opinion that an attempt to limit the definition legally such that a single investigator model is not a hearing is argumentative and is essentially a legal argument in favor of one hearing model, disguised with semantics under guise of "expert opinion." I also note that whether or not Deena Wallace or any other administrators at Rollins College conceived of a single investigator model as a hearing or hearing model is entirely irrelevant to whether or not it may be considered as such in the law.

I note that the Seventh Circuit now permits a single investigator model at public institutions, although it appears that its ruling has no direct impact on private colleges, such as Rollins College, in any event.

Professor Johnson also badly describes my interactions with Rollins College regarding their hearing model choices, and I now correct him.

As I opined in my original expert report, at the time of my visit to Rollins College in 2014, OCR had expressed a preference for the single investigator model. I note that I did not assert that OCR offered *guidance* to this effect, instead the Obama administration permitted (via a report, *Not Alone*, from the White House Task Force to Protect Students from Sexual Assault, among other communications) schools to use a variety of grievance models. At that time, the *Not Alone* report stated the following reflecting OCR's preference at the time:

---

[94] *Id.*
[95] *Doe v. Purdue University*, *supra* note 13, at 18 – 19 (internal citations omitted) (emphasis added).

Schools are experimenting with new ideas. Some are adopting different variations on the "single investigator" model, where a trained investigator or investigators interview the complainant and alleged perpetrator, gather any physical evidence, interview available witnesses – and then either render a finding, present a recommendation, or even work out an acceptance-of-responsibility agreement with the offender. These models stand in contrast to the more traditional system, where a college hearing or judicial board hears a case (sometimes tracking the adversarial, evidence-gathering criminal justice model), makes a finding, and decides the sanction.

Preliminary reports from the field suggest that these innovative models, in which college judicial boards play a much more limited role, encourage reporting and bolster trust in the process, while at the same time safeguarding an alleged perpetrator's right to notice and to be heard.[96]

Professor Johnson does not challenge my opinion; simply the foundation of my opinion (by my use of "the passive verb").[97] There is a reason for his failure to meet the issue head on; my opinion is accurate. The foundation for my opinion includes the above language from not only the *Not Alone* report but also conversations with *current and former staff at the U.S. Department of Education's Office for Civil Rights* (with whom I had several interactions with at various meetings and conferences, including my own conference through my appointment at Stetson College of Law) and conversations with other consultants and lawyers in direct contact with OCR and/or its staff. I am prepared to so testify if called to do so in this matter, although I might point out that it might be sufficient for me to opine that at that time, from approximately the period from 2014 to 2017, it was my belief that OCR had such a preference and I was motivated to share that belief with Rollins College at that time. I also note that I did not then, nor ever have, "championed" a model for Rollins College[98]—a false assertion; instead I offered Rollins College my opinions from time to time regarding the status of federal regulation in real time and offered recommendations based on interactions with them to help them choose for themselves as to how to proceed. I wish to point out that I recommended that Rollins College **consider** their choice of model in my recommendations: "Consider moving from a hearing panel model to a trained investigator model. Await further guidance on hearing panels in Title IX incidents from the Dept. of Education through FAQs and resolution of the UNC Chapel Hill matter."[99] Note that I clearly recommended that Rollins College "await further guidance" specifically with respect to hearing panels.

---

[96] *Not Alone*, *supra* note 17, at 14.
[97] *See Johnson Supplement, supra* note 2, at 15 n.58.
[98] *Id.* at 17.
[99] Hierophant Enterprises, Inc., *Observations and Suggestions from Rollins Visit* (March 19, 2014).

33

I wish to point out that these *Observation and Suggestions* documents from my 2014 and 2017 visits to the Rollins College campus are from personal notes.[100]  These documents were never shared with Rollins College staff, but instead I communicated my recommendations orally to them in a meeting at the end of each visit.  Rollins College staff did not ever obtain, nor did they ask for, any written deliverable as such, from these visits.

In a subsequent visit I did not "praise" Rollins College as Professor Johnson suggests:

> Indeed, in a 2014 "major recommendation" to Rollins, Professor Lake himself took a different view of things than he does now, arguing that the school should "[c]onsider moving from a hearing panel model to a trained investigator model. Three years later, Lake praised the college for having "as we suggested, . . . moved from a hearing panel model to a single investigator model.[101]

I acknowledged that Rollins College had followed the *suggestion to consider the choice* of the single-investigator model. Professor Johnson's above assertion makes no sense to me: I did not change my mind about anything discussed here. I also should address the following assertion: "Given his role in Rollins' decision to curtail accused students' rights and move from a hearing to a single investigator model…"[102] I did not play a role in Rollins College's *curtailing rights*; indeed there is not foundation whatsoever in any information I have reviewed supporting the assertion that Rollins College or its administrators "decided to curtail" anyone's rights, and I certainly played no role in any such decision or sought to achieve such a goal. Campuses other than Rollins College have used a single-investigator model.

Professor Johnson offers a variety of opinions that culminate with this:

> The use of a single investigator without the opportunity for a hearing is no longer, in my opinion, a generally accepted practice. The single investigator model, in my opinion, has been found unreliable in part because the model does not permit a student or finder of fact the opportunity to pose questions to witnesses to resolve factual and credibility issues. I base this opinion, in part, on the fact that multiple courts have noted that the single investigator model is incompatible with fair and equitable resolution of Title IX allegations.[103]

---

[100] Created with assistance from my wife and business partner, Jennifer Lake.
[101] *Johnson Supplement, supra* note 2, at 16.
[102] *Id.* at 17.
[103] *Id.* at 16.

