UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN DOE,

      Plaintiff,

v.                                                  Case No. 6:18-cv-1069-Orl-37LRH

ROLLINS COLLEGE,

      Defendant.
_____

## ORDER

Defendant Rollins College ("**Rollins**") moves for summary judgment (Doc. 60 ("**Rollins's Motion**")), and Plaintiff John Doe ("**Doe**") moves for partial summary judgment (Doc. 56 ("**Doe's Motion**")). The parties responded (Docs. 72, 74) and replied (Docs. 75, 76). On review, Rollins's Motion is granted in part, and Doe's Motion is granted in part.

## I.   BACKGROUND[1]

Following a sexual encounter in his campus dorm room with fellow student Jane Roe, Doe was found responsible for violating Rollins's Title IX: Sexual Misconduct and Harassment Policy ("**Policy**"), resulting in disciplinary sanctions. (Doc. 56-1; Doc. 61-5,

---

[1] In resolving a summary judgment motion, the Court ordinarily presents the facts in the light most favorable to the non-moving party. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). Here, however, both parties move for summary judgment, and the material underlying facts are not in dispute—rather, it is the inferences drawn from those facts that the parties dispute. So in the Background, the Court presents the undisputed facts from the record evidence.

pp. 9–35.) Doe now sues Rollins for violations of Title IX and breach of contract. (Doc. 14.) Title IX of the Civil Rights Act provides that "[no] person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Doe says Rollins violated Title IX by discriminating against him based on gender during its handling of a sexual misconduct allegation against him. (*See* Doc. 14.) The breach of contract claim stems from alleged failure to follow both the Policy and Rollins's Responding Party Bill of Rights. (Docs. 56-1, 56-13). For context, let's first review Rollins's policies, training, and email on Title IX, then the incident and investigation into Doe's conduct, and end with other sexual misconduct investigations at Rollins.

A.      **Rollins's Policies**

In 2011, the U.S. Department of Education issued the "Dear Colleague Letter" to colleges, to provide guidance for complying with Title IX and to encourage prompt and equitable procedures to address sexual misconduct. (Doc. 61-12 ("**Dear Colleague Letter**").) According to Doe's expert, Professor Johnson, the Dear Colleague Letter's "significant procedural changes increased the chances that an accused student would be found responsible for a sexual misconduct allegation." (Doc. 63-1, p. 3.)[2] Following the Dear Colleague Letter, in 2015, Rollins adopted the Policy. (Doc. 56-1.) The Policy defines sexual misconduct that violates Rollins's community standards and explains how reports

---

[2] Professor Johnson has been permitted to testify as an expert on the history and background of Title IX. (Doc. 109.)

of sexual misconduct will be handled by Rollins. (*Id.* at 2.) Rollins says it's committed to

a "timely and fair resolution of sexual misconduct and harassment complaints." (*Id.*) The

Policy mandates:

> Where the College has received a report of sexual misconduct or
> harassment but the reporting party requests that he or she remain
> confidential and/or requests that the College not pursue an investigation,
> the College must balance this request with its responsibility to provide a
> safe and non-discriminatory environment for all members of the Rollins
> community. The College is required to take all reasonable steps to
> investigate and respond to a complaint, but its ability to do so may be
> limited by the reporting party's request. However, under compelling
> circumstances including: evidence of a pattern of repetitive behavior, the
> use of force or threat of force, or the use of a weapon by the responding
> party, the College may conduct further investigation, or take other
> appropriate measures without the reporting party's consent. The reporting
> party will be informed whenever possible of any action the College takes to
> resolve the complaint, including further investigation and corrective or
> disciplinary steps.
>
> The College will respond promptly and equitably when any incident of
> sexual misconduct or harassment is *alleged* against a faculty, staff, or
> student. Typically the process will be completed *within 60 days*. This
> timeframe may be extended *only* for good cause. If good cause exists to
> extend the timeframe, both the reporting party and the responding party
> *will* be notified in writing of the extension and the reason for the extension.
> This includes a direct compliant [sic] or if the College becomes aware of the
> situation by other reliable means. The College's response may take a
> number of forms within its discretion. This includes offering reasonable
> protection and services to the complainant or others, conducting a Title IX
> inquiry or review, conducting an investigation, and imposing corrective
> action.

(*Id.* at 4, 14 (emphasis added).)

If an investigation is deemed necessary, a Title IX Investigator ("**Investigator**") is

charged with conducting it. (*Id.* at 14.) Both the reporting and responding party have the

opportunity to be heard, to have an advisor during the investigation, and to provide

relevant witnesses. (*Id.*) The Policy also dictates when the students' prior sexual history can be considered:

> During the investigation process, the Title IX Investigator will determine whether information concerning the *prior sexual history* of either party is *relevant*. In general, in a case where the responding party raises consent as a defense, any prior consensual relationship between the parties may be relevant. Any other prior sexual history of the reporting party is typically not relevant and may not be permitted. *Prior sexual history of the responding party* may be *relevant* where there is *evidence of a pattern of misconduct* that may be relevant in the determination of responsibility assigning of corrective action.

(*Id.* (emphasis added).) In addition to the Policy, Rollins's Title IX Office published a bill of rights for the responding and reporting parties. (Doc. 56-13.) The Responding Party Bill of Rights includes numerous protections for a student responding to a sexual misconduct allegation, including the right "[t]o not have IRRELEVANT prior sexual history considered as information in the investigation." (*Id.* at 2.)

After the investigation, the Investigator determines responsibility by a preponderance of the evidence, and Rollins's Office of Community Standards and Responsibility determines sanctions if necessary. (Doc. 56-1, pp. 14–15.) Rollins found Doe violated the Policy by engaging in non-consensual sexual intercourse and sexual contact. (Doc. 56-6, pp. 56–57.)[3] The Policy definitions are:

> Related to Non-consensual Sexual Intercourse: Having or attempting to have sexual intercourse with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact.