In reaching these conclusions Professor Johnson draws attention to the proposed new regulations from the Department of Education proffered in 2018 and comments from a law firm's practice group.[104]

There is no question that some courts have rendered decisions since the operative time period of this matter, and that OCR has modified guidance and that the Department of Education is proposing new regulations. However, I fail to see how any of this impacts the application of actual objective standards in this matter, and I reiterate my opinions from my original report. It is axiomatic that advice to clients in some jurisdictions could now change in light of new judicial rulings that are valid for those clients in that jurisdiction and in light of potential new regulations reversing the course of federal policy. The field must prepare, as it always must, for significant changes in law. But it is patently unfair to ask a private college to anticipate changes in public law and changes in regulatory enforcement approaches in a crystal ball. None of what Professor Johnson adds in his supplemental report alters the fact that actual applicable objective standards during the operative time period of this matter gave Rollins College the flexibility to choose a grievance model in response to its Title IX obligations. Indeed, in *Davis*,[105] the United States Supreme Court held:

> We stress that our conclusion here-that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment-does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. We thus disagree with respondents' contention that, if Title IX provides a cause of action for student-on-student harassment, "nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages." . . . [106]

> School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. The dissent consistently mischaracterizes this standard to require funding recipients to "remedy" peer harassment . . . and to "ensur[e] that ... students conform their conduct to" certain rules . . . . Title IX imposes no such requirements.[107]

---

[104] *See id.* at 17.
[105] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).
[106] *Id.* at 648 (internal citations omitted).
[107] *Id.* (internal citations omitted).

I observe that Professor Johnson questions my impartiality with regards to the use of a single-investigator model. I note that I was not "asked to evaluate whether [my] recommendations from 2014 were appropriate" as Professor Johnson suggests.[108] I was actually engaged in this legal matter for the following purposes: "The substance of the expert consultation, report(s) produced, and any testimony at deposition or trial will relate generally to Title IX issues at Rollins College."[109]

Professor Johnson remarks: "I should note that [Professor Lake's] report does not reveal Professor Lake's contemporaneous recommendation for Rollins to embrace the single investigator model."[110] I believe I made clear in my original report, and have reiterated here, that at the time of my visit to Rollins College in 2014 many colleges considered implementing, and did implement, the single-investigator model based on the White House Task Force to Protect Students from Sexual Assault's report, *Not Alone*, and communications with operatives at the Department of Education, as discussed, *supra*.[111]

---

[108] *Johnson Supplement, supra* note 2, at 18.

[109] Peter Lake, *Description of Services and Schedule of Fees: John Doe v. Rollins College* (March 16, 2019), at 1.

[110] *Johnson Supplement, supra* note 2, at 18.

[111] In my 2017 Title IX Primer, I discuss "pure investigator models" (synonymous with single-investigator models) as follows:

> Keep in mind that if your institution chooses to use a pure investigator model, for compliance and due process purposes, this is, legally speaking, a "hearing." Some institutions, courts, and policymakers may struggle with accepting a pure investigator model in matters that may have substantial impact on the lives of students and their reputations. Expect there to be litigation and legal wrangling over these issues going forward and be advised that legal outcomes may impact OCR guidance substantially in the future.

> How might a pure investigator model have advantages? For one thing, it appears that model pushes the field towards a more professionalized and administrative approach to critical responses under Title IX. Highly trained investigators investigate the facts and make decisions based upon their training and experience. This type of model could improve decision making, assuming that these decisions are made fairly, impartially, and effectively, and are subject to meaningful review. Poorly trained decision makers could subvert the purposes of Title IX, potentially engaging in decision making that is not trauma-informed or otherwise well-trained. Hybrid models often appeal to institutions and others because they introduce a level of perceived procedural protection—a check and balance on an investigator. However, the hybrid models introduce risks of error, too. It is notable that some systems that continue to use a hybrid model may find that hearing panels (or single hearing officers) may have a tendency to follow the recommendations of an investigator in a very large number [of] cases. To the extent that any system has this tendency, the system is actually functioning very much like a pure investigator system, even if it has separate features of a hearing process. It is also critical to assess whether a hybrid model is improving outcomes—hybrid systems need to be reviewed just as pure investigator models do.

> Pure investigator models have some propensity to be more efficient. Hybrid models often require more extensive personnel and training. However, one

My work with Rollins College was not designed or delivered to favor any individuals or interest groups. And, whether Professor Johnson would care to admit this or not, my recommendations to Rollins College in 2014 and 2017 are not relevant to any issue in this matter. What Rollins College and its administrators actually *did* in *this matter* pursuant to *actual applicable objective standards* is at issue.[112]

## *Investigative Criteria and Rollins Procedures*

Professor Johnson argues: "In at least three significant respects, Title IX coordinator Jimenez and Investigator Wallace articulated different procedural criteria."[113] I note at the outset that his opinions in this section are not, in my opinion, relevant to issues in this matter. There are no objective standards applicable in this matter for specific "investigative criteria" or "procedures."[114]

---

> significant advantage of hybrid models may be cultural acceptance. The similarity of hybrid models to pre-existing models of discipline for students and employees may make these systems more culturally appealing. For employees in systems with collective bargaining rights, hybrid systems may be the only systems that are consistent with pre-existing collective bargaining agreements and established state law regarding employee rights.

Peter F. Lake, *The Four Corners of Title IX Regulatory Compliance: A Primer for American Colleges and Universities* (Hierophant Enterprises, Inc. 2017) at 156 – 157. This hardly shows evidence of my "championing" of one specific type of adjudication model. Each type of adjudication model has plusses and minuses and must be carefully considered by a campus with respect to that campus's culture, staffing, resources, policies, etc.