> Related to Non-consensual Sexual Contact: Having or attempting to have

---

[3] The page numbers for citations to Deena Wallace's report (Docs. 56-5, 56-6) are those from the bottom center of the page.

> sexual contact with another individual without consent. Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, or disrobing of another without permission. Intimate parts may include the breasts, genitals, buttocks, mouth or any other part of the body that is touched in a sexual manner.

(Doc. 56-1, p. 6.) Both parties are to be notified simultaneously, in writing, of the outcome. (*Id.* at 15.) A party may appeal in writing within five days of receiving written notice of the outcome based on procedural misconduct, inappropriate sanctions, or insufficient evidence. (*Id.*) The Title IX Coordinator[4] determines which Rollins Vice President hears the appeal. (*Id.*) Rollins will notify both parties in writing of the appeal outcome. (*Id.*)

By 2017, shifting political winds prompted discussion about repealing the Dear Colleague Letter. (*See* Doc. 56-3.) In response to these potential changes, Rollins's Title IX Coordinator Oriana Jimenez ("**Jimenez**") said Rollins couldn't "afford to change anything drastically right now." (*Id.* at 4.) Jimenez later said she meant Rollins wasn't required to change anything and there was nothing Rollins could have improved about its process. (Doc. 56-2, pp. 46:1–9, 52:8–16.)[5] In 2017, the U.S. Department of Education withdrew the Dear Colleague Letter noting criticisms of it "placing improper pressure upon universities to adopt procedures that do not afford fundamental fairness." Letter from Office for Civil Rights, U.S. Dep't of Educ. (Sept. 22, 2017); (*see also* Doc. 56, p. 6.)

---

[4] The Title IX Coordinator oversees Rollins's "response to all reports of sexual misconduct and harassment, conduct[s] training and coordinat[es] compliance with the mandates of Title IX." (Doc. 56-1, p. 8.) The Title IX Coordinator is "knowledgeable and trained in the College's policies and procedures, state and federal laws that apply to sexual misconduct and harassment, and the dynamics of sexual misconduct and harassment." (*Id.*)

[5] Citations to depositions will refer to the page number on the top right corner of the deposition transcript.

### B.   Rollins's Title IX Training & Email

During Title IX trainings for students, Rollins included statistics and charts identifying the gender of people involved in or affected by sexual misconduct. (*See* Docs. 74-9– 74-13.) Some of those statistics are: 1 in 5 college women will be sexually assaulted during their college years; 6.4% of college-aged men perpetrate rape; 99% of people who rape are men; and about 40% of gay men, 47% of bisexual men and 21% of heterosexual men in the United States have experienced sexual violence. (Doc. 74-9, pp. 3, 4, 7; Doc. 74-11, p. 7.) Here are examples of Rollins's training charts addressing sexual violence and gender:



Rollins/Doe - 001195





(Doc. 74-12, pp. 59, 60; Doc. 74-13, p. 28.)

Rollins's Title IX Office also sent an email to the student body in 2015 titled, "Engaging Men to Prevent Sexual Violence." (Doc. 74-7.) The email included an article stating, "[w]hile most men do not commit acts of violence, males perpetrate the majority of sexual assaults on women and other men." (*Id.*) It continued, "[m]en act in a hyper-masculine and sexually aggressive manner to gain approval from their male peers, not to impress women, research suggests." (*Id.*) The email concluded by stating educational

institutions "should treat men as partners, not as potential perpetrators, by emphasizing the positive role men can play." (*Id.*)

### C.  Alleged Misconduct & Jane Roe's Report

Doe and Jane Roe both attended Rollins and became friends after Doe's freshman year. (Doc. 56-5, p. 7; Doc. 61-4, p. 17:2–11.) During Doe's senior year, on February 17, 2017, they attended a function at Doe's fraternity, drank alcohol, and went to a bar called "The Porch." (Doc. 56-5, pp. 7–8, 17–19.) They left the Porch together and arrived at Doe's dorm room in the early morning hours of February 18, 2017. (*Id.* at 8–9, 18–19.) They put on a movie and kissed, Doe inserted his fingers into Jane Roe's vagina, and she touched his penis. (*Id.* at 9–10, 19–20.) Jane Roe then left Doe's dorm room. (*Id.* at 10, 20.) On February 22, 2017, Jane Roe reported to Jimenez that the sexual encounter with Doe was not consensual. (*Id.* at 2–3; Doc. 56-2, p. 115:9–15.) Jane Roe did not want to participate in a Title IX investigation, and Rollins did not investigate her allegation at that time but provided academic and housing accommodations following her report. (Doc. 56-5, p. 3; Doc. 56-2, pp. 116:7–21, 122:10–123:16.)

Nine months later, in November 2017, Rollins received an anonymous call that an individual with a name similar to Doe's had sexually assaulted three women. (Doc. 56-5, p. 3; Doc. 56-2, p. 127:7–24.) After this call, Jimenez reached out to Jane Roe to see if she wanted to proceed with an investigation against Doe. (Doc. 56-2, pp. 127:3–128:19.) Jimenez told her that because of this call, the Title IX Office would be looking into Jane Roe's February report, regardless of Jane Roe's decision to move forward. (*Id.* at 128:20–129:3.) Jane Roe decided to participate, memorialized in an email sent on November 17,

2017. (*Id.* at 129:17–24; Doc. 56-7.) Doe was notified of the allegation against him on November 20, 2017. (Doc. 56-8.) The same day, Rollins placed a no-contact order between Jane Roe and Doe, made further academic accommodations for Jane Roe, and offered academic accommodations to Doe.  (Doc. 56-5, p. 3.)