[112] Because of the proximity of this attempt to impute some motive to me without foundation—and falsely—I note Professor Johnson's comment that:

> Professor Lake criticizes the titles of some of my work [in his original expert report]. I've authored, co-authored, edited, or co-edited nine books published by trade presses. I've chosen the title for none of them. I've never chosen the title for an article published with a trade publication. (My experience is the common practice in that regard.) I didn't choose the title for my last two books with university presses, either. Professor Lake's remarks about the titles, therefore, are puzzling, though his framing the bulk of his report as a criticism of mine saves him from the difficult task of attempting to show how Rollins' process didn't exhibit signs of gender bias.

*Johnson Supplement, supra* note 2, at 18 n.77. I tend to regard Professor Johnson's attempt to distance himself from the titles of his own work as a "no I am not, you are" moment in his report. I should point out that it may be defamatory to attribute a title of a book to authors when they do not accept that title or concede the right to title the work to a publisher. I might appreciate the circumstances of a second author on a book such as "Rape Frenzy," but I doubt Professor Johnson disavows the titles of his books, and I note that he does not offer his opinion on whether or not he agrees with, and accepts, those titles. He has advocated for male respondent interests and must now contend with the fact that the corpus of his work in title and content could be viewed as favoring one gender and an interest group.

[113] *Id.* at 18.

[114] *See* language in *Davis*, as quoted *supra*, on page 35 of this report.

First, I would note that what Professor Johnson describes as an "ambush"[115] is not such, and
merely reflects common practice. I am unaware of any Title IX process where each and every
question or is offered to a witness in advance—in any model, whether a single investigator,
hearing panel or hybrid model. In a single investigator model, it falls upon the investigator to
determine how to construct interviews: the testimony quoted on pages 18 - 19 of Professor
Johnson's report is not remarkable in any way.  Moreover, based on Rollins College's own
policies, a student would be on notice that in some situations prior sexual history could be
relevant.[116] I again note that respondent had an advisor of his choice to assist him.[117]

Second, Professor Johnson's concerns revolving around a "definitional issue"[118] are not well
founded. Although I will not speak for either Oriana Jimenez or Deena Wallace as their
testimony is their own. I will observe that some individuals in a blackout state may "exhibit
some signs of intoxication" and be able to communicate with others but are otherwise
incapable of consent.[119]

---

[115] *Johnson Supplement, supra* note 2, at 18.  Professor may be attempting to use a term that appears in one of my
PowerPoint slides but does so here inappropriately.

[116] *See* discussion of Rollins College's policy with respect to prior sexual history, *supra*, at pages 14 – 16.

[117] In fact, in consultation with his advisor, Doe chose not to answer questions regarding some of the witnesses in
this matter during Doe's meeting with the investigator. *See* Deena Wallace [on behalf of Rollins College],
*Investigative Report in the Matter of Daniel Sang ("Responding" Party) and Jane Roe ("Reporting Party")*, (Dec. 12,
2017), at 21.

[118] *Johnson Supplement, supra* note 2, at 19.

[119] Rollins' 2015 policy language states:

> An individual in a blackout state may or may not meet the definition of
> incapacitation. Such an individual may appear to act normally but may not have
> later recall of the events in question.  The extent to which a person in this state
> affirmatively gives words or actions indicating a willingness to engage in sexual
> activity and the other person is unaware – or reasonably could not have known
> – of the alcohol consumption or blackout, must be evaluated in determining
> whether consent could be considered as having been given.

Rollins Policy, *supra* note 46 (*Rollins/Doe* 000680). Research published in 2016 on "alcohol-induced blackouts"
states:

> Alcohol-induced blackouts are defined as amnesia, or memory loss, for all or part
> of a drinking episode. During a blackout, a person is able to actively engage and
> respond to their environment; however, the brain is not creating memories for
> the events. Alcohol-induced blackouts are often confused with passing out from
> alcohol, but blacking out and passing out are very different states of
> consciousness. A person experiencing a blackout is conscious and interacting
> with his or her environment; whereas, a person who has passed out from alcohol
> has lost consciousness and capacity to engage in voluntary behavior. Memory
> deficits during a blackout are primarily anterograde, meaning memory loss for
> events that occurred after alcohol consumption. It is important to note that
> short-term memory remains intact during an alcohol-induced blackout, and as
> such, an intoxicated person is able to engage in a variety of behaviors, including
> having detailed conversations and other more complex behaviors like driving a
> vehicle, but information about these behaviors is not transferred from short-
> term to long-term memory, which leads to memory deficits and memory loss for
> these events. There is no objective evidence that a person is in an alcohol-

Or, a person may so exhibit signs of intoxication, and say "yes" but do so under duress or respond this way out of fear of violence (imagine someone with knife to their throat with an aggressor demanding "say yes"). Ms. Jimenez's testimony is entirely reasonable in light of the questions she was asked in her deposition on April 15, 2019:

Page 58

1    A.  Because, it says, "or behavior."  And
2  affirmative consent does not constitute behaviors.
3  Affirmative consent is verbal, yes means yes.
4    **Q.  Okay.  So, it's not -- I'm glad you clarified**
5  **that.  So, Rollins doesn't require a verbal yes, it**
6  **could be, yes, inferred from conduct?**
7    A.  Sure.
8    **Q.  Okay.  And another way you could commit sexual**
9  **assault is if the other person is incapacitated, right?**
10    A.  I mean, not getting consent is not getting
11  consent.  It doesn't matter the circumstances.  But,
12  incapacitation constitutes a circumstance where a person
13  would not be able to consent.
14    **Q.  Okay.  So, what -- so, how does Rollins treat**
15  **the use of alcohol, in terms of its effect on consent?**
16    MS. DEGANCE:  Object to the form.
17    THE WITNESS:  Yeah, can you clarify that for
18  me?
19  BY MR. ENGEL:
20    **Q.  Sure.  I mean, one way of reading the policy,**
21  **is that, the use of alcohol only matters if it results**
22  **in the person being incapacitated.  Am I reading that**
23  **correctly?**
24    A.  Can you restate your question?
25    **Q.  Sure.  And I'm not trying to hide the ball from**