### D.     Investigation & Findings

Once Rollins decided to move forward in November, it hired an outside Investigator, Deena Wallace ("**Wallace**"), to investigate Jane Roe's allegation. (*See* Doc. 56-5; Doc. 56-9, p. 22:19–23.) Wallace interviewed twenty-two witnesses, Jane Roe four times, and Doe once, in the presence of his advisor, Eric Barker ("**Barker**"). (*See* Doc. 56-5, p. 3; Doc. 56-9, pp. 117:25–118:7.) Jane Roe alleged that during the encounter with Doe, she was drunk, tired, and told Doe "no" and "stop." (Doc. 56-5, pp. 8–10.) Doe claimed Jane Roe did not tell him to stop or show signs of being uncomfortable. (*Id.* at 17–22.)

After the investigation, Wallace issued a seventy-one-page report with fifteen exhibits, finding Doe responsible for violating the Policy. (Docs. 56-5, 56-6.) Wallace recognized she needed to assess the credibility of Jane Roe and Doe because there were no other eyewitnesses to the encounter and their testimony conflicted. (Doc. 56-6, p. 58.) Ultimately, she found Jane Roe more credible. (*Id.* at 58, 62.) She identified the following reasons for believing Jane Roe: her report to a friend hours after the assault was consistent with her other reports of the encounter; she used great detail in explaining how Doe placed her hand on his penis; she physically manifested stress; her personality changed following the incident; and her inability to see Doe on campus. (*Id.* at 58–60, 62, 63, 71.) Wallace acknowledged the conflicting evidence against Jane Roe, like her text to Doe and

another friend about the incident stating she was too drunk to say she was uncomfortable, contradicting that she said "no" and "stop." (*Id.* at 60, 71.) But Wallace accepted Jane Roe's explanation that she was still processing the event and was not ready to say Doe assaulted her. (*Id.*)

Wallace found Doe's testimony that the encounter was consensual not credible. (Doc. 56-5, pp. 26–27.) Wallace asked Doe and Jane Roe about Doe's prior girlfriends and explained, "[Doe] said he has not had a real girlfriend while at Rollins College and admitted to developing a crush on girls who were strictly friends in the past." (*Id.* at 20.) Wallace also emphasized the testimony of three female witnesses. (Doc. 56-5, pp. 34–36; Doc. 56-6, pp. 37–41, 50–51.) Witness 8 alleged Doe may have assaulted her, but Wallace said she didn't consider Witness 8's testimony in assessing Doe's responsibility because she believed Doe did not have sex with her. (Doc. 56-5, pp. 35–36; Doc. 56-6, pp. 37, 64.) And Wallace explained Doe's "genuine, sincere statement" about this witness was drastically different than his statements about his encounter with Jane Roe, further convincing her of Jane Roe's version. (Doc. 56-6, p. 64.) Witness 10 alleged Doe had sex with her without her consent. (*Id.* at 38–41.) Witness 19 did not allege misconduct against Doe. (*Id.* at 49–51.) Wallace showed Doe and Witness 19, separately, a video of the two of them kissing at a bar. (Doc. 56-5, p. 21; Doc. 56-6, p. 50.) Doe said they kissed, and he inserted his fingers in Witness 19's vagina. (Doc. 56-5, p. 21.) Witness 19 said she does not remember the encounter but identified herself in the video and said she would have consented to kissing Doe. (Doc. 56-6, p. 50.) She said it would be "out of the ordinary" for her to agree to further sexual contact, but she doesn't remember what happened. (*Id.*)

Despite discrediting Witness 8, Wallace summarized "all three of these women" were friends of Doe, drank alcohol, and "ended up having their vagina's [sic] penetrated by him without giving informed, knowing, and voluntary consent." (*Id.* at 64.) Wallace concluded Jane Roe was credible and Doe was not, in part because of his "past history of ignoring lowered inhibitions and performing sexual acts on females without their informed, knowing and voluntary consent," and the preponderance of the evidence showed Doe violated the Policy. (*Id.* at 63, 71.)

Once Wallace completed the report, Jimenez edited it (*see* Doc. 74-4) and Doe received a letter notifying him of the findings on March 5, 2018 (Doc. 56-10). Doe received the following sanctions: (1) a no-contact order between Doe and Jane Roe; (2) dismissal from Rollins; and (3) privilege restrictions that Doe was not permitted to participate in commencement ceremonies, alumni reunion events or to return to campus. (Doc. 56-10, p. 26.) Doe appealed, and the Vice President of Student Affairs, Mamta Accapdi, affirmed the findings and sanctions but ensured they had no effect on Doe's undergraduate degree from Rollins.[6] (Doc. 61-9, p. 62:16–21.)

### E.    Other Rollins Investigations

While Doe was a student, there were twelve reports of sexual misconduct at Rollins. (*See* Doc. 74-1.) All involved a male respondent, and all but one had female reporting students. (*Id.* at 2–10.) Ten investigations found the male student responsible for violating the Policy; three were overturned on appeal. (*Id.*) So Rollins found the male

---

[6] Doe earned his degree by the time the process finished. (Doc. 61-9, p. 62:16–21.)

responding student responsible in eight of the twelve investigations conducted. (*See id.*)
Two reports from these investigations are in the record and similar to Doe's. (Docs. 74-2,
74-3.) They included nearly identical statements on the accused student's credibility as in
Doe's report: "[In] weighing the credibility of Respondent's testimony, it was difficult to
find his statements regarding the actual incident credible." (*See* Doc. 74-2, p. 32; Doc. 74-
3, p. 41 (same); Doc. 56-6, p. 62 (same)). And, like Doe's report, they found the male
responding student had a pattern of sexual misconduct. (*See* Doc. 74-2, p. 32; Doc. 74-3,
p. 43; Doc. 56-6, p. 64.)