Page 59

1  you.  Let me give you an example.  I've dealt with other
2  Title IX Coordinators, who've said that, if the person
3  has one drink of alcohol, they are unable to provide
4  affirmative consent.  That's not the rule at Rollins, is
5  it?
6    A.  No.
7    **Q.  Okay.  If a person is intoxicated, are they**
8  **able to provide affirmative consent, under the Rollins**
9  **policy?**
10    A.  According to our policy, the statement is,
11  where alcohol is involved, incapacitation is a state
12  beyond drunkenness or intoxication.
13    **Q.  Okay.  So, that's what I'm trying to get at.**
14  **If we have a student who is intoxicated, okay?  Let's**
15  **say, they're -- you're familiar with, they're too drunk**
16  **to drive a car?**
17    A.  Sure.
18    **Q.  Okay?  But, they're not considered**
19  **incapacitated, under the policy?  There's a gap there,**
20  **right?**
21    A.  Not necessarily.
22    **Q.  Okay.  Explain that to me.**
23    A.  If a person --
24    MS. DEGANCE:  Object to the form.
25    THE WITNESS:  If a person is too drunk to

---

induced blackout, thus it can be difficult or impossible to know whether or not a drinker is experiencing a blackout.

Wetherill, R. and Fromme, K., *Alcohol-Induced Blackouts: A Review of Recent Clinical Research with Practical Implications and Recommendations for Future Studies*, Alcohol Clin Exp Res. 2016 May; 40(5): 922–935. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4844761/pdf/nihms762300.pdf.

1    drive, they are too drunk to consent.
2  BY MR. ENGEL:
3     Q.  Okay.
4     A.  That is incapacitation.  They're incapacitated
5  from doing something they would normally be able to do.
6     Q.  Okay.  So, you interpreted the policy that, if
7  a person was beyond what would be able -- too drunk to
8  drive, they are considered incapacitated?
9     A.  You're -- you're -- you're trying to take
10 something and slice it into these pieces that doesn't --
11 it can't be sliced into.
12    Q.  Oh, I'm not trying to slice it, I'm trying to
13 understand how you applied the policy.  So, I read, on
14 Page 680 -- I think you just read it -- where alcohol is
15 involved, incapacitation is a state beyond drunkenness
16 or intoxication.  Okay?
17          So, if a person is -- let me give you a
18 hypothetical.  If a person is drunk, can they -- and
19 they engage in sexual activity at Rollins College, would
20 that be a violation of this policy?
21          MS. DEGANCE:  Object to the form.
22          THE WITNESS:  You're leaving out the factor of
23 consent.  You're just saying, if a person is drunk.
24          MR. ENGEL:  Yeah.
25          THE WITNESS:  A person can be drunk and not

1    consent.
2  BY MR. ENGEL:
3     Q.  Right.  But, a person can be drunk and say,
4  yes, I want to consent to this activity?
5     A.  Sure.  A person can be drunk and consent,
6  depending on their circumstances of drunkenness, which
7  are going to be different from mine, or yours, or
8  anybody else's.
9     Q.  Okay.  So, let me see if I can put it this way.
10 I can think of, you know, three states of the world for
11 someone.  Someone is sober, someone is drunk but not
12 incapacitated, and someone who is incapacitated.  Okay?
13 Now, we agree, if a person says, yes, I want to engage
14 in sexual activity, while they're sober, no violation of
15 policy.  Right?
16    A.  Correct.
17    Q.  Okay.  If a person is incapacitated, they're
18 unable to provide any kind of yes or no, right?  So,
19 that would be a violation of the policy, right?
20    A.  Correct.
21    Q.  Okay.  What I'm trying to get at, is that
22 middle state.  So, a person who is drunk, but not
23 incapacitated, and they say to their partner, yes, I
24 want to engage in sexual activity.  Has their partner
25 violated a Rollins policy?

1     A.  It's based on -- it depends on too many other
2  circumstances that you're leaving out.
3     Q.  Well, what am I leaving out?
4     A.  A person can say, yes, and be physically
5  exhibiting other signs of intoxication that should tell
6  another person that they are not able to -- that they
7  shouldn't be engaging in sexual contact with this
8  person.
9     Q.  Okay.  So, let me be clear.  So, if a person is
10 exhibiting signs of intoxication, and they say, yes, I
11 want to engage in sexual activity, that still may be a
12 violation of Rollins policy?
13    A.  Depending on the circumstances, sure.
14    Q.  What are those circumstances?
15          MS. DEGANCE:  Object to the form.
16          THE WITNESS:  I can't give you examples of
17 circumstances, without looking at a specific case
18 file.  But, what I'm saying is, that, there are
19 circumstances in life where a person could verbalize
20 yes, and still visually be unable, or just not a
21 good idea.  Not a respectful thing to do.
22 BY MR. ENGEL:
23    Q.  Okay.  And, so, where -- show me the part of
24 the Rollins policy that that would violate.
25    A.  If a person is lacking control of their