Alleging Rollins's treatment of him was gender-biased, Doe sued for selective
enforcement, erroneous outcome, and breach of contract. (Doc. 14.) Rollins moves for
summary judgment on all claims. (Doc. 60.) Doe moves for partial summary judgment
on his selective enforcement claim and part of his breach of contract claim. (Doc. 56.)
Briefing complete (Docs. 72, 74, 75, 76), the matter is ripe.

## II.   LEGAL STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no
genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for
which the movant would bear the burden of proof at trial, it must affirmatively show the
absence of a genuine issue of material fact and support its motion with credible evidence
demonstrating that no reasonable jury could find for the nonmoving party on all of the
essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)

(citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflicts arise between the facts evidenced by the parties, [the court] credit[s] the nonmoving party's *version*," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

### III.   ANALYSIS

### A.   Title IX Claims

Title IX prohibits discrimination on the basis of gender under any education program receiving federal funding. 20 U.S.C. § 1681(a).[7] Title IX's purposes are to "avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). The U.S. Court of Appeals for the Eleventh Circuit has not defined how to analyze a Title IX challenge to a university's disciplinary proceeding but has recognized, without adopting, the *Yusuf* framework used by other courts. *See Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018); *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994).[8] *Yusuf* identified two theories to attack a university's disciplinary proceedings as gender biased: (1) the plaintiff was innocent; or (2) regardless of guilt, the plaintiff's gender affected the decision to discipline or the penalty given. *Yusuf*, 35 F.3d at 715. They are respectively called "erroneous outcome" and "selective enforcement." *Id.* Doe alleged both. (Doc. 14.)

Instead of the *Yusuf* framework, Rollins argues the Court should apply the *McDonnell Douglas* burden-shifting framework from Title VII cases for employment discrimination. (Doc. 60, pp. 7–9); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[7] It's undisputed Rollins falls under Title IX. (*See* Docs. 56, 60.)

[8] *See, e.g., Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003); *Koeppel v. Romano*, 252 F. Supp. 3d 1310, 1322 (M.D. Fla. 2017); *Doe v. Lynn Univ., Inc.*, 224 F. Supp. 3d 1288, 1291 (S.D. Fla. 2016); *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 924 (S.D. Iowa 2018); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 673 (M.D. Tenn. 2018).

Under *McDonnell Douglas*, the plaintiff first must establish a prima facie case of discrimination, then the defendant must justify the allegedly discriminatory action, and last the plaintiff must show the justification was pretext. 411 U.S. at 802, 804. The framework was based off the specific statutory scheme of Title VII, which is vastly different from Title IX. *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1330 (11th Cir. 2020) (Tjoflat, J., concurring); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (citation omitted). And Title IX was modeled after Title VI, which doesn't always use *McDonnell Douglas*.[9] *Cannon*, 441 U.S. at 694; *see, e.g., Carr v. Bd. of Regents of Univ. Sys. of Ga.*, 249 F. App'x 146, 148–49 (11th Cir. 2007) (declining to apply *McDonnell Douglas* to a Title VI claim). This Court has already determined that the *Yusuf* framework is best suited to the evaluation of a Title IX claim and finds no reason to retreat from that determination. (*See* Doc. 38, p. 5 (motion to dismiss order)); *Mancini v. Rollins Coll.*, No. 6:16-cv-2232-Orl-37KRS, 2017 WL 3088102, at *5 (M.D. Fla. July 20, 2017).

*Yusuf* provides a useful way to contextualize the conduct Doe alleges was discriminatory—the implementation of the Policy as it relates to the outcome and his treatment compared to Jane Roe's. (Doc. 74, pp. 13–19.) But ultimately, talismanic labels aside, the question boils down to this: did Rollins discriminate against Doe on the basis of gender? *See Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019) (explaining *Yusuf*

---

[9] In an unpublished per curium opinion, the Eleventh Circuit said a district court *may* use *McDonnell Douglas* in a Title VI case. *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 927–28 (11th Cir. 2013). Unpublished opinions are not binding precedent but may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina*, 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

and similar tests simply describe ways a student can show discrimination). After scrutiny of the record, there is no evidence by which a reasonable juror could conclude Rollins's conduct toward Doe was motivated by his gender. Was the process biased in favor of the accuser? Perhaps. Were all the accused in the disclosed investigations males? Unquestionably. Is the institution responsible for the fact that the students who reported sexual assault were primarily female? Hard to see why. *See, e.g.*, *King v. DePauw Univ.*, No. 2:14-cv-70-WTL-DKL, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014.) Is a preponderance of the evidence standard too lenient given the life-altering consequences of an errant finding? Reasonable minds could disagree. These are Doe's best facts under the *Yusuf* lens.

### 1.       Erroneous Outcome

Doe claims the encounter with Jane Roe was consensual, so the finding against him was incorrect. (*See* Doc. 56-5, pp. 17–22.) To establish his erroneous outcome claim, Doe must show: (1) an articulable doubt as to the accuracy of the proceeding against him; and (2) gender bias was a motivating factor in the outcome. *See Yusuf*, 35 F.3d at 715.

### a.       Articulable Doubt

An articulable doubt is established by providing evidence of procedural flaws, evidentiary weaknesses, strengths of the defense, or "other reason[s] to doubt the veracity of the charge." *Yusuf*, 35 F.3d at 715. The Court need not pass judgment on Doe's guilt, only whether a reasonable jury could doubt the outcome. *See id.* The imperfect application of an imperfect policy easily raises articulable doubt as to Doe's guilt.