1  physical movements, unaware of their circumstances or
2  surroundings, or unable to communicate for any reason.
3     Q.  Okay.  So, is that a standard?
4     A.  Any of these things could be happening to any
5  degree, at any point in time, before a person becomes
6  so-called incapacitated or is in that middle state.  So,
7  if a person is lacking control of their physical
8  movements, but they verbalize, yes --
9     Q.  Okay.  So, suppose they're able to -- suppose
10 they've had a bunch of beers to drink, they're able to
11 control their physical movements, they're aware of their
12 circumstances, but they're still drunk enough that, if
13 they went and drove a car, they would get arrested.  Can
14 that person engage in sexual activity consistent with
15 this policy?
16          MS. DEGANCE:  Objection to form.
17          THE WITNESS:  It's too convoluted of a
18 question.  I'm not going to respond.  We're saying,
19 right here, an individual in a blackout state may or
20 may not meet the definition of incapacitation.  That
21 person may act normally and may later have no recall
22 of events in question.
23 BY MR. ENGEL:
24    Q.  Okay.  So, would that person have violated --
25 would that be a violation of policy, then?

Page 64

1       MS. DEGANCE:  Objection to form.
2       THE WITNESS:  Would what be a violation?  What
3    are you asking?
4       MR. ENGEL:  What you just described.
5       MS. DEGANCE:  Object to the form.
6       THE WITNESS:  I don't even understand what
7    you're asking, I'm sorry.
8  BY MR. ENGEL:
9    **Q.  So, if an individual appears to act normally,**
10  **says they want to engage in sexual activity, but later**
11  **can't recall the event, is there a violation of the**
12  **policy by their partner?**
13      A.  It depends on the circumstances.  That's why we
14  do an investigation.  And I, again, am not the person
15  that comes to a determination about the policy
16  violation.  I never was.
17    **Q.  Hold that thought.**
18      MR. ENGEL:  Can you mark that, and we'll want
19    to come back to that question.
20  BY MR. ENGEL:
21    **Q.  Now, on Page 680, it describes the Title IX**
22  **Coordinator's role, okay?  And one of the roles, it**
23  **indicates, is to provide training on, quote, "The**
24  **dynamics of sexual misconduct and harassment."  What**
25  **does that mean?**

I note that Professor Johnson does not reproduce the questions asked of Deena Wallace during her deposition on June 19, 2019, which were not identical to the questions asked of Ms. Jimenez, and for convenience and clarity I reproduce that part of Ms. Wallace's testimony here:

41

1    Q    And in particular, if we look at the last bullet
2    point on 679, it indicates an individual who is physically
3    incapacitated from alcohol or other drug consumption is
4    unable to give consent.
5        A    Correct.
6        Q    Okay.  So what is your understanding of the term
7    physically incapacitated?
8        A    My personal interpretation of physically
9    incapacitated is a state -- let's see.  The policy
10   describes it on page 680.  So are you asking my personal
11   feelings, or are you asking what the policy says?
12       Q    Well, I'm asking you your understanding of the
13   policy.  For example, on 680, it indicates "Where alcohol
14   is involved, incapacitation is a state beyond drunkenness
15   and intoxication."
16       A    Where?  Okay.  Yeah.  So somebody -- so sometimes
17   in these types of cases, I will use, like, the one to ten
18   scale.  One being completely sober and ten being completely
19   incapacitated or passed out drunk.  My interpretation of
20   somebody incapacitated would be described by other
21   witnesses as a nine or a ten.  Somebody who had -- was
22   being described as either passed out -- completely passed
23   out and unable to walk and talk.  You know, somebody that
24   couldn't be woken up or roused when shaken.  Somebody that
25   was maybe throwing up continually and couldn't stand.

1    Somebody that couldn't walk at all on their own.  Somebody
2    who couldn't speak to where anybody could understand them.
3        Q    So it's your understanding that's the standard
4    that you have to meet in order to be considered
5    incapacitated due to alcohol use under this policy?
6        A    Under this policy?  That's how I interpreted it.
7    Yes.
8        Q    And you believe that's the standard you've
9    applied in other cases?
10       A    Yes.  That's how I would -- yeah.  Somebody that
11   couldn't be understood.  Somebody that is not retaining
12   memories.  All of that I think is, you know, somebody who
13   doesn't really know where they are or what they are doing
14   is the way --
15           And keep in mind that I'm also analyzing this
16   from the back end.  I am not there on the front end, so if
17   somebody is saying -- telling me, "I had no memory
18   whatsoever," or "I didn't know where I was," those are all
19   indicators to me reviewing on the background -- reviewing
20   on the back end that they were probably incapacitated or
21   more likely than not in an incapacitated state.  If they
22   had the ability to retain memories, even if not 100 percent
23   of the details, I wouldn't -- if they had the ability to
24   walk and talk, and if other witnesses saw them speaking
25   relatively normally, then I wouldn't find them

1    incapacitated.
2        Q    So is it possible that both people in a sexual
3    encounter could be incapacitated?
4        A    It's possible.
5        Q    Okay.  Have you ever run into that situation?
6        A    I have not run into that situation.
7        Q    So looking at page 686 of Exhibit 29.
8        A    I'm sorry.  686?
9        Q    Yeah.  When we're talking in numbers, we are
10   talking about the Bates numbers at the bottom of the page.
11       A    Sure.  Thank you.
12       Q    Okay.  And that generally describes the process
13   that you would follow when conducting your investigations?
14       A    Yes.
15       Q    Now, I think you've indicated that Rollins has
16   more than one Title IX investigator, to the best of your
17   knowledge?
18       A    I believe that there is somebody -- there's --
19   yes.  I believe that there is somebody else that they use.
20   Yeah.
21       Q    Okay.  How are you selected to perform any
22   particular investigation?
23       A    I don't know.  I have no idea how they choose who
24   to call.
25       Q    Do you know if the complainant or the respondent