Doe identifies two procedural flaws—Rollins's delay in investigating him and the

consideration of his prior sexual history. (Doc. 74, pp. 11, 19–20.) Under the Policy, "[t]ypically the process will be completed within 60 days" after any incident of sexual misconduct is alleged against a student. (Doc. 56-1, p. 14.) "This timeframe may be extended only for good cause," and if good cause exists both parties "will be notified in writing of the extension and the reason for the extension." (*Id.*) The Policy's timeline wasn't met. Jane Roe reported the incident to the Title IX Office on February 22, 2017; Doe was notified of the investigation on November 20, 2017—271 days after the report; and Doe received the finding on March 5, 2018—376 days after the report. (Doc. 56-5, pp. 2–3; Doc. 56-10.)

Rollins argues the clock started in November when Jane Roe decided to participate in an investigation, but this contradicts the Policy and Rollins's actions.[10] (*See* Doc. 72, p. 11; Doc. 56-1, p. 14.) It's true that Jane Roe opted not to pursue the inquiry after reporting it, but Doe asserts he has a right to a prompt investigation while recollections are fresh and evidence more readily available. Doe also claims a right to know he stood accused of sexual assault. Rollins had the discretion to pursue the investigation, with or without Jane Roe's cooperation, in February 2017. (*See* Doc. 56-1, p. 4.) Instead, Rollins responded by providing Jane Roe with accommodations in February. (*See* Doc. 56-5, pp. 2–3; Doc. 56-2, p. 118:6–10.) These accommodations represent a response by Rollins to the allegation which did not include investigating or notifying Doe. (*See* Doc. 56-1, p. 4.) The clock

---

[10] Rollins's investigation of Doe was about the February incident and not the November anonymous tip. (Doc. 56-5.) If Rollins was investigating the anonymous tip, then the clock would have started in November. (*See* Doc. 56-1, p. 14.)

started when an incident of sexual misconduct was alleged against Doe, not when Jane Roe decided to participate in an investigation. (*See id.* at 14.) And Rollins neither made a good cause determination to extend the process nor notified the parties in writing as required by the Policy. (Doc. 56-1, p. 14.)

Even if the clock started in November, Rollins was still late. (*See* Doc. 72, p. 11 n.70.) More than sixty days lapsed from the November start date before Rollins explained it needed more time due to Wallace's hospitalization.[11] (Doc. 56-12.) Wallace's hospitalization may have been good cause for an extension, but Rollins failed to timely notify the parties in writing of this extension as required. (*See* Doc. 56-1, p. 14; Doc. 56-12.) Rollins also says it complied with the Policy because the *investigation* was completed on December 12, 2017, but that's not the point. (Doc. 72, p. 11.) The Policy states the *process* will be completed in sixty days. (Doc. 56-1, p. 14.) The Policy uses "investigation process" when discussing the investigation and "process" when referring to Rollins's response to sexual misconduct, encompassing more than just the investigation. (*Id.*) So Rollins violated the sixty-day provision.

Doe also says Rollins violated the Policy by considering Doe's irrelevant prior sexual history. (Doc. 74, p. 19.) Under the Policy and Responding Party Bill of Rights, Doe's sexual history "may be relevant where there is evidence of a pattern of misconduct" and Doe has the right to "not have IRRELEVANT prior sexual history considered as

---

[11] On January 23, 2018, Barker emailed Jimenez that it had been sixty-four days since Doe was notified of the investigation, exceeding the sixty-day policy. (Doc. 56-12.) Jimenez apologized for the delay, stating Wallace had been in the hospital but the report should be finalized by the end of the month. (*Id.*)

information in the investigation." (Doc. 56-1, p. 14; Doc. 56-13, p. 2.) Wallace considered Doe's sexual history in two ways—alleged sexual misconduct and prior girlfriends. (*See* Docs. 56-5, 56-6.)

Wallace evaluated the testimony of three female witnesses. One witness alleged Doe may have assaulted her, but Wallace didn't find her credible; another alleged Doe had sex with her without her consent; and a third didn't allege sexual misconduct against Doe but said she likely would not have agreed to sexual contact beyond kissing when showed a video of Doe inserting his fingers in her vagina at a bar. (Doc. 56-5, pp. 21, 35–36; Doc. 56-6, pp. 37–41, 49–51, 64.) From these witnesses, Wallace found a pattern of conduct, they were all friends of Doe, drank alcohol, and "ended up having their vagina's [sic] penetrated by him without giving informed, knowing, and voluntary consent." (Doc. 56-6, p. 64.) Wallace found Doe was not credible, in part, because of "his past history of ignoring lowered inhibitions and performing sexual acts on females without their informed, knowing and voluntary consent." (*Id.* at 63.) To what extent Wallace considered the witnesses' testimony in finding Doe responsible and whether this testimony shows a pattern of misconduct permissible to consider under the Policy are disputed facts.

Wallace also asked both Jane Roe and Doe whether Doe had any prior girlfriends. (Doc. 56-5, pp. 7, 20.) Wallace explains these questions were not related to a pattern of misconduct; rather, they were to figure out if Doe understood consent in a sexual context. (Doc. 56-9, pp. 97:4–104:15.) But it's unclear whether this inquiry is relevant under the

Policy.[12] (*See* Doc. 56-1, p. 14; Doc. 56-13, p. 2.) This ambiguity is furthered by Jimenez stating she would not ask how many prior girlfriends an accused student has had in a sexual misconduct investigation. (Doc. 56-2, p. 80:12–14.) And if an Investigator asked such questions, Jimenez said she would require them to explain the questions' relevancy. (*Id.* at 80:24–81:15.) A genuine dispute exists over whether Wallace's questions about Doe's prior girlfriends were relevant under the Policy and the Responding Party Bill of Rights. (Doc. 56-1, p. 14; Doc. 56-13, p. 2.)