Here Deena Wallace's testimony appears to relate to the important distinction between being totally incapacitated—"passed out drunk"—and *lacking capacity* to consent to particular action of another. Oriana Jimenez and Deena Wallace's testimony are not inconsistent here (in part because they were answering different questions), and in my opinion are perfectly reasonable answers, the type of which I would expect from trained and experienced administrators. I will also point out that I struggle to see the relevance to this matter even if, *arguendo*, these two administrators had inconsistent understandings of relevant definitions of Rollins Code. If this had been an issue, it could have been raised and rectified in Rollins College's appeal process if it had been material to the final resolution of this matter.[120]

Third, Professor Johnson makes the following assertion:

> On another front, Wallace's deposition suggests that—at a definitional level—she basically ignores two plausible (if not likely) motives for a complainant filing a false report. First, she cited not any of her training, but "common sense" for the proposition that a student who had drunken but consensual sex might file a false Title IX report. And she saw no inconsistency between Jimenez's decision to inform neither Doe nor Wallace that the complainant had received an academic accommodation (which at least provided a possible reason to lie) and the conclusion of her report that "no witnesses, including respondent, could think of a reason why reporter would have a motivation to make this up." Judge XX Graham rebuked Ohio State for identical conduct—withholding a complainant's academic accommodation and then seeing the disciplinary board issue a finding that challenged the respondent for his inability to offer a reason why the complainant might have lied.[121]

I note first that Professor Johnson has never offered an opinion that the reporter in this matter "lied" or otherwise provided false information, as he also never offered his opinion that the plaintiff is, in fact, innocent. Professor Johnson's concerns here about Deena Wallace's testimony are convoluted and I am not entirely certain what he is attempting to opine at this point. I will not speculate. I am curious, however, how he imagines receiving an (unspecified) academic accommodation "provided a possible reason to lie," and how this is relevant in a matter where no one accused the reporter during the investigation of this matter of lying or fabrication.[122]

---

[120] *See* discussion of Rollins College's grounds for appeal, *supra,* note 78.
[121] *Johnson Supplement, supra* note 2, at 19 – 20.
[122] *See* Deena Wallace, *Investigative Report in the Matter of Daniel Sang, supra* note 117.

I also observe that this subsection his supplemental response features references to two cases outside the state of Florida and outside the Eleventh Circuit with different facts from the instant matter.[123]

*Gender Bias* [124]

After making unfounded assertions about training received by Rollins College in his initial report, which I addressed in my original report,[125] Professor Johnson here attempts to confront the weaknesses in his original report by making false claims regarding my training materials and trainings that I provided to Rollins College as a consultant. I will remind Professor Johnson that I am not a party in this matter, and the assertion that I, or my materials, were biased is not just simply false and scurrilous, but entirely irrelevant to this matter even if were somehow true or a matter of "opinion." I will assume for sake of my response that he may have intended to neither make statements of and concerning me personally nor my materials but to argue (albeit incorrectly) that although created and offered in a neutral and balanced way—which they were—my materials nonetheless may have (somehow) had some effect of creating gender bias.

Allow me to show why this is profoundly misguided. Rollins College administrators were in fact given the opportunity to learn from scenarios that included a potential female victimizer and a potential male victim. In the face of this information provided in my original report, Professor Johnson's original opinions now visibly suffer from being ill-informed. In what appears to be an effort to draw attention away from a critical weakness in his original report—that his original opinions lacked foundation—Professor Johnson attacks the two scenarios I used attempting to paint them—independently of the context in which they were used—as somehow gender biased.

---

[123] *Johnson Supplement, supra* note 2, at 19 n. 85 and n. 87 (mentions of *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774 (2015), and *Doe v. Ohio State Univ.*, 311 F.Supp.3d 881 (2018)).

[124] Professor Johnson has now reviewed Oriana Jimenez's deposition and it appears that he wishes to offer the following observation, which is not clearly connected to the heading under which it appears:

> My original report noted the curious element of the training materials (in mixed-gender cases) prepared by Rollins Title IX staffers for various campus constituencies choosing to have all complainants be female and all respondents male. Jimene'z's deposition provided insight into the haphazard ways in which she chose material for college training. When asked about a training slide claiming that a key goal of Title IX is to establish procedures to help survivors, said that she hadn't reached this conclusion independently. Instead, she commented, "This slide came off the Internet from a different school." She justified the training's sometimes straying into tangential ideological points by claiming, "We talk about sexual misconduct and harassment from a social justice perspective."

*Johnson Supplement, supra* note 2, at 20 (internal citations omitted). It appears that Professor Johnson offers his opinions here that training at Rollins College was "haphazard." I fail to see how this connects to any issue of gender bias at all even if "true"; and it is my opinion, based in part on having actually delivered training to Rollins College administrators, that Rollins College has made significant commitment to hiring trained personnel and training them with respect to Title IX.

[125] *See* Lake, 3/29/19 *Expert Response, supra* note 1, at 29 – 32.