Beyond the procedural flaws, Doe claims his own testimony and the testimony of Barker, Doe's advisor during the investigation, is evidence to doubt the veracity of the charge against him. (Doc. 74, p. 19.) Doe had a meeting with Jimenez before speaking to Wallace where Jimenez said, "[w]hen it's all said and done, I will make sure that you appeal this case." (Doc. 61-4, p. 90:7–8.) Doe interpreted this to mean a decision to find him responsible was made before Doe was asked a single question. (*Id.* at 90:9–24.) Barker said he didn't think Wallace exhibited gender bias against Doe, but he thought Wallace didn't believe Doe and knew where she wanted to go during that first and only meeting with him. (*See* Doc. 61-11, pp. 24:15–20; 30:1–3.) Barker thought Wallace "seemed more like a prosecutor than a . . . fact finder." (*Id.* at 24:9–13.) Whether Jimenez and Wallace decided the outcome before speaking with Doe is a genuine dispute of fact.

Doe asserts the encounter was consensual and has provided evidence of

---

[12] While prior sexual history between the parties may be relevant if consent is raised as a defense, it is otherwise irrelevant absent evidence of a pattern of misconduct. (*See* Doc. 56-1, p. 14.)

procedural flaws and raised questions on the veracity of the charge. These issues create an articulable doubt about the outcome, but they do not demonstrate a discriminatory bias based on gender.

### b.        Gender Bias

Doe must show gender bias affected the outcome. *See Yusuf*, 35 F.3d at 715. Bias can be shown through evidence such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Let's assess Doe's best facts on the presence of gender bias. Rollins adopted the Policy after the issuance of the Dear Colleague Letter, and Jimenez expressed resistance to changing it. (Doc. 56-1; Doc. 56-3, p. 4.) Doe says the Policy favored females over males because according to Doe's expert, Professor Johnson, the Dear Colleague Letter pressured colleges to adopt procedures that increased the chances an accused student would be found responsible for sexual misconduct. (Doc. 74, p. 2; Doc. 63-1, p. 3.) And Doe points out that all accused students at Rollins while Doe was a student were male, despite a sixty percent female student body. (Doc. 74, p. 8; Doc. 74-1.) But "schools are not responsible for which students choose to report sexual misconduct." *Rossley*, 342 F.3d at 929 (citations omitted). Rollins's training statistics and charts link sexual violence to the denigration of women and hypermasculinity. (Doc. 74-12, pp. 59, 60; Doc. 74-13, p. 28.) But nothing in the record indicates these materials don't represent the statistical and cultural reality. *See Doe v. Colgate Univ.*, 760 F. App'x 22, 31 (2d Cir. 2019). Jimenez also sent an article to the student body stating men act in a hyper-masculine and sexually

aggressive manner to impress male peers. (Doc. 74-7.) But again, Doe doesn't call into doubt the accuracy of this email beyond his conclusory argument that it's misleading. (*See* Doc. 74, p. 5); *see also Colgate Univ.*, 760 F. App'x at 31–32. And the email concluded schools *shouldn't* treat men as potential perpetrators. (Doc. 74-7.) Doe also highlights the procedural flaws in his investigation as evidence of gender bias. (Doc. 74, pp. 6–10.) Rollins investigated Doe nine months late. (Doc. 56-1, p. 14; Doc. 56-5, pp. 2–3.) And when it did investigate, the Investigator seemed to have already made up her mind. (*See* Doc. 61-4, pp. 89:7–90:8; Doc. 61-11, p. 24:15–20.) Wallace dove into Doe's sexual history, potentially in violation of the Policy. (*See* Docs. 56-6, 56-1, 56-13.) And she used nearly identical language to other reports in concluding Doe was not credible. (*See* Docs. 56-6, 74-2, 74-3.)

True enough, these factors may demonstrate a victim-centered approach to the investigation of the alleged sexual misconduct, but conspicuously absent is evidence of discriminatory bias motivated by gender. If anything, as noted by other courts, "the inference of pro-victim bias is an obvious alternative explanation that overwhelms any potential of gender bias" *Rossley*, 342 F. Supp. 3d at 928 (quoting *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1079 (D. Colo. 2017). Absent evidence of gender bias, Doe's erroneous outcome claim under Title IX cannot survive summary judgment. *See Haidak*, 933 F.3d at 75; *Doe v. Univ. of Denver*, No. 17-cv-01962-PAB-KMT, 2019 WL 3943858, at *10 (D. Colo. Aug. 20, 2019).

### 2. Selective Enforcement

Doe also claims selective enforcement based on Rollins's failure to investigate Jane

Roe. (Doc. 56, pp. 22–28.) A selective enforcement claim asserts that a school decided to discipline a student or decided on certain penalties based on the student's gender. *Yusuf*, 35 F.3d at 715. To prevail, Doe must show a similarly situated individual of the opposite sex was treated differently. *See Rossley*, 342 F. Supp. 3d at 931.