44

I note four things relating to the first scenario involving Dega Bah,[126] as Professor Johnson apparently did not carefully read the scenario. First, Professor Johnson incorrectly asserts that the scenario contained a "male complainant"—it did not.[127] Both parties in this scenario are female. Second, Professor Johnson makes another error stating that the scenario "involved . . . non-college-aged parties." The scenario actually featured only **one** individual specifically identified as an "adjunct professor and 45-year veteran costumer" (Ms. Fett later states in the scenario "I am a 68-year-old woman"...she is not 45 years old as Professor Johnson states) and another individual is identified as "a 21-year-old junior studying theater arts." [128] (Incidentally, I note that college students can be, and are, almost any age.) Third, Professor Johnson draws attention to the Stars Wars theme of the fictional characters three times[129] and appears to intimate that because of that, the scenario is somehow inauthentic.[130] In fact, the scenario is a very realistic adaptation of actual facts encountered in my work in the field from an actual incident at an actual American campus. The presence of fictional characters or changed names does not make a scenario inauthentic, and I should note that all hypotheticals involve fictitious names.  Fourth and finally, Professor Johnson offers no significant critique of that scenario. I believe this scenario to be useful in discussion of issues of employee-on-student harassment, what constitutes harassment, etc.; that is why I include it, among others, in my training sessions.

Professor Johnson appears to dislike the other scenario, the Mitchell scenario. Professor Johnson's preferences, of course, have no bearing on any issue in this matter; and it is common for academics to prefer their own scenarios. The Mitchell scenario involves competing, inconsistent narratives and individuals grieving against one another and I again point out here that Rollins College administrators were offered specific training on situations where a male respondent might also be a complainant, and vice versa. Professor Johnson offers a variety of editorial comments, which say a great deal about *his* perspectives on training. I will take them in turn below. I note that one goal in using this scenario is to help trainees better understand how not to rush to judgment and fairly assess information; another is to help trainees understand when to seek additional information, and why.

---

[126]  *See id.* at Appendix B (the Dega Bah and Ms. Fett scenario was used in a Title IX 201 Intermediate training (through my partnership with ACPA-College Student Educators International) attended by Deena Wallace in October 2017).

[127] I assume Professor Johnson meant to say "male respondent." Professor Johnson states:

> [N]ew discovery material did suggest that Rollins Title IX officials received training from an outside vendor (Professor Lake) that on at least two occasions involved a male complainant. The first of these, provided as an appendix to his report, involved a scenario with non-college age parties (the respondent is listed as 45 years old) whose names (Dega Bah and Ms. Fett, at Wookie College) played off a Star Wars theme.

*Johnson Supplement, supra* note 2, at 20 (internal citation omitted). The respondent in this scenario, Ms. Fett, is female.  The complainant in this scenario, Dega Bah, is also female.

[128] *See* Lake, 3/29/19 *Expert Response, supra* note 1, at Appendix B.

[129] *See Johnson Supplement, supra* note 2, at  19 – 21.

[130] Professor Johnson makes a comparison of the Dega Bah scenario to another scenario: "Unlike the Star Wars-themed scenario, this one has an authentic, ripped-from-the-headlines feel . . ." *Id*. at 21.

- "[N]othing in the scenario suggests that the complaint filed by the male student occurred in good faith."[131] This comment is spurious. The purpose of the scenario is to help trainees evaluate and discuss issues of credibility. If the scenario starts with such a statement of good faith, then participants might be led to believe the trainer wants them to accept the veracity of the accounts of one or either party, defeating the purpose of the exercise.

- "The male student's motives for filing a cross-complaint come across as obviously retaliatory and in bad faith."[132] This is one, and only one inference, that might be drawn from the facts of this scenario, but as I discuss when using this scenario, a prime motivation to file a complaint is because one believes, in good faith, that their rights have been violated; and second-in-time reporting does not create any presumption of a motive to retaliate. Moreover, we discuss the reality that a witness providing essentially hearsay evidence of motive may or may not be credible or reliable. We also discuss the fact that someone's legitimate right to protect their reputation is not in and of itself a motive to retaliate; the hiring of a lawyer may also create advocacy issue for the rights of a party (we even discuss potential ineffective assistance of counsel concerns).  Professor Johnson has done exactly what I train against—making assumptions about information before evaluating it. His reactions suggest implicit bias in favor of male respondents, or little to no operational experience. Consider the next two editorial comments.

- "The female complaint, by contrast, was presented as courageous and idealistic. A hypothetical interview with a female witness featured this passage: 'She said Smith eventually told her that she was filing a complaint and that 'her #1 consideration was justice.' She told her that she wanted to prevent Mitchell from treating younger students the same way Mitchell had treated her.' Her hypothetical female witnesses showed Smith as very credible—speaking to them immediately after the event, describing the male student as 'kind of rape-y.'"[133] These editorial observations are in the eye of the beholder and reveal much about Professor Johnson's perspectives. The female respondent/complainant, named Alice Smith in the scenario, is never actually identified in the scenario as "courageous" or "idealistic"; and although there was information potentially corroborating her narrative, there was also information suggesting problems with her narrative. Again, this is for the trainees to discuss and evaluate. It is entirely possible that the female, Ms. Smith, is either fabricating her story and posturing as the victim after a regretted encounter or is reporting in good faith but due to trauma or otherwise, may not be a reliable witness. The scenario is a platform to discuss credibility *and* reliability; and discuss the critical value in observing the demeanor of witnesses—and the not uncommon need to adduce additional information, *inter alia*.