Doe says Jane Roe was similarly situated because they were both drunk during the February incident and Rollins did not investigate whether Doe could have consented to sexual activity. (Doc. 56, pp. 22–28.) This isn't enough. "An accused student and his or her accuser can be compared to show selective enforcement if the parties allege misconduct against each other," but the two can't be compared "if the accused student did not similarly initiate or attempt to initiate a complaint against his or her accuser." *See Rossley*, 342 F. Supp. 3d at 933 (citation omitted). Jane Roe reported sexual misconduct to Rollins; Doe did not. (*See* Doc. 56-5; Doc. 61-4, p. 113:11–13.) And unlike the plaintiff in *Rossley*, Doe does not claim he was discouraged or dissuaded from formalizing a complaint against Jane Roe. (*See* Doc. 61-4, pp. 111:19–113:13); *see Rossley*, 342 F. Supp. 3d at 933. Comparing Jane Roe and Doe does not eliminate a non-discriminatory reason for Rollins's decision not to investigate Jane Roe—Doe's failure to allege misconduct. *See Stenzel v. Peterson*, No. 17-580 (JRT/LIB), 2017 WL 4081897, at *6 (D. Minn. Sept. 13, 2017). So Jane Roe is not a similarly situated individual. (Doc. 56-5, pp. 19–20); *cf. Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 662 (D. Conn. 2019) (denying summary judgment on selective enforcement claim where both students alleged misconduct).

Doe's reliance on *Doe v. Miami University*, 882 F.3d 579 (6th Cir. 2018) and another Rollins investigation, does not compel a different result. (*See* Doc. 56, p. 25.) *Miami*

*University* is inapposite as it deals with a deliberate indifference claim at the pleading stage, which does not require a similarly situated individual. 882 F.3d at 584, 590. Doe argues another investigation where Rollins didn't investigate the female reporting party when the male responding party was drunk is a comparator, but this theory fails. (*See* Doc. 56, p. 24.) Doe doesn't explain how comparing two Rollins investigations with the same result establishes the elements of selective enforcement—a comparator of the opposite sex and *different* treatment. *See Rossley*, 342 F. Supp. 3d at 931. Without a similarly situated individual, Doe's selective enforcement claim cannot survive summary judgment. *See Mallory*, 76 F. App'x at 641.

### B.    Breach of Contract

Doe argues Rollins breached the Responding Party Bill of Rights and Policy requirements to complete sexual misconduct proceedings in sixty days, to refrain from considering an accused student's irrelevant sexual history, and to provide a fair resolution. (Doc. 56, pp. 13–22; Doc. 74, p. 20.) Doe also alleges Rollins breached an implied covenant of good faith. (Doc. 74, p. 20 n.17.) Rollins counters that it followed its policies and if any breach occurred, it was not material and didn't damage Doe.[13] (Doc. 60, pp. 24–25; Doc. 72, pp. 7–17.)

---

[13] Rollins also argues even if it breached its implied-in-fact contract, Doe can only prevail if he shows Rollins acted arbitrarily and capriciously. (Doc. 60, pp. 24–25; Doc. 72, p. 7.) The arbitrary and capricious standard applies in Florida where a student disputes a school's decision, but the school followed its policies. *See, e.g.*, *McCawley v. Universidad Carlos Albizu, Inc.*, 461 F. Supp. 2d 1251, 1258–59 (S.D. Fla. 2006) (applying the standard where the student admitted, and the school properly determined the student violated the school's policies); *Jarzynka v. St. Thomas Univ. Sch. of Law*, No. 03-20652-CIV-LENARD/KLEIN, 2005 WL 8154066, at *7 (S.D. Fla. Aug. 24, 2005) (applying the standard

To establish breach of contract, in Florida, Doe must show: "(1) the existence of a contract; (2) a material breach of the contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citations omitted). It is undisputed Doe and Rollins had an implied-in-fact contract and the terms can be derived from Rollins's published policies, including the Policy and Responding Party Bill of Rights.[14] (Doc. 60, p. 24; Doc. 56, pp. 9–10; Doc. 72, pp. 7–17); *see Sharick v. Se. Univ. of Health Sci., Inc.*, 780 So. 2d 136, 138 (Fla. 3d DCA 2000). Florida analyzes a breach of an implied-in-fact contract the same as an express contract.[15] *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012); *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 275 F. Supp. 3d 1332, 1342 (S.D. Fla. 2017). With the existence of a contract established, let's turn to whether there were any material breaches of the contract and resulting damages. *See Vega*, 564 F.3d at 1272.

---

where the school reserved the right to take disciplinary action without following procedures); *Jallali v. Nova Se. Univ., Inc.*, 992 So. 2d 338, 342–343 (Fla. 4th DCA 2008) (applying the standard where the school reserved the right to change its policy). The arbitrary and capricious standard is inapplicable here where Doe alleged Rollins violated policies it was contractually obliged to follow. (*See* Doc. 14, ¶¶ 88–103; Doc. 74, p. 20; Doc. 56-2, p. 53:1–10 (Jimenez acknowledged Rollins must follow the Policy)); *see also Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992) ("The obligation of a contract consists in its binding force on the party who makes it." (citation omitted)).

[14] For summary judgment only, Rollins does not dispute the Policy and Responding Party Bill of Rights are terms of the parties' implied-in-fact contract. (Doc. 72, p. 7 n. 55.)

[15] The only difference between an implied-in-fact contract and an express contract is the parties' method of expressing assent. *See Shaffer v. Bank of N.Y. Mellon*, No. 8:17-cv-565-T-33AAS, 2017 WL 3065222, at *3 (M.D. Fla. July 19, 2017).

### 1.    Sixty-Day Provision

Doe claims Rollins failed to address the sexual misconduct allegation against him within sixty days, as required by the Policy. (Doc. 56, pp. 10–13.) Although Rollins breached the sixty-day provision of the Policy when it investigated Jane Roe's allegation nine months after she reported it, *see supra* Section III.A.1.a, Rollins argues any breach of the sixty-day provision was not material and did not damage Doe. (Doc. 72, pp. 12–13.) A breach is material when it "goes to the essence of the contract." *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015). Whether an alleged breach is material is a question of fact to be determined by the trier of fact. *Britt Green Trucking, Inc. v. FedEx Nat'l, LTL, Inc.*, No. 8:09-cv-455-T-33TBM, 2014 WL 3417569, at *6 (M.D. Fla. July 14, 2014) (citing *Covelli Family, L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008)). The plaintiff can only recover where he "sustained a substantial injury due to the breach" and these "damages are a proximate result of the material breach." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1343 (M.D. Fla. 2006). On this record, the Court cannot determine whether the breach was material or caused Doe damages. For example, Jimenez conceded memories could have faded in the nine months Rollins delayed investigating, which could have impacted the findings. (*See* Doc. 56-2, p. 130:15–17.) So a genuine dispute of fact exists on whether the breach of the sixty-day provision was material and caused Doe's damages. *See Britt Green Trucking Inc.*, 2014 WL 3417569, at *6.