- "These hypothetical documents were produced for 'training purposes only.' But Mitchell—the non-Star Wars-themed male complainant presented in the Lake training—is presented as an almost cartoonish portrayal of a drunk, selfish, male frat boy

---

[131] *Id.*

[132] *Id.*

[133] *Id.* at 22 (internal citation omitted).

obsessed with his muscles, exploiting a near-perfect female. If *that's* what Professor Lake saw as useful for training Rollins' Title IX officials office about as a typical campus sexual assault, perhaps it's unsurprising that the officials themselves relied on gender stereotypes in the scenarios that they themselves prepared."[134] Apart from the snarky tone of this comment, the opinion that my trainings at Rollins College (or, more accurately, training offered to a national audience that Rollins officials attended) somehow led Rollins College administrators to adopt and then rely on gender stereotypes heaps speculation upon argument, not fact—and is utterly unsupported by any information I have reviewed, and my experiences with Rollins College administrators. Moreover, the perception of the stereotypes Professor Johnson describes are his. There is nothing in the scenario that casts Mitchell as "selfish"; it is perfectly reasonable to protect one's reputation if one is innocent. There is nothing in the scenario that describes the female as "near perfect" or anything like that; in fact, I am not even sure what that means, and I would ask a trainee to clarify if using such a description. Mitchell is an adult male college student, not a boy. If find it intriguing that Professor Johnson sees him this way—particularly the truly bizarre observation that Mitchell was "obsessed with his muscles." The facts in my scenario suggest that *he lost muscle mass due to stress*, which would concern any reasonable human being, male or female, and is not perforce a sign of obsession. One reason this fact is present in my scenario is that many state legal systems look at physical symptoms of distress as some proof of actual mental distress; this fact might actually serves to potentially *corroborate* that the male, Mitchell, has experienced trauma and also that he may be telling the truth about the impact the situation is having on him (I suppose I must clarify that I am not suggesting that someone is telling the truth *because* they suffer trauma).

In short, Professor Johnson has completely missed the point of the scenarios and has given me some concern in how he has reacted to them about his own potential implicit bias.

*Conclusion*

In the conclusion of his supplemental report, Professor Johnson states "Rollins has acted in a manner that favored female reporting parties and disadvantaged male responding parties."[135] It is my opinion that there is no information that I have reviewed that supports this opinion, and that this opinion in itself is insufficient to establish anything relevant in this matter. I reiterate my opinions from my original report here:

> I do not share Professor Johnson's concerns about thoroughness and factual accuracy, procedural fairness, training and trauma, and gender bias in training. Instead, I observed evidence of a prompt, equitable and impartial resolution of a contested matter on campus. I express my concerns about the potential for opening the

---

[134] *Id.*
[135] *Id.* at 22.

47

floodgates of federal court litigation regarding contested Title IX matters on private college campuses simply because an impacted individual disagrees with a final resolution and/or because an impacted individual merely raises the possibility of bias (which, as my report indicates, I do not detect here). I do not observe any basis for the claim that there was an erroneous outcome in this matter; and I do not believe it is fair to ask a private college, acting in good faith in Title IX compliance efforts, to be called to account under public law "due process" standards articulated in other jurisdictions *after* relevant events in this matter—particularly regarding procedures that Rollins College was guided *not* to use by federal regulators.  Private colleges are not courts—particularly quasi-criminal courts. Title IX exists to combat sex discrimination, and not to create such courts on private college campuses under the supervision of federal courts.[136]

Professor Johnson also states three additional points by way of conclusion:

**First**, Jimenez's role as a surreptitious editor, strengthening the presentation against the accused, extended beyond the Doe case—despite her claims of neutrality. **Second**, Rollins, under Title IX coordinator Jimenez, appears to have had a clear policy of treating the sexual histories of male respondents differently from those of female complainants. And **third**, Rollins had a pattern of selectively enforcing its policies by not pursuing possible misconduct committed by female students.[137]

None of these opinions bear upon the actual objective standards in this matter. I disagree with Professor Johnson's three points. First, as I have opined, Oriana Jimenez was not a "stealth" editor, did nothing surreptitiously, and from the information I have reviewed and from personal knowledge, performed her Title IX duties in good faith and in accordance with applicable objective standards. Second, Rollins College had no such "clear policy" as Professor Johnson articulates; this statement is both false and misleading. Although Rollins College had policies guiding the uses for which prior history may be used in an investigation, the policies are *gender neutral*; and, as I have earlier opined, are entirely consistent with applicable objective standards. Third, even if this were somehow relevant to this matter, I do not observe any "pattern of selective enforcement" related to sex from the materials I have reviewed, and I observe that Professor Johnson's opinion here is founded on his perceptions of how this matter was investigated, and mere speculation.

---

[136] *See* Lake, 3/29/19 *Expert Response, supra* note 1, at 33.
[137] *Johnson Supplement, supra* note 2, at 22 (emphasis added).

Professor Johnson's supplemental report is largely an exercise in gaslighting and shot-gunning—distracting attention away from the fact that he offers no opinion that Rollins College in fact made an error in this matter, and attempting, without success, to attack Rollins College's process and its administrators—even me—in a multitude of ways, well beyond issues that the respondent raised himself in the transit of the investigation and appeal.  Professor Johnson also does not address the challenges I have raised with his report adequately; he claims sex discrimination, but I observe no such thing in the materials I have reviewed.  I now interpret both of Professor Johnson's reports as advocating for the application of *new and unprecedented legal* standards for a private college in Florida, perhaps for what he perceives to be pro-respondent legal reform. I will let the lawyers in this matter address the merits and demerits of potentially applying new legal standards to Rollins College. I would be pleased to offer the Court my views on potential law reform if asked to do so, but I respectfully regard offering offering unsolicited legal opinions in the context of this expert report to be beyond the scope of my engagement except insofar as to meet and address concerns raised by Professor Johnson, in line with the scope of my engagement.

_____

The opinions expressed in this supplemental expert response are based on my own professional experience, expertise and knowledge and are offered in response to Professor Johnson's supplemental expert report.   Should new information, including additional opinions from Professor Johnson, be produced at any time related to this matter after my report is submitted, I reserve the right to alter my opinions and/or amend this report.

Respectfully,

Professor Peter F. Lake

49