### 2.      Prior Sexual History

Doe also contends Rollins breached its contract when Wallace asked about Doe's previous girlfriends and considered witness testimony of prior sexual conduct. (*See* Doc. 56, pp. 18–22.) There is a dispute whether Rollins breached the Policy and Responding Party Bill of Rights based on the consideration of Doe's prior sexual history. *See supra* Section III.A.1.a. Rollins's assertion that Wallace has full discretion to determine what's relevant does not resolve the dispute. (*See* Doc. 72, p. 14.) This assertion is undermined by the policies: an accused student has the right not to have irrelevant prior sexual history considered and prior sexual history may be relevant where there is a pattern of misconduct. (*See* Doc. 56-1, p. 14; Doc. 56-13, p. 2.) The Investigator does not have unfettered discretion to dive into an accused student's sexual history. Since a factual question remains as to whether this inquiry into Doe's sexual history was relevant under the policies, summary judgment is inappropriate. *See Border Collie Rescue, Inc.*, 418 F. Supp. 2d at 1343 (declining summary judgment where there was a triable issue on whether the contact was breached).

### 3.      Fair & Equitable

Doe argues Rollins failed to respond "equitably" and provide a "fair" resolution to Jane Roe's sexual misconduct allegation against him as guaranteed by the Policy. (Doc. 56-1, pp. 2, 14.) Specifically, Doe claims his treatment throughout the investigation was unfair and gender biased. (Doc. 74, pp. 7–15.) Rollins says it followed its policies and did not discriminate against Doe. (Doc. 60, pp. 11–25.) Doe did not provide sufficient evidence of gender bias for a Title IX claim, but he did provide sufficient evidence that

Rollins favored the reporting student. *See supra* Section III.A.1. Doe presented evidence Rollins didn't treat him fairly or equitably—deciding he was responsible before hearing his side of the story and failing to follow procedures mandated by the Policy and Responding Party Bill of Rights. *See supra* Section III.A.1. There is a genuine dispute whether Rollins responded fairly and equitably to Jane Roe's allegation, precluding summary judgment. *See Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 87–88 (1st Cir. 2018) (finding summary judgment on breach of basic fairness inappropriate where there is a genuine dispute on other breaches of contract related to the sexual misconduct investigation).

### 4.   Implied Covenant of Good Faith

Last, Doe argues Rollins breached an implied covenant of good faith and fair dealing by failing to provide Doe a fair investigation. (Doc. 74, p. 25 n.17.) This claim is duplicative and subsumed by the breach of fairness claim. *See Trs. of Bos. Coll.*, 892 F.3d at 88 (finding implied covenant of good faith claim superfluous where school promised basic fairness in contract).[16] So the Court grants summary judgment for Rollins on Doe's claim for breach of the implied covenant of good faith found in Count III. (Doc. 14, ¶¶ 100–101); *see Rossley*, 342 F. Supp. 3d at 943–44 (granting summary judgment on implied covenant of good faith and fair dealing that was subsumed by express breach of contract).

---

[16] Rollins argues the implied covenant of good faith does not attach to an implied-in-fact contract. (*See* Doc. 76, p. 8.) The Court does not reach this issue because the claim is co-extensive with the fairness provision of the Policy, but it appears the implied covenant of good faith can apply to an implied-in-fact contract. *See Shaffer*, 2017 WL 3065222, at *6 (attaching the implied covenant of good faith to an implied-in-fact contract on a motion to dismiss).

The action will proceed on Doe's other breach of contract claims found in Count III. (Doc. 14, ¶¶ 88–103.)

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1.   Plaintiff John Doe's Motion for Partial Summary Judgment (Doc. 56) is **GRANTED IN PART AND DENIED IN PART**:

   a.   The Motion is **GRANTED** to the extent Defendant Rollins College breached the sixty-day provision of the Policy.

   b.   In all other respects, the Motion is **DENIED**.

2.   Defendant Rollins College's Motion for Summary Judgment (Doc. 60) is **GRANTED IN PART AND DENIED IN PART**:

   a.   The Motion is **GRANTED** as to Doe's Title IX claims: Count I for erroneous outcome (Doc. 14, ¶¶ 64–77) and Count II for selective enforcement (Doc. 14, ¶¶ 78–87).

   b.   The Motion is **GRANTED** as to breach of the implied covenant of good faith and fair dealing found in Count III of the Complaint (Doc. 14, ¶¶ 100–101).

   c.   In all other respects, the Motion is **DENIED**.

3.   The Clerk is **DIRECTED** to enter judgment in favor of Defendant Rollins College and against Plaintiff John Doe with respect to Count I (Doc. 14, ¶¶ 64–77), Count II (Doc. 14, ¶¶ 78–87), and the implied covenant of good faith and fair dealing breach found in Count III (Doc. 14, ¶¶ 100–101).

4.      This matter will proceed to trial on Plaintiff's remaining claims.

5.      In light of this Order, the parties' deadline to file their Joint Final Pretrial

Statement and Trial Briefs (*see* Doc. 108) is extended to Wednesday, **March**

**11, 2020**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 7, 2020.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